**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NICOLE BANKS, as Independent Administrator of the Estate of DEXTER ANTONIO REED, Deceased, | ) ) ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | |
| CITY OF CHICAGO, a municipal corporation, CHICAGO POLICE DEPARTMENT OFFICERS ALEXANDRA GIAMPAPA (Star 13853), THOMAS SPANOS (Star 3110), VICTOR PACHECO (Star 18337), GREGORY SAINT LOUIS (Star 5153), and AUBREY WEBB (Star 5105), | ) ) ) ) ) ) ) ) ) | Case No. Jury Trial Demanded |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, deceased, by and through her attorneys, Action Injury Law Group, LLC, Hart McLaughlin & Eldridge, LLC, and Community Justice and Civil Rights Clinic at Northwestern Pritzker School of Law, alleges as follows against Defendants, City of Chicago, a municipal corporation, and Chicago Police Department Officers Alexandra Giampapa (Star 13853), Thomas Spanos (Star 3110), Victor Pacheco (Star 18337), Gregory Saint Louis (Star 5153), and Aubrey Webb (Star 5105):

**INTRODUCTION**

1. For generations, the Chicago Police Department, and particularly specialized units like Tactical Teams, have intentionally preyed on Chicago's young Black men in divested and low-income neighborhoods. Chicago Police Department leaders promote brutally violent, militarized policing tactics. They encourage discriminatory, pretextual traffic stops by imposing

1

quotas on officers and providing officers with financial incentives to make arrests at the end of their shifts. Despite millions of taxpayer dollars invested in a Consent Decree intended to remedy these systematic deficiencies, Chicago Police Department leaders make a mockery of reform and refuse to comply with the most basic principles of constitutional policing The pretextual stop of Dexter Reed, and the escalation exhibited by the offending police officers, created an environment that directly resulted in his death.

2.      Dexter was a 26-year-old Black man who made his home on the Westside of Chicago. Dexter was a beloved son, brother, nephew, and friend. As a child, Dexter developed a love for basketball, and led his team at Westinghouse High School to a regional championship in 2016. After high school, Dexter continued to play basketball at Morton College. Known amongst his family and friends as a sweet and respectful young man, Dexter also loved cooking healthy food for his family and aspired to be a sportscaster.

 

3.      Dexter lived with physical and mental disabilities. He was diagnosed with post-traumatic stress disorder, and this condition adversely affected Dexter's ability to work, to process and remember information, and to communicate.

4. On March 21, 2024, Defendant Chicago Police Department ("CPD") officers targeted Dexter during a predatory, violent, unlawful traffic stop that ended with Defendant Officers shooting Dexter 96 times in 41 seconds. One Defendant Officer continued to shoot at least three bullets into Dexter's body as he lay unarmed, lifeless and bleeding out on the street. Rather than attempt to provide Dexter with lifesaving aid, Defendant Officers handcuffed Dexter's arms behind his lifeless body and then walked away. Eventually, Dexter was transported to the hospital where he was pronounced dead.

5. Defendant Officers violated numerous laws and CPD policies during their encounter with Dexter. The initial stop was unlawful and pretextual. Defendant Officers had no reasonable suspicion that Dexter violated any law, and they falsely stated otherwise in official CPD reports.

6. Defendant Officers who initially approached Dexter's vehicle were outrageously escalatory. They started by sideswiping Dexter's vehicle—approaching him aggressively in an unmarked vehicle without any forewarning. Next, while wearing hoodies, jeans, and other casual clothing, they brandished their weapons in a threatening manner, screamed curse words at Dexter, and attempted to unlawfully enter his vehicle. Defendant Officers unlawfully pointed their guns at Dexter, thus escalating the situation and exponentially increasing the risk of death for everyone—Dexter, Defendant Officers, and bystanders alike. Then, Defendant Officers used wildly disproportionate force against Dexter—repeatedly shooting at him even when he clearly presented no threat. Finally, Defendant Officers ignored Dexter as he was handcuffed and bleeding out on the street. For many critical minutes, Defendant Officers refused to attempt to provide him with any lifesaving aid.

7. Defendant Officers who unlawfully targeted Dexter acted pursuant to CPD's longstanding and systemic unlawful policies and practices. Defendant Officers are all members

of one of CPD's notorious tactical or "Tact" teams. In 2017, the United States Department of Justice ("DOJ") concluded CPD's Tact teams engage in persistent unlawful conduct, including racial profiling and brutal unlawful force.

8.    Sixteen months before Dexter's death, Memphis police officers, who were members of that city's Tact team equivalent, conducted a traffic stop of Tyre Nichols, a 29-year-old Black man. The Memphis officers savagely beat Tyre, punching him, kicking him, and striking him with their batons. Three days later, Tyre died as a result of his injuries. National outrage ensued and the DOJ convened a task force on specialized units.[1] Notwithstanding, CPD's Tact teams continue to fail to comply with *any* of DOJ's best practices for specialized units.

9.    Dexter's death is also directly attributable to CPD's longstanding practice of engaging in unlawful traffic stops. CPD officers routinely target Black drivers on Chicago's south and west sides for minor traffic violations. The large scope and persistent unlawfulness of CPD's Mass Traffic Stop Program has most recently been documented by the Free to Move Coalition[2] and in a class action complaint filed by the ACLU of Illinois.[3] Free to Move's data analysis concluded that Black drivers comprised 51.2% of people pulled over despite Black people making up less than 30% of the city's residents.[4] In contrast, over 32% of Chicago's population is white, and 13.6% of stops by CPD were of white drivers.[5] CPD officers in the 11th District—where Defendant Officers stopped Dexter—conduct more traffic stops than almost anywhere else in the

---

[1] National Policing Institute, "Considerations for Specialized Units," (2024) (https://portal.cops.usdoj.gov/resourcecenter/content.ashx/cops-r1140-pub.pdf).
[2] Chicago 2023 Traffic Stops Data Report, Impact for Equity and Freedom to Move, (April 2024) (https://static1.squarespace.com/static/63d2d655b90633181eddd9f3/t/660e299cda717d5d38a60c94/1712204191952/2023+Traffic+Stops+Data+Report+v.6+%5BFINAL%5D.pdf).
[3] *Wilkins v. City of Chicago*, No. 23CV04072 (N.D. Ill.) (https://www.aclu-il.org/sites/default/files/wilkins_v._chicago_-_complaint.pdf).
[4] Chicago 2023 Traffic Stops Data Report, Impact for Equity and Freedom to Move (April 2024) (https://static1.squarespace.com/static/63d2d655b90633181eddd9f3/t/660e299cda717d5d38a60c94/1712204191952/2023+Traffic+Stops+Data+Report+v.6+%5BFINAL%5D.pdf).
[5] *Id.*

City.[6] Most of CPD's traffic stops focus on minor non-moving violations that are unrelated to safety. This data provides further evidence that most CPD traffic stops since 2016 have been pretextual.[7]

10.     CPD's Mass Traffic Stop Program imposes productivity quotas on officers. A 2020 email from the District 11 Commander instructs officers to document and increase traffic stops in the 11th District, and states in relevant part: *"Tact [teams] should be leading the district in stops with the watches closely behind. [District 11] has the most violence and should be leading the city (Districts) in stops."*[8] There is no support for the proposition that unlawful, pretextual traffic stops help end violence. To the contrary, every available study related to this issue demonstrates that these sorts of police community interactions have negative effects on public safety and police-community relations. [9]

11.     The CPD Tactical Defendant Officers involved in Dexter's pretextual traffic stop have a history of making unconstitutional stops for alleged failure to wear seatbelts or other falsely asserted routine traffic violations so that they can intentionally escalate the traffic stop into a full unconstitutional search.

---

[6] Traffic Stops in Chicago Police District 11
(https://static1.squarespace.com/static/63d2d655b90633181eddd9f3/t/64cefe7e91851131bb4f90e2/1691287173079/D-11+Factsheet.pdf).
[7] This allegation first appeared in *Wilkins v. City of Chicago*, No. 23CV04072 (N.D. Ill.), ¶429 (https://www.aclu-il.org/sites/default/files/wilkins_v._chicago_-_complaint.pdf).
[8] This allegation first appeared in *Wilkins v. City of Chicago*, No. 23CV04072 (N.D. Ill.), ¶486 (https://www.aclu-il.org/sites/default/files/wilkins_v._chicago_-_complaint.pdf).
[9]     *People v. Carpenter*, 2024 IL App (1st) 220970, ¶ 6 ("What is known as "driving while Black" (DWB) is a pernicious reality that corrodes trust in law enforcement and the legal system. DWB involves police using "stereotypical thinking and hunches" and "dubious investigative techniques" in traffic stops."); Russell, K. K., ""Driving While Black": Corollary Phenomena and Collateral Consequences." *Boston College Law Review* 40 (3): 717–32 (1999) (failing to address DWB and related phenomena has grave consequences for society. The association of race with crime and deviance increases the probability that Black persons will be targeted for arrest, thereby increasing their probability of being convicted and incarcerated. The result is increased disenfranchisement and social marginality with reduced employment possibilities among other factors, thereby fueling a cycle of recidivism.)

12.     CPD's own uncontroverted data confirms CPD's Mass Traffic Stop Program subjects Black people to a significantly increased risk of police violence. A 2022 analysis by the City of Chicago Office of Inspector General ("OIG") concluded "Black people were overrepresented—relative to their share of those stopped—in investigatory stops that lead to uses of force."[10] The OIG further concludes CPD officers are more likely to use serious and harmful force against Black people than people of any other race.[11] According to the OIG, in the 11th District, 77% of the people CPD targets for traffic stops are Black.[12] But 94% of the people CPD uses force against during traffic stops are Black.[13] These troubling statistics are well known to the CPD, yet it refused to implement practices sufficient to remedy these harms.

13.     CPD's racially biased policy and practice violations described above are not new. Identical systemic failures were documented by the DOJ in 2017, and the Police Accountability Task Force ("PATF") in 2016. Those reports describe how Tact team officers in unmarked cars and plain clothes have long patrolled Chicago's Black neighborhoods hunting for opportunities to escalate low-level traffic stops, engage in unlawful violence, and to effectuate arrests.[14] Defendant Officers' terrifying disproportionate use of force here—96 gunshots in 41 seconds— is consistent with CPD's well-documented and longstanding practices of unlawful gun pointing, deadly escalation, and unlawful force. These CPD policies lead directly to Dexter's death.

14.     Since 2019, CPD has operated pursuant to a Consent Decree that purports to remedy these systemic harms. As of June 2023 (the most recent report available), CPD has failed

---

[10] Report On Race And Ethnicity Based Disparities In The Chicago Police Department's Use Of Force, page 31, City of Chicago Office of Inspector General (https://igchicago.org/wp-content/uploads/2022/02/Use-of-Force-Disparities-Report.pdf).
[11] *Id*. at 42.
[12] *Id*. at 53.
[13] *Id.*
[14] Investigation of the Chicago Police Department, U.S. Department of Justice (Jan. 13, 2017) (https://www.justice.gov/d9/chicago_police_department_findings.pdf).

to fully comply with 94% of all Consent Decree requirements.[15] Among those failures, CPD has failed to fully comply with 90 of the 96 paragraphs related to use of force.[16] Its record on impartial policing fares no better. CPD has failed to comply with the basic provision requiring that it "prohibit discrimination on the basis of [race]."[17] Had CPD complied with its Consent Decree obligations, Dexter Reed would be alive today.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §1331 and civil rights cases pursuant to 28 U.S.C. §1343, as well as supplemental jurisdiction over state law claims pursuant to 28 U.S.C. §1367.

16.     Venue is proper in this District under Title 28 of the United States Code, § 1931(b) because all incidents, events, and occurrences giving rise to this action occurred in the Northern District of Illinois, Eastern Division, and all parties reside in this District.

## PARTIES

17.      On March 21, 2024, Dexter Antonio Reed, was 26 years old, and lived with his family at 155 N. Wolcott Ave, #3S, Chicago, Illinois.

18.     Plaintiff, Nicole Banks, is Dexter Reed's mother and Independent Administrator of the Estate of her now-deceased son. She resides in Chicago, Illinois.

19.     At all times relevant, Chicago Police Department Officer Alexandra Giampapa (Star 13853), was acting under color of state law and within the scope of her employment with the City of Chicago as a sworn police officer, and is sued in her individual capacity and as an agent of City of Chicago.

---

[15] *Illinois v. City of Chicago*, No. 17-CV-6260 (N.D. Ill. 2019) (Independent Monitoring Report 8) [hereinafter "IMT Report 8"] at 5 (https://cpdmonitoringteam.com/wp-content/uploads/2023/11/2023.11.01-Independent-Monitoring-Report-8-and-Comprehensive-Assessment-Part-I-website.pdf).
[16] *Id.* at 24.
[17] *Id.*

20.     At all times relevant, Chicago Police Department Officer Thomas Spanos (Star 3110), was acting under color of state law and within the scope of his employment with the City of Chicago as a sworn police officer, and is sued in his individual capacity and as an agent of City of Chicago.

21.     At all times relevant, Chicago Police Department Officer Victor Pacheco (Star 18337), was acting under color of state law and within the scope of his employment with the City of Chicago as a sworn police officer, and is sued in his individual capacity and as an agent of City of Chicago.

22.     At all times relevant, Chicago Police Department Officer Gregory Saint Louis (Star 5153), was acting under color of state law and within the scope of his employment with the City of Chicago as a sworn police officer, and is sued in his individual capacity and as an agent of City of Chicago.

23.     At all times relevant, Chicago Police Department Officers and Supervisors, including Officers John Doe 1 and John Doe 2, were acting under color of state law and within the scope of his employment with the City of Chicago as a sworn police officer.

24.     City of Chicago is a municipality duly incorporated under the laws of the State of Illinois. City of Chicago is the employer of Chicago Police Officers Alexandra Giampapa, Thomas Spanos, Victor Pacheco, Gregory Saint Louis, and Aubrey Webb. City of Chicago further is responsible for the policies, practices, and customs of its Police Department.

## FACTUAL ALLEGATIONS

### I.  CPD's UNLAWFUL MASS TRAFFIC STOP PROGRAM TARGETS THE WESTSIDE OF CHICAGO.

25.     As described in detail below, CPD operates an unlawful Mass Traffic Stop Program. For at least half a century, CPD has implemented police programs characterized by

high-volume stops of Black and Latino people based on low-level violations that CPD uses as excuses to harass, surveil, and intimidate Black and Brown Chicagoans.[18]

26.     Beginning approximately at the end of 2015 and early 2016, CPD shifted from a program of mass investigatory stops targeting Black and Latino people and the neighborhoods where they primarily reside, to a program of mass pretextual traffic stops targeting Black and Latino people and the neighborhoods where they primarily reside.[19]

27.     CPD operates its Mass Traffic Stop Program with particular force on the Westside of Chicago, where the Defendant Officers unlawfully stopped, detained, and eventually shot at Dexter Reed at least 96 times. CPD officials have repeatedly affirmed that officers should conduct traffic stops "where violent crime occurs."[20] There is, however, no correlation between CPD's Mass Traffic Stop Program and violence prevention. Fewer than 1% of CPD traffic stops recover contraband. The vast majority of CPD's traffic stops are not made for "offenses indicating dangerous driving behavior and the stops did not produce evidence of criminal activity."[21]

28.     CPD officers conduct 22% of all traffic stops in the 11th District and the surrounding area—but only 6% of Chicago's drivers live in this area. [22]

29.     CPD's Mass Traffic Stop Program imposes quotas on CPD officers. CPD internal emails reveal that over a period of several years, 11th District CPD Supervisors repeatedly demanded Tact Team Members report, focus on, and increase pretextual traffic stops.[23] On the

---

[18] This allegation first appeared in *Wilkins v. City of Chicago*, No. 23CV04072 (N.D. Ill.), ¶387 (https://www.aclu-il.org/sites/default/files/wilkins_v._chicago_-_complaint.pdf).
[19] *Id*. at ¶411.
[20] *Id*. at ¶449.
[21] Chicago 2023 Traffic Stops Data Report, page 10, Impact for Equity (April 2024) (https://www.impactforequity.org/wp-content/uploads/2024/04/2023-Traffic-Stops-Data-Report.pdf).
[22] *Id*.
[23] This allegation first appeared in *Wilkins v. City of Chicago*, No. 23CV04072 (N.D. Ill.), ¶¶478-485 (https://www.aclu-il.org/sites/default/files/wilkins_v._chicago_-_complaint.pdf).

day they encountered Dexter, Defendant Officers operated pursuant to CPD's Mass Traffic Stop Program and attempted to achieve the quotas imposed upon them by District 11 Supervisors.

## II. DEFENDANT OFFICERS CONDUCTED AN UNLAWFUL, PRETEXTUAL STOP OF DEXTER REED.

30.     On the evening of March 21, 2024, at approximately 6:00 PM, Dexter drove his recently purchased white SUV on Ferdinand Street, in the City of Chicago. The weather was clear and it was still daylight. Dexter stopped his vehicle at a red light at the intersection of Hamlin and Ferdinand, facing westbound. When the light turned green, Dexter drove through the intersection and traveled westbound onto the 3800 block of West Ferdinand. Another vehicle traveled westbound, immediately behind Dexter. Dexter traveled within the speed limit and complied with the stop sign at the next intersection, Ferdinand and Avers.

31.     On the same date and time, Defendants CPD Officers and Tact Team members Alexandra Giampapa, Thomas Spanos, Victor Pacheco, Gregory Saint Louis, and Aubrey Webb patrolled District 11 in an unmarked, silver CPD SUV. Defendant Officer Webb drove the vehicle.

32.     While Dexter drove onto the 3800 west block of Ferdinand, Defendant Officers' vehicle was south of Dexter, stopped at a red light.

33.     After both Dexter and the vehicle traveling immediately behind Dexter traveled through the intersection of Hamlin and Ferdinand, Defendant Officer Webb approached and ran through a red light at the intersection of Hamlin and Ferdinand, turning left onto Hamlin. Video footage demonstrates Defendant Officers made the decision to target Dexter merely three seconds after his vehicle came in their line of sight.

34.     Defendant Officer Webb accelerated his unmarked car to pass the vehicle traveling immediately behind Dexter. Defendant Webb then pulled the unmarked CPD vehicle alongside Dexter's vehicle and angled it as if to sideswipe Dexter's car. This maneuver forced Dexter to

stop his car just past the northwest corner of Ferdinand and Avers. Defendant Webb used this vehicle maneuver to unlawfully detain Dexter.



35.      West Ferdinand Street, between Hamlin and Avers—where Defendant Officers stopped Dexter's car—is a residential area, populated by numerous single and multiunit family dwellings, with green space and wide sidewalks for community members to enjoy.

36.      Each named Defendant Officer completed a Tactical Response Report documenting Defendant Officers' initial justification for engaging with Dexter. Those reports state Defendant Officers pulled Dexter over incident to a "traffic stop." Defendant Officer's reports affirms that, at the time they targeted Dexter, Defendant Officers had no information to suggest Dexter had committed any serious or violent offense. The reports further affirm Defendant Officers targeted Dexter pursuant to CPD's Mass Traffic Stop Program.

37.      Surveillance camera footage reflects Defendants lacked reasonable suspicion to suspect Dexter of any traffic violation. Defendant Officers conducted the sideswipe maneuver on Dexter within seconds after they saw his vehicle. Camera footage affirms that at all times he was in Defendant Officers' line of sight, Dexter complied with all applicable traffic laws.  Defendant Officers had no legal justification to target, stop, and detain Dexter.

38. After evaluating available video evidence regarding this traffic stop, Andrea Kersten, the Chief Administrator of the Civilian Office of Police Accountability ("COPA") wrote to CPD Superintendent Snelling documenting concerns with the Defendant Officers' credibility and justification for stopping Dexter. Specifically, "COPA is uncertain how the officers could have seen this seat belt violation given their location relative to (Reed's) vehicle and the dark tints on (his) vehicle windows. . .This evidence raises serious concerns about the validity of the traffic stop that led to the officers' encounter with (Reed)."[24]

### III. DEFENDANT OFFICERS UNLAWFULLY POINT FIREARMS AT DEXTER AND ENGAGE IN ESCALATORY CONDUCT DURING THE UNLAWFUL STOP.

39. After Defendant Officers unlawfully curbed Dexter's vehicle, they engaged in a number of violent, threatening, and ultra-aggressive policing tactics intended to confuse and to create chaos. Defendant Officers screamed conflicting commands at Dexter, brandished batons in a threatening manner, used disrespectful and profane language, unlawfully attempted to enter his vehicle, and pointed their weapons at Dexter's face without legal justification.

40. Defendant Officer Giampapa exited the unmarked CPD SUV from the back passenger side. She was un-uniformed and wore a hoodie and blue jeans. Defendant Officer Giampapa did not announce herself as a police officer, nor did she advise Dexter why he had been stopped.

41. Instead, Defendant Giampapa aggressively demanded "Roll the window down, roll the window down. What are you doing?" Dexter complied and completely rolled down his front driver's side window. In response to Defendant Officer Giampapa's question, Dexter stated that he was doing "nothing."

---

[24] COPA Chief Raises Concerns About Why Police Pulled Over Dexter Reed Before Deadly Shooting, Matt Masterson (April 9, 2024) (https://news.wttw.com/2024/04/09/copa-chief-raises-concerns-about-why-police-pulled-over-dexter-reed-deadly-shooting).



42.     Defendant Officer Giampapa then ordered Dexter to roll down his other windows. Body camera footage suggests Dexter became flustered and, in an effort to comply with Defendant Officer Giampapa's commands, mistakenly partially rolled up the driver's side window instead of rolling down the vehicles' other windows. The fact that Dexter had committed no violation, but was still subject to Defendant Officers' aggressive threats undoubtedly created confusion and panic for Dexter.

43.     After Dexter's window rolled partially up, Defendant Officer Giampapa commanded Dexter "do not roll the window up." At the same time, Defendant Officer Giampapa unholstered her firearm and pointed it at Dexter's face. While she pointed her gun at Dexter, she attempted to open the driver's side door of Dexter's vehicle. Defendant Officer Giampapa unreasonably pointed her gun at Dexter within seconds after she approached his vehicle



44. With her gun pointed at Dexter's face, Defendant Officer Giampapa continued yelling, screaming repeatedly "Open the doors now!" Dexter replied "Okay, Okay I'm trying." Defendant Giampapa never acknowledged Dexter's words and never inquired whether his window had malfunctioned or if his door was jammed. Instead, she continued screaming at him with her gun aimed at him.

45. Defendant Officer Saint Louis, who was un-uniformed wore a hoodie pulled up over his head and jeans. Defendant Officer Saint Louis did not announce himself as a police officer nor did he advise Dexter why he had been stopped.

46. Defendant Officer Saint Louis exited the unmarked CPD vehicle from the front passenger's seat and approached the front passenger side of Dexter's vehicle at the same time Defendant Giampapa approached Dexter on the driver's side. Defendant Officer Saint Louis approached Dexter with an extended baton in his raised hand and immediately ordered Dexter to roll down his passenger side window and commanded "Put your ... put your window down, man," "Hey roll this one down too… Hey, unlock it!" Seconds after he approached the vehicle, Defendant Officer Saint Louis pointed his gun at Dexter, cocking his wrist and aiming the weapon at Dexter through the windshield.



47. Defendant Officer Pacheco was un-uniformed, wearing khaki pants and a baseball cap. Defendant Officer Pacheco did not announce himself as a police officer nor did he advise Dexter why he had been stopped and curbed.

48. Defendant Officer Pacheco exited the unmarked SUV from the back passenger side and approached the driver's side of Dexter's vehicle. Immediately after exiting CPD's vehicle, Defendant Officer Pacheco pointed his firearm at Dexter and began screaming "Do not f---'g roll it up. . .Unlock the f---'g door."

49. Defendant Officer Spanos was un-uniformed, and dressed in a hoodie, khakis, and a knit cap. Defendant Officer Spanos did not announce himself as a police officer nor did he advise Dexter why he had been stopped and curbed.

50. Defendant Officer Spanos exited the unmarked SUV from the back driver's side and approached the driver's side of Dexter's vehicle. Standing just a few feet from Dexter's vehicle. Defendant Officer Spanos immediately unholstered and pointed his gun at Dexter and yelled "Put both hands up!"



51.    CPD policy prohibits officers from pointing their firearms at a person unless objectively reasonable to do so.[25]

52.    CPD's Use of Force Policy General Order 03-02 provides that officers will "use de-escalation techniques to prevent or reduce the need for force. . ." The Policy further provides de-escalation techniques include providing a "warning and exercising persuasion and advice prior to the use of force" and determining whether the situation could be "stabilized through the use of time, distance and positioning." The Policy also requires CPD officers "treat all persons with courtesy and dignity which is inherently due every person and will act, speak, and conduct themselves in a courteous, respectful, and professional manner." Finally, the Policy prohibits officers from using force unless it is the "minimum amount of force needed to provide for the safety of any person."

53.    Defendant Officers surrounded Dexter and failed to identify themselves as officers or to explain why they conducted the aggressive, pretextual stop and trapped him in between the curb and a parked car. Defendant Officers then each unholstered and pointed their guns at Dexter at close range and screamed various and conflicting commands at him, with several of them repeatedly and forcefully pulling on his car doors and trying to get inside his vehicle. Defendant Officers' actions created a confusing and chaotic environment and placed Dexter in objective fear for his safety, and at risk of great bodily harm. None of the Defendant Officers engaged in any type of de-escalation. Instead, they pointed their weapons at Dexter and used profane language in clear violation of CPD policy.

54.    CPD's Use of Force Policy General Order 03-02 imposes on CPD officers an affirmative obligation to intervene when they observe a use of force that is "excessive or

---

[25] CPD Department Notice 19-01 (https://home.chicagopolice.org/wp-content/uploads/2019/07/Firearm-Pointing-Incidents_DRAFT_02JUL19.pdf).

otherwise in violation" of CPD policy. The Policy instructs officers to "verbally intervene" to stop a violation.

55.    From the driver's side of the CDP vehicle, Defendant Officer Webb observed Defendant Officers Giampapa, Saint Louis, Pacheco, and Spanos engage in the escalatory and unlawful conduct described above. In clear violation of CPD policy, Defendant Officer Webb took no action to intervene or deescalate.

56.    By pointing their firearms at Dexter during a minor traffic stop and otherwise escalating this encounter as detailed above, Defendant Officers Giampapa, Saint Louis, Pacheco and Spanos engaged in an unreasonable use of force. By observing these unlawful actions and failing to take action, Defendant Officer Webb violated his duty to intervene.

### IV.    DEFENDANT OFFICERS DEMONSTRATED A GROSS DISREGARD FOR THE SANCITY OF HUMAN LIFE WHEN THEY SHOT DEXTER REED 96 TIMES IN 41 SECONDS AND FIRED BULLETS INTO DEXTER'S MOTIONLESS BODY.

57.    Defendant Chicago Police Officers Giampapa, Pacheco, Spanos, and Webb unloaded a barrage of bullets at Dexter while he was inside his vehicle. At some point either before or after the Defendant Officers Giampapa, Pacheco, Spanos, and Webb began shooting at Dexter, Defendant Officer Saint Louis sustained a gunshot injury when a bullet grazed his wrist.[26]

58.    After Defendant Officers Giampapa, Pacheco, Spanos, and Webb shot their weapons at Dexter for approximately 27 seconds, firing approximately 83 shots, Dexter exited

---

[26] The Office of the Cook County State's Attorney is currently evaluating whether "the force used by [the Defendant Officers] constitutes grounds for criminal charges." Pending the outcome of that investigation and the return of ballistics evidence related to this incident, Plaintiff anticipates amending the complaint to allege counts against the individual Defendant Officers focused on the use of lethal force prior to the moment Dexter exits his vehicle. No such claims are alleged in this version of the complaint. *See* City promises thorough investigations into fatal police shooting of Dexter Reed, Justin Kaufmann and Monica Eng (April 9, 2024) (https://www.axios.com/local/chicago/2024/04/09/dexter-reed-shooting-investigation-police-video);Chicago Mayor Holds Press Conference on Dexter Reed Shooting (April 9, 2024) (https://pantagraph.com/news/local/chicago-mayor-holds-press-conference-on-dexter-reed-shooting/video_a26df798-2e2a-500e-bd4d-67b20fdda102.html).

his vehicle, unarmed, with hands empty and raised in sign of surrender. At this point, Dexter posed no threat of imminent harm.

59.     After observing Dexter exit his vehicle, the Defendant Officers Giampapa, Pacheco, Spanos, and Webb failed to provide Dexter with any commands or warnings. Nor did any of these Defendant Officers attempt to engage in any de-escalation. Instead, they continued to shoot at Dexter in a reckless, out-of-control manner demonstrating a complete disregard for Dexter's humanity.

60.     After Dexter exited his vehicle, unarmed and with his hands empty, Defendant Officers Giampapa, Spanos, and Pacheco moved closer to Dexter.

61.     Defendant Officer Giampapa shot additional bullets at Dexter.

62.     Dexter collapsed to the ground at the rear of his vehicle. His head slammed into the street and lay unmoving and face down, with his head under the rear of his vehicle.

63.     At this point, Defendant Officers Giampapa, Pacheco, Spanos, and Webb took no action to determine if Dexter was alive. Nor did they make any effort to secure him medical assistance.

64.     Instead, Defendant Officers Spanos and Pacheco continued to shoot at Dexter even as he lay motionless, face down in the street.

65.     Even after Dexter fell to the street, Defendant Officer Spanos paused his shooting, and then fired an additional three shots at Dexter's body as he lay facedown and motionless on the street.

66.     Ultimately, Defendant Officers Giampapa, Pacheco, Spanos, and Webb shot 96 bullets at Dexter 41 seconds after they first encountered him.



67.     In the letter to Superintendent Snelling, based on a review of relevant video evidence, COPA Chief Kersten documented "grave concerns about [Defendant Officers Giampapa, Pacheco, Spanos, and Webb's] ability to assess what is a necessary, reasonable, and proportional use of deadly force."[27]

68.     CPD's Use of Force Policy G03-02 instructs officers that CPD's "highest priority is the sanctity of human life. In all aspects of their conduct, Department members will act with the foremost regard for the preservation of human life and the safety of all persons involved." This Policy further provides that officers must continually "assess the situation and modify[] the use of force as circumstances change."[28]

69.     In violation of CPD written policy and applicable law, Defendant Officers Giampapa, Pacheco, Spanos, and Webb used grossly disproportionate force against Dexter when he clearly presented no threat to the officers.

---

[27] COPA Chief Raises Concerns About Why Police Pulled Over Dexter Reed Before Deadly Shooting, Matt Masterson, (April 9, 2024) (https://news.wttw.com/2024/04/09/copa-chief-raises-concerns-about-why-police-pulled-over-dexter-reed-deadly-shooting).

[28] CPD's Use of Force Policy G03-02 (https://home.chicagopolice.org/wp-content/uploads/2017/05/G03-02_Use-of-Force_TBD.pdf).

70.     Defendant Officer Spanos demonstrated a gross disregard for the sanctity of human life when he continued to fire his weapon at Dexter's motionless body, even after the other Defendant Officers ceased firing.

## IV.     DEFENDANT OFFICERS FAILED TO PROVIDE DEXTER WITH ANY LIFE SAVING MEASURES AS HE LAY BLEEDING OUT ON THE STREET.

71.     None of the individual Defendant Officers provided any life-saving measures to Dexter after they had shot 96 bullets at him, striking him multiple times. Instead, Defendant Officers Giampapa, Pacheco, Spanos, and Webb left Dexter lying face down on the City street with his head under his vehicle as he bled out.

72.     After the shooting stopped, Defendant Giampapa approached Dexter as he lay in the street with one shoe missing. Blood poured from his head and pooled on the street. Despite Dexter's obvious and urgent medical needs, Defendant Officer Giampapa called for an ambulance for Defendant Officer Saint Louis, but never communicated Dexter's need for care.

73.     Instead, Defendant Officer Giampapa repeatedly screamed at Dexter "don't move, don't move, don't f---'ing move!" When Defendant Giampapa was just a few feet from Dexter she stated "he's still breathing." Defendant Officer Webb responded "we need EMS here now! We need EMS here now!" At this point both Defendant Officers Giampapa and Webb realized Dexter was still alive and in need of urgent medical attention. But neither Defendant Officers Giampapa nor Webb took any action to provide Dexter with any lifesaving care.

74.     Defendant Officer Giampapa continued to move closer to Dexter, while repeatedly screaming "hey don't f--'ing move! Do not f--'ing move!" When she was close enough to touch Dexter Defendant Officer Giampapa stated repeatedly "I don't know where the gun is."  She attempted to issue commands to Dexter, stating "hey dude, let go of the gun" as she pulled Dexter's left hand out from underneath body. Simultaneously, Defendant Officer Webb pulled Dexter's right hand out from underneath his body. Dexter's hands were empty. There was no gun

in his possession or near his body. After confirming Dexter did not have a gun in his hands, Defendant Officers Webb and Giampapa walked away from Dexter. At no time did they provide him with lifesaving aid.

75.    Officer John Doe 1 aided by Officer John Doe 2 took over for Defendant Officers Webb and Giampapa and placed handcuffs on Dexter.

76.    After Dexter was handcuffed, another John Doe Officer exclaimed, "I don't know where it is" seemingly in reference to a weapon the officers suspected Dexter of possessing. In response, Officer John Doe 1, walked away from Dexter, walked in a circle around Dexter's vehicle, CPD's vehicle and other parked vehicles and explained to a fellow officer that he is "trying to find a gun."

77.    While Officer John Doe 1 attempted to "find a gun," Officer John Doe 2 stood over Dexter's body. Neither Officer John Doe 1 nor Officer John Doe 2 provided Dexter with any lifesaving aid.

78.    In sharp contrast, while Defendant Officers ignored Dexter's obvious and urgent medical needs, multiple CPD officers surrounded and provided aid to Defendant Officer Spanos who was—in his own words: "ok, [but] just freaking out." After reloading his weapon three times and shooting Dexter dozens of times, blood was splattered on Defendant Officer Spanos' pants. When he realized his pants were blood stained, Defendant Officer Spanos exclaimed plaintively to other CPD officers "these are my favorite pants."

79.    Seconds later, Defendant Officer Spanos approached Dexter while he was laying on the street, bleeding out. He observed Officers John Does 1 & 2 standing over Dexter while failing to provide him with any lifesaving aid. Defendant Officer Spanos took no action to provide Dexter with aid nor did he encourage any Officers John Does to do so.

80.     Eventually, other CPD officers who arrived at the scene, immediately provided Dexter with chest compressions and other potentially lifesaving aid. Their efforts came too late to save Dexter. He was pronounced dead later that day.

81.     CPD Special Order S11-10-03 provides that every CPD member—including each Defendant—receive training in Law Enforcement Medical and Rescue Training, often referred to as LEMART. LEMART instructs CPD officers on the use of four lifesaving implements: (1) tourniquets to stop arterial bleeding; (2) combat gauze containing a hemostatic agent that can stop bleeding in seconds; (3) chest seals that prevent air from entering the chest cavity of gunshot victims and (;4) pressure bandages to stop bleeding. A reasonable police officer who has training about and access to these implements would use them to attempt to save the life of any gunshot victim.

82.     CPD General Order 03-02 provides that CPD officers are required to "immediately request appropriate medical care for [an] injured person" and guides officers to provide medical care consistent with their training to any individual with visible injuries.

83.     Defendants Officers Giampapa, Pacheco, Spanos, Webb, and Officer John Does 1 and 2 had access to the lifesaving implements described above and training on how to use them. Despite this fact, these Defendants refused to provide care to Dexter and further failed to request appropriate medical care for Dexter "as soon as it was safe and practicable" in violation of CPD policy and the law.

**V. DEFENDANT OFFICERS' DISCIPLINARY HISTORY DEMONSTRATES CPD'S SUPERVISION AND ACCOUNTABILITY FALURES.**

84.     Chicagoans filed at least 41 complaints against Defendants Officers Giampapa, Spanos, Pacheco, Saint Louis, and Webb alleging that these officers engaged in unlawful traffic

stops.[29] On March 21, 2024, the day they encountered Dexter, Defendant Officers had been cleared of wrongdoing in only three of those 41 complaints.[30]

85.     According to Block Club Chicago, three of those complaints allege the same officers made similar traffic stops in the City's Harrison (11th) Police District on February 26, March 1, and March 6, 2024, less than a month before the traffic stop that led to Dexter's death."[31]

86.     On at least seven occasions, one or more of the named Defendant Officers were accused of unlawful traffic or pedestrian stops. Some of these allegations include instances where members of the public allege that one or more of the named Defendant Officers engaged in an unlawful traffic stop for an alleged seat belt violation. The complainants alleged that the officers falsely claimed they observed a seat belt violation.[32]

87.      Defendant Officer Spanos has been on the force for two years and has at least seven complaints on file with COPA, including two for alleged excessive force and five claiming improper stops or searches.[33]

88.     According to the Citizens Police Data Project, "more than 30% of complaints against CPD officers involve just 10% of the police force." [34] This data means that the named Defendant Officers have significantly more complaints than the average Chicago Police officer.

---

[29] Chicago Police Officers Involved in Dexter Reed Shooting Have Been Named In Past Complaints Tied To Traffic Stops, Andy Grimm, Chicago Sun-Times (April 12, 2024) (https://chicago.suntimes.com/police-reform/dexter-reed-shooting/2024/04/12/chicago-police-officers-dexter-reed-shooting-complaints-traffic-stops).
[30] Id.
[31] Cops Who Shot Dexter Reed Had History of Traffic Stops Drivers Say Were Unwarranted, New Docs Show, Kelly Bauer and Mack Liederman (April 12, 2024) (https://blockclubchicago.org/2024/04/12/cops-who-shot-at-dexter-reed-were-under-investigation-for-other-traffic-stops-after-complaints-new-docs-show).
[32] Supra, n. 29.
[33] Id.
[34] Citizen Police Data Project (https://cpdp.co).

89.     The National Institute of Justice documents that officer supervisors rely on complaint data, traffic stop reports, and use of force documentation "to identify officers who who's behavior is problematic" before an officer faces formal discipline. [35]

90.     Upon information and belief, the named Defendant Officers' CPD supervisors had knowledge of Defendant Officers' complaint records and traffic stop productivity.

91.     Despite having knowledge of Defendant Officers' history of violating the rights of Black community members, Defendant Officers' CPD supervisors failed to take any action to redirect, counsel or otherwise supervise Defendant Officers in an effort to stop violent, pretextual and racially discriminatory traffic stops. To the contrary, on information and belief, consistent with CPD's Mass Traffic Stop Program, Defendant Officers' CPD supervisors urged Defendant Officers to engage pretextual traffic stops under the guise of protective policing.

92.     Defendant Officers and the on-scene supervisors engaged in behavior consistent with CPD's modus operando of allowing CPD officers to engage in serious misconduct with impunity. First, shortly after Defendant Officers stopped shooting at Dexter, Defendant Officer Giampapa instructed Defendant Officer Spanos "don't say anything!," apparently in reference to the fact that Defendant Officers were wearing body cameras and their words would be captured. Then, once Defendant Officers' CPD Supervisor John Doe 3 arrived on the scene, he instructed Defendant Officers to disable their body cameras.

93.     At this point, Defendant Officers stood together and the scene was not secure—in fact Dexter still lay on the street bleeding out. Neither Defendant Officers' CPD Supervisor Doe 3 nor Defendant Officers stated why they disabled their cameras at this moment. As a result of this act, body camera footage does not reveal how or when the named Defendant Offices left the

---

[35] Early Warning Systems: Responding to the Problem Police Officer, Research in Brief, Samuel Walker, *et. al.* (July 2001)     (https://nij.ojp.gov/library/publications/early-warning-systems-responding-problem-police-officer-research-brief).

scene, whether they had any further interaction with Dexter, and whether they engaged in any conversation about their actions during this incident.

## VI. THE POLICY AND PRACTICE FAILURES OF THE CITY OF CHICAGO AND THE CHICAGO POLICE DEPARTMENT LED TO DEXTER'S DEATH.

### A. CPD Operates a Mass Traffic Stop Program That Encourages Officers to Engage in Unlawful, Pretextual Traffic Stops in a Racially Discriminatory Manner.

94.     Defendant Officers' unlawful, violent, discriminatory and pretextual traffic stop of Dexter detailed above was not an isolated incident. Instead, it was a direct and intended result of a long-standing CPD mass traffic stop program that includes targeting Black and Latino drivers for pretextual traffic stops citywide, saturating Black and/or Latino neighborhoods with pretextual traffic stops, and imposing quotas for pretextual traffic stops.

95.     For at least half a century, CPD has implemented police programs characterized by high-volume stops of Black and Latino people based on low-level violations that CPD uses as excuses to harass, surveil, and intimidate community members of color.

96.     CPD has never shown that its mass stop practices are justified or effective methods for addressing crime in Chicago.

97.     To the contrary, in its 2016 report, PATF found "CPD's dependence on investigatory stops as an essential part of its policing strategy has only served to worsen already fractured community relations." The PATF included the following data showing 46% of 100,676 traffic stops in 2013 involved Black people, whereas 27% involved Whites. [36]

---

[36] Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities they Serve, Police Accountability Task Force (April 2016) (https://igchicago.org/wp-content/uploads/2017/01/PATF_Final_Report_4_13_16-1.pdf [hereinafter "PATF Report").

98.     Moreover, the PATF report found CPD searched Black and Hispanic drivers were searched approximately four times as often as white drivers, yet CPD's own data show that contraband was found on white drivers twice as often as Black and Hispanic drivers.

99.     The PATF found "[t]here is substantial evidence that people of color— particularly African-Americans—have had disproportionately negative experiences with the police over an extended period of time. There is also substantial evidence that these experiences continue today through significant disparate impacts associated with the use of force, foot and traffic stops and bias in the police oversight system itself,"[37] as depicted in this model included in the PATF report:



100.     Despite the DOJ and PATF findings, beginning approximately at the end of 2015 and early 2016, CPD shifted from a program of mass investigatory stops targeting Black and Latino people and the neighborhoods where they primarily reside, to a program of mass pretextual traffic stops targeting Black and Latino people and the neighborhoods where they primarily reside. CPD's mass traffic stop program entails saturating neighborhoods where Black or Latino

---

[37] *Id.*

people primarily reside with traffic stops and targeting Black and Latino drivers citywide for traffic stops, including in primarily-white neighborhoods.[38]

101.    According to data that CPD reports to the Illinois Department of Transportation ("IDOT") pursuant to the Study Act, CPD's total number of traffic stops increased from approximately 83,000 stops in 2014 to approximately 500,000 stops in 2022, as shown below.[39]



102.    The City's Office of Emergency Management and Communications ("OEMC") makes a record of each time a police officer "radios in" to dispatch that the officer is conducting a traffic stop. Each year, OEMC records at least 100,000 more unique radio dispatches for CPD traffic stops than the total number of traffic stops that CPD reports to IDOT, as shown in the  following figure:[40]

---

[38] *Wilkins v. Chicago*, No. 23-cv-4072, ¶¶407-408 (https://www.aclu-il.org/sites/default/files/wilkins_v._chicago_-_complaint.pdf).
[39] *Id.* at 412.
[40] *Id.* at 415.



Data source: Public IDOT data and de-duplicated OEMC traffic stop data for Jan 2016 to Sep 2022, courtesy of Wes Skogan. Sep-Dec 2022 data is projected.

103.    According to OEMC data, CPD officers radioed in approximately 871,000 traffic stops in 2019; 481,000 traffic stops in 2020 (during the height of the Covid-19 pandemic); and 505,000 traffic stops in 2021. According to OEMC data for the first three quarters of 2022, CPD made close to 500,000 traffic stops through September 2022, and was on pace to exceed 600,000 total traffic stops in 2022.[41]

104.    At least since 2016, CPD has used traffic stops primarily as a pretext to stop Black and Latino drivers and search for evidence of crimes unrelated to traffic violations, and/or as an alleged strategy of general deterrence, based on discriminatory stereotypes that Black and Latino drivers are more likely than white drivers to commit crimes or possess contraband.[42]

105.    CPDs' mass traffic stop program is not aimed at roadway safety. Three overarching facts support this assertion. First, most CPD traffic stops since 2016 have not resulted in a citation. Second, most CPD traffic stops since at least 2016 have been made for minor, non-moving violations unrelated to road safety. And third, CPD officials have claimed, in published

---

[41] *Id.* at 416.
[42] *Id.* at 420.

documents and public statements, that they are pursuing their mass traffic stop program for alleged investigatory and crime-deterrence purposes. [43]

106.     In the period 2016-2019, the number of traffic stops by Chicago police increased significantly, while traffic stop totals statewide (excluding Chicago) remained stable during that period, as shown below. [44]



Data source: Public IDOT data. 2022 non-CPD data currently unavailable.
20% of IL departments do not report data to IDOT, so statewide totals are undercounts.

107.     If driving behavior had changed, one would expect to see statewide trends in traffic stops that mirror Chicago's trends, an increase in stops by the Illinois State Police within Chicago, or both. Instead, CPD's mass traffic stop program is an outlier compared to other Illinois jurisdictions and police forces.[45]

108.     In recent years, CPD officers have written traffic citations in less than 5% of traffic stops, on average. Specifically, in 2022, only 3.4% of CPD traffic stops resulted in any citation.

---

[43] *Id.* at 421.
[44] *Id.* at 424.
[45] *Id.* at 425.

In 2021, the figure was 4.8%. In 2015, by contrast, CPD officers wrote citations in over 65% of traffic stops.[46]

109.    Prior to 2016, CPD's citation rate in traffic stops was closer to those of other large cities in Illinois and across the country. Today, CPD's very low rate of traffic citations is an outlier among large police jurisdictions in Illinois and around the country. As Impact for Equity (formerly BPI) and the Free 2 Move Coalition pointed out in a March 2023 report, "[t]he rate of citations across traffic stops in Chicago is significantly less than the rate of citation in Aurora (25%) and Joliet (79%) in 2021, the next largest cities in Illinois, and the rate of citations in New York City (77%) in 2022 or Houston (52%) in 2021." [47]

110.    Most CPD traffic stops since 2016 have been based on alleged minor, non-moving violations—specifically, licensing/registration or equipment issues—that are unrelated to road safety, as shown below. This data provides further evidence that most CPD traffic stops since 2016 have been pretextual.[48]



---

[46] *Id.* at 427
[47] *Id.* at 428; *see also* Impact for Equity (BPI) & The Free 2 Move Coalition, A New Vehicle for "Stop and Frisk": The Scope, Impact, and Inequities of Traffic Stops in Chicago, 12 (March 2023) (https://www.impactforequity.org/wp-content/uploads/2023/04/A-New-Vehicle-for-Stop-and-Frisk-Report.pdf).
[48] *Id.* at 429.

111.    As Impact for Equity and the Free 2 Move Coalition pointed out in a May 2023 report, the year 2022 was the first time since CPD began reporting data in 2004 that the category of license and registration violations was the primary reason alleged for CPD's traffic stops. Impact for Equity & The Free 2 Move Coalition, A New Vehicle for "Stop and Frisk": Update, 2 (May 2023) (last visited June 25, 2023).

112.    The March 2023 report concluded: "Large numbers of stops for minor equipment or licensing reasons can be indicative of pretextual stops because the need for a law enforcement traffic safety response is remote. This increases the likelihood that the true motivation for the stops is to 'fish' for non-traffic related criminal activity" without reasonable articulable suspicion.[49]

113.    Defendant City of Chicago has admitted publicly it has a policy, practice, and custom of saturating higher-crime areas with pretextual traffic stops, supposedly as a way to decrease crime and/or violence in the city.[50]

114.    In each year 2021-2023, each Police District within CPD has prepared and published a District Strategic Plan ("DSP"). The purpose of the DSPs is to require each Police District to gather community input, list the community's top three types of crimes or issues it plans to address, and specify how CPD plans to address them and measure success.[51]

115.    In each year 2021-2023, more than half of CPD's 22 Police Districts listed traffic enforcement as an express strategy to address crimes or violations other than violations of the Illinois Vehicle Code or Chicago Traffic Code.[52]

---

[49] *Id.* at 433
[50] *Id.* at 434.
[51] *Id.* at 435
[52] *Id.* at 436.

116.     In each year 2021-2023, nearly all Police Districts additionally proposed to address their top three concerns through "missions" such as "violence suppression missions," "high visibility missions," "enforcement missions" "directed patrol," and the like. On information and belief, most or all of these "missions" are euphemisms for conducting high volumes of pretextual traffic stops.[53]

117.     The DSPs show that between 2021 and 2023, CPD has used traffic stops as its strategy to counter nearly every kind of crime listed as a priority in every Chicago Police District—everything from pedestrian loitering to homicide—indicating that CPD's mass traffic stop program consists of pretextual stops, such as those with a primary goal of searching for contraband and/or intimidating community members as a purported means of general deterrence.[54]

118.     CPD has made efforts since 2016 to periodically rebrand its existing public safety programs, CPD's stated policy throughout this period has been to inundate communities where the majority of residents are Black or Latino people with pretextual traffic stops, the admitted purpose of which is not to increase traffic safety but allegedly to investigate and/or deter drivers of color on the unfounded, stereotyped assumption that drivers of color are more likely to be engaged in criminal activity than white drivers.[55]

119.     As part of its mass traffic stop program, City and CPD leaders use traffic stop quotas to encourage and/or require police officers to make large numbers of traffic stops.[56]

120.     CPD primarily emphasizes traffic stop quotas for Police Districts located in neighborhoods on the West and South Sides of the City, as well as citywide CPD teams that

---

[53] *Id.* at 437.
[54] *Id.* at 438.
[55] *Id.* at 455.
[56] *Id.* at 457.

primarily operate in the same neighborhoods, where the majority of residents are Black or Latino.[57]

121.    CPD traffic stop quotas manifest both as specific numbers of traffic stops that officers or units are directed to produce, and as pressure on CPD supervisors and officers to maintain or increase the reported numbers of traffic stops.[58]

122.    From approximately 2016 through the present, City and CPD leaders have instructed CPD officers to increase and/or maintain the number of traffic stops they generate. Often, CPD leaders impose quotas for specific numbers of traffic stops.[59]

123.    CPD and city leadership have repeatedly affirmed and imposed traffic spot quotas on CPD members. On Sunday August 9, 2020, for example, First Deputy Superintendent Eric Cato III, the second-highest ranking CPD official, emailed District 10 Commander Gilberto Calderón, District 11 Commander Darell Spencer, and District 15 Commander Patrina Wines to inform them that their traffic stop numbers were "not sufficient." Cato directed the Commanders to "give your WOLs [Watch Operations Lieutenants] daily reminders about the importance of traffic stops."[60]

124.    On September 9, 2020, Cato forwarded traffic stop totals from the CompStat unit to the Districts 10, 11, and 15 Commanders, stating: "Look at your traffic stop strategy and be prepared to address how you will utilize traffic stops to address violence. Effective traffic stops sill [sic] decrease violence."[61]

---

[57] *Id.* at 457.
[58] *Id.* at 458.
[59] *Id.* at 467.
[60] *Id.* at 479.
[61] *Id.* at 480.

125.    On September 20, 2020, Cato emailed the District 11 Commander, "Please look into your tact teams [sic] traffic stops." Commander Spencer replied: "That conversation has already been had with the new Lt. He's going to have a meeting with the sergeants."[62]

126.    On October 2, 2020, Cato again emailed the District 11 Commander, this time stating: "Please meet with your WOLs [Watch Operations Lieutenants] and develop a plan to address traffic stops, [District] 011 can do better."[63]

127.    Approximately 20 minutes after receiving the email from Cato, the District 11 Commander emailed all lieutenants in District 11 the following: "All, See attached report [summarizing daily traffic stop totals]. I know that manpower is a struggle but we can do better when it comes to traffic stops. . . . I've asked each WOL to assign cars to traffic missions and have those cars submit the activity to the 'WOL' prior to the end of their tour for review and discussion (with the assigned officers). . . . This will be placed squarely on the WOL to show an increase in our traffic related enforcement on your watch. . . . Tact should be leading the district in stops with the watches closely behind. 011 has the most violence and should be leading the city (Districts) in stops. 'They are making the stops but not recording them' is not a valid reason. Capt McKenzie see me about this matter today." (Emphases added).[64]

128.    Two days later, on October 4, 2020, Cato again emailed the District 11 Commander with a summary of traffic stop totals, stating "please develop a plan to increase traffic stops on the first watch. I am sure this is not only being monitored by me," apparently referencing the Superintendent, Mayor, and/or other City and CPD leaders.[65]

---

[62] *Id.* at 484.
[63] *Id.* at 485.
[64] *Id.* at 486.
[65] *Id.* at 487.

129.     In depositions taken between December 2021 and March 2022 in a lawsuit filed by a CPD whistleblower, *Paz v. City of Chicago*, 2021-L-00514 (Cook. Cty. Cir. Ct.), CPD sergeants in the Community Safety Team testified that aggressive, pretextual traffic stops were a core practice of CPD's specialized units.[66]

130.     CPD leaders, and supervisors closely monitored the number of traffic stops made by teams and/or officers and personally enforced the traffic stop quotas. Using CPD's Performance Recognition System and other regular reports of team, unit, or officer "activity," CPD leaders checked, at times on a daily basis, whether officers and units were complying with CPD traffic stop quotas.[67]

131.     CPD leaders enforced the quota system by threatening adverse employment consequences for officers who failed to meet the numerical thresholds. CPD leadership also enforced the traffic stop quota system by directly or indirectly promising employment benefits to CPD supervisors and officers who fulfilled the quota numbers.[68]

132.     In recent statements, CPD leaders continued to refer to a quota system within CPD. During a January 4, 2022 press conference with Mayor Lightfoot, then-Superintendent Brown discussed daily quota "goals" and threatened adverse employment action for leaders whose units could not meet the quotas: "We likely will need to break untold records in this department to turn the tide and we're committed to doing that. We're setting that as the goal, every single day. So, we have an end-of-the-year goal and we divide it by 365. So, what do you have to do today to meet that goal? Today. If you can't meet it today, are you the leader for this department? Or do we need to change leaders? Because we have to make Chicago safer. We have to."[69]

---

[66] *Id.* at 494.
[67] *Id.* at 499.
[68] *Id.* at 500, 502.
[69] *Id.* at 515.

133.    The IMT's Focus Group with young Black and Latinx men documented that participants frequently encountered police during traffic stops. Specifically, the IMT documents a " a pattern. . . in which participants recounted an incident about a stop for a minor infraction, which led to an officer indicating a secondary issue or suspicion, which then led to a search or background check or similar check. Few participants recounting incidents with this pattern indicated that they ended in arrest or anything more than a ticket. Some participants described being pulled over or stopped in a car illustrate this pattern and the negative tone of their experiences."[70]

134.    On information and belief, City and CPD leaders continue to pressure CPD managers and supervisors to track, report, and/or sustain and/or increase traffic stop numbers.[71]

135.    On information and belief, City leaders and CPD supervisors continue to pressure, encourage, incentivize, and/or demand traffic stops from CPD officers in satisfaction of numerical quotas, and/or threaten or imply threats of adverse employment action against officers who do not bring in certain numbers of traffic stops. [72]

B.    CPD's Mass Traffic Stop Program is Rife with Racial Disparities and Implemented in a Racially Discriminatory Manner.

136.    CPD's mass traffic stop program, implemented through the policies, practices and customs alleged above have caused widespread disparities and discrimination against Black and Latino drivers in Chicago. As the number of pretextual traffic stops by CPD has increased since 2016, so have the racial and ethnic disparities among the drivers subjected to CPD traffic stops.[73]

---

[70] IMT Special Report Focus Group (Sept. 2022) (https://cpdmonitoringteam.com/wp-content/uploads/2022/09/2022.09.01-Ip.).
[71] *Wilkins v. Chicago*, No. 23-cv-4072, ¶518 (https://www.aclu-il.org/sites/default/files/wilkins_v._chicago_-_complaint.pdf).
[72] *Id.* at 519.
[73] *Id.* at 520.

137.     In each year since 2004, Black drivers have made up significantly more than one-third of the drivers subjected to traffic stops by CPD, as shown in the following graph. [74]



138.     Beginning around 2016, when CPD initiated its mass traffic stop program, the percentage of Black drivers stopped, already higher than any other racial or ethnic group, increased significantly. As shown in the figure above, Black drivers made up fewer than half of the drivers subjected to traffic stops in 2014, but by 2017, that figure had risen to approximately 65% and remained between 60-65% through 2022.[75]

139.     Under their mass traffic stop program, CPD has concentrated traffic stops in neighborhoods on the South and West Sides of Chicago where most residents are Black or Latino. Defendants know or reasonably should know the demographics of the neighborhoods disproportionately affected by the mass traffic stop program.[76]

140.     For example, Police District 7 (Englewood) on the South Side, and Police District 11 (Humboldt Park/Little Village) on the Westside, together accounted for almost one-fifth of

---

[74] *Id.* at 523.
[75] *Id.* at 524.
[76] *Id.* at 537.

CPD's total traffic stops during the years 2015-2021, despite encompassing less than 5% of the City's total population.[77]

141.    More recent data compiled by Impact for Equity in its 2023 Traffic Stops Data Report reveals CPD continues in its pattern and practice of racially discriminatory traffic stops:



142.    These racially motivated patterns and practices are particularly relevant here. "Police District 11, on Chicago's West Side, had the highest number and percentage of traffic stops—nearly 10.5% of all traffic stops across the city, or a total of 56,301 stops." [78]



---

[77] *Id.* at 538.
[78] *Id.*

143. The racial disparities and racial discrimination in CPD's Mass Arrest Program are so well known and so well documented that, in a recent decision, the Illinois Appellate Count expounded at length about the problems with law enforcement tactics that focus on people "driving while Black" (DWB). The court here refers to DWB as "a pernicious reality that corrodes trust in law enforcement and the legal system. DWB involves police using "stereotypical thinking and hunches" and "dubious investigative techniques" in traffic stops." *People v. Carpenter*, 2024 IL App (1st) 220970, ¶ 6.

144. The *Carpenter* court goes on to explain that several indicators support a finding that a police officer targeted a driver simply because they are Black: (i) minor infractions as a pretext for investigating unrelated suspicions; (ii) stereotypes or assumptions about race based on police conduct or statements during the stop; (iii) prolonged detention inconsistent with the nature of the stop; (iv) a search without proper justification, usually based on stereotypes rather than reasonable suspicion, (v) unequal enforcement, such as pulling over a person of color, for a violation seldom of consequence in a white neighborhood; (vi) targeting neighborhoods or areas predominately populated by people of color; and (vii) use of disrespectful behavior, aggression, or excessive force by police. Individually or together, the elements do not indicate or imply racial bias. . .. Nevertheless, the more indicators, the more likely the stop was for DWB. Id. at ¶ 10. The named Defendant Officers' stop of Dexter demonstrates each of these indicators.

145. The Consent Decree contains 32 paragraphs crafted to end racist practices like driving while Black. The CPD remains out of compliance with the most foundational paragraphs of the impartial policing provisions. [79]

---

[79] IMT Report 8, Appendix 4 (hereinafter "IMT 8-App. 4") (https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-4-Use-of-Force-2023.11.01.pdf).

146.    Paragraph 153 of the Decree requires *inter alia* that CPD "ensure that its policies and practices prohibit discrimination on the basis of any protected class under federal, state, and local law…" The Consent Decree Independent Monitor concluded that "CPD did not achieve Preliminary compliance with ¶153 because they have not developed a broad and comprehensive Impartial Policing plan or strategy that provides the framework for which the CPD will meet the requirements of this paragraph."[80]

147.    Paragraph 155 of the Decree prohibits officers "from using race, ethnicity, color, national origin, ancestry, religion, disability, gender, gender identity, sexual orientation, immigration status, homeless status, marital status, parental status, military discharge status, financial status, or lawful source of income when making routine or spontaneous law enforcement decisions. . ."[81] CPD is not in full compliance with this provision. CPD has failed to incorporate this provision into its training nor has CPD documented "any improvements in officers street-level behavior and decision making. . ."[82]

148.    Paragraph 156 requires that CPD provide "guidance through training and supervision" regarding prohibitions on racial (and other types of profiling/reliance on stereotypes in law enforcement decisions. CPD is not in full compliance with this provision because, *inter alia*, CPD has failed to deliver to its Officers the training required by this provision.[83]

149.    Paragraph 159 provides that CPD will require officers to "immediately report to a CPD supervisor all incidents where they observe other CPD members who have engaged in misconduct, including discrimination, profiling, or other bias-based policing."[84] CPD is not in

---

[80] IMT 8-App. 4, p. 2
[81] *Id.* at 9.
[82] *Id.*
[83] *Id.* at 12.
[84] *Id.* at 22

full compliance with this requirement because it has failed to deliver required training and has not ensured that this requirement is implemented in practice. [85]

150.     Paragraph 169 provides that CPD, inter alia, CPD will revise polices and pratices to ensure that officers "provid[e] reasonable accommodations, to the extent safe and feasible, in order to facilitate CPD officer encounters with individuals with a disability."[86] CPD has not reached any stage of compliance with this provision and in the last reporting period "did not provide any evidence of further compliance."[87]

### C.     CPD Targets Black Drivers with Escalatory Conduct and Unjustified Violence.

151.     In 2022, the City of Chicago Office of Inspector General ("OIG") issued a report on racial and ethnic disparities in the use of force by CPD.[88] The report was based on data from CPD from October 17, 2017 through February 28, 2020.[89] The OIG Report concluded that "Black people were far more likely to be stopped by the police than non-Black people in investigatory stops and traffic stops. This result was consistent across CPD Districts, and the disparity cannot be explained entirely by different patterns of officer behavior in the Districts that CPD defines as "high crime" Districts (i.e., CPD's "Tier 1" Districts)."[90]

152.     The OIG's 2022 Report also found that "once stopped in an investigatory stop or traffic stop, Black people were more likely than non-Black people to face use of force. This result was also consistent across CPD Districts." These disparities are particularly present in District 11, where Black people comprise 78% of the population, 77% of the people stopped but 93% of all uses of force incident to a traffic stop.[91]

---

[85] *Id.*
[86] *Id.* at 53.
[87] *Id.*
[88] IG, Report on Race- and Ethnicity-based Disparities in the Chicago Police Department's Use of Force (Mar. 1, 2022) (hereinafter "OIG UOF Report").
[89] OIG UOF Report, p. 7.
[90] *Id.*
[91] *Id.* at 53.

153.    CPD's own data proves that its officers frequently escalate traffic stops. In 2022, 29% of all gun pointing incidents occurred incident to a traffic stop. [92] In 2021, 27% of all gun pointing incidents occurred incident to a traffic stop. [93]

154.    The IMT Focus Group with Black and Latino men ages 18-35 documented hat that participants' repeatedly described officers' behavior during traffic stops as "aggressive, tough, intimidating, arrogant, or physically or verbally abusive. The extent to which officers were aggressive or tough was enough for many participants to indicate feeling very frightened or intimidated during the interaction."[94] Participants provided much discussion regarding harassment and officers escalating situations. It was not unusual for a participant to say that they had been harassed in the past—sometimes repeatedly and, in some cases even, by the same officers—ranging from repeated stops for minor infractions to threats and intimidation.[95]

155.    The IMT Focus Group participants "stated feelings of fear of the police and expressed that they also felt sometimes that the police seemed to be afraid of ordinary civilians and, therefore, acted too harshly in their interactions with civilians. It was stated several times that civilians hesitated before calling the police for fear of an exaggerated reaction, which can have severe repercussions on the community network. Even in involuntary interactions, like getting pulled over by the police, individuals stated that the police were too harsh.[96]

156.    The IMT conducted a large, representative community survey between October 2021-May 2022, "about overall police services, effectiveness, community engagement, responsiveness, trustworthiness and procedural justice, contact and interactions with the Chicago

---

[92] CPD Tactical Review and Evaluation Division 2022 Year-End Report, p. 69 (https://home.chicagopolice.org/wp-content/uploads/2022-YEAR-END-REPORT-21-JUNE-23.pdf).
[93] PD Tactical Review and Evaluation Division 2021 Year-End Report, p. 71 (https://home.chicagopolice.org/wp-content/uploads/2021-YEAR-END-REPORT.pdf).
[94] IMT Special Report Focus Group (Sept. 2022), p. 30 (https://cpdmonitoringteam.com/wp-content/uploads/2022/09/2022.09.01-IMT-Special-Report-Focus-Groups-with-Black-and-Latino-Men-.._.pdf).
[95] *Id.* at 6.
[96] *Id.* at 38.

Police Department, misconduct complaints and investigations, and confidence in reform." [97] The survey results affirm the persistent existence of the racial disparities described above. Black Chicagoans were four times more likely than White Chicagoans to have been stopped in a vehicle (27.5% vs. 6.7%) or while walking or standing on the street (12.4% vs. 2.8%) over the last 12 months.[98] Ten percent of Young Black Men reported experiencing a use of force (other than handcuffing) by a CPD officer, a rate six times greater than all Chicago adults during this time period.[99] Eleven percent of Young Black Men reported having had a gun pointed at them by a Chicago police officer over the past 12 months, over five times the rate of Chicagoans overall (under 2%).[100]

157.    The survey went on to conclude: "the gap between Young Black Men and the average Chicagoan persists as strongly as it did in 2020. Young Black Men had, by far, the least positive and most negative perceptions of police compared to other groups, including Black Chicagoans in the general sample.[101]

158.    CPD's failures relate directly to Defendant Officers' actions and inactions. CPD operates with a policy, custom, pattern and practice of engaging in racially discriminatory and/or disparate traffic stops pursuant to its Mass Traffic Stop Program. Pursuant to the Mass Traffic Stop Program, CPD subjects Black Chicagoans to various forms of violence escalation and excessive force. The named Defendant Officers violated Dexter's rights pursuant to this well-documented pattern and practice.

---

[97] IMT Community Survey Report, 2021-2022 (https://cpdmonitoringteam.com/wp-content/uploads/2023/05/2023.05.30-IMT-Community-Survey-Report-October-2021-May-2022-filed._-2.pdf).
[98] *Id.* at 11.
[99] *Id.*
[100] *Id.*
[101] *Id.* at 15.

D. **CPD Tactical Teams Routinely Engage in Violent and Unconstitutional Policing Practices and the City Provides Monetary Incentives to Officers who Engage in Abusive Policing Tactics.**

159.    CPD's tactical teams have a long history of targeting Chicagoans on the south and west sides of the City with unlawful violence and corrupt schemes.

160.    In 2017, the DOJ released a report documenting CPD's unconstitutional policies and practices. DOJ investigators explained that Tact teams of officers who "wear either plainclothes or a uniform consisting of a black shirt, khaki pants, and black boots. This attire sends the message that these officers are not meant to be neighborhood police officers, but instead operate outside CPD's normal police channels. As CPD officers put it, the saturation teams "are jump out squads." [102]

161.    The DOJ also found CPD officers make tactical decisions that unnecessarily increase the risk of deadly encounters including failure to await backup and use of unsound tactics in approaching vehicles. In particular, the DOJ also noted CPD's practice of using dangerous and untrained vehicle maneuvers designed to box in suspects' cars, initiating a traffic stop by pulling in sideways in front of the suspects' car, and thereby exposing the passenger officer to the risk of gunfire or serious injury if the driver had opted to ram the police car. This is precisely the technique Defendant Officers used to target Dexter's vehicle. [103]

162.    The DOJ further reports that CPD "incentivizes this tactical-oriented policing approach by elevating members of specialized units to special status. According to officers, being a member of a specialized unit or team carries prestige, and is considered as a "step up" for those uninterested or unable to obtain promotions to sergeant or other command positions. . . [O]fficers are selected for TACT teams based on their "aggression, hustle, and effort. . .." [104]

---

[102] DOJ Report, pp. 31, 142, 143.
[103] *Id.* at 30.
[104] *Id.* at 142.

163.     According to the DOJ, Tact officers "like to hunt" for [alleged] offenders. One Tact officer proudly reported to the DOJ that he made 1,300 arrests in 11 years. The DOJ investigators stated "[t]he quality, impact, or even legitimacy of those arrests appeared generally unimportant to most of those that we spoke with throughout CPD."  Another TACT team officer noted that guidance from supervisors was: "If you get me a gun [from an arrestee], we'll take care of you."[105]

164.     Throughout its history CPD members involved in formal and informal specialized teams have garnered headlines for participation in savage brutality and corruption:

a.  Former Chicago Police Sergeant Ronald Watts and his tactical team engaged in robbery, extortion, evidence fabrication, and excessive force in the Ida B. Wells Homes in Chicago throughout the 2000s.

b.  In 2007, the CPD disbanded its Special Operations Section ("SOS"), tasked with taking guns and drugs off the street in the early 2000s, after a criminal investigation showed its officers abused citizens for financial gain. Seven members of the unit were criminally charged with armed robbery, home invasion, and kidnapping. SOS was the most complained against unit (in a list of 662 officers who amassed 11 or more complaints between 2001 and 2006), but the least likely to be disciplined. Since then, CPD changed the name of its specialized unit from SOS to Tact Team. But the name is the only thing that has changed.

c.  Notorious Commander Glen Evans, who was a tactical Lieutenant, shoved a gun down a suspect's throat and pressed a taser against the man's groin. Among many other documented acts of violence, Evans also fractured the bones of a woman's face and threatened to  "push her nose through her brain." Commander Evans was implicated in at least 45 excessive force complaints between 1988 and 2008—more than any other CPD officer during those decades. Evans is far from the only CPD Tact Team member to face criminal charges.[106]

d.  During 1973-4, CPD Tact Team officers in the 7th District accepted money and/or drugs in exchange for releasing these offenders without formally arresting and charging them. *United States v. Blasco*, 581 F.2d 681, 682 (7th Cir. 1978).

e.  CPD Tact team officers from the Public Housing South Division stole cocaine and large sum of money from a purported drug dealer and planned to distribute the cocaine to public housing residents. *United States v. Patterson*, 162 F. Supp. 2d 1017, 1018 (N.D. Ill. 2001).

---

[105] *Id.* at 142, 150.
[106] Jim Daley, *Doesn't Make it Wrong*, South Side Weekly (Sept. 2023); Chip Mitchell, *Embattled Commander No. 1 for Excessive Force Complaints*, WBEZ (Aug. 2014).

f. From 2004-2006, CPD Tact team officers stole money and drugs from arrestees. The officers also took drugs so they could plant them on people if a future stop or search did not establish probable cause for an arrest. A federal court sentenced a CPD officer to 23 months in custody as a result of convictions resulting from this scheme. See *United States v. Shamah*, 624 F.3d 449, 452–53 (7th Cir. 2010).

g. Daniel Fair and other members of the Calumet District Tact team currently face criminal charges for official misconduct and obstruction of justice based on allegations that, in 2020 and 2021, these Tact team members destroyed evidence in relation to unlawful arrests and searches. Further, an investigation reveals Fair's Tact team found "a stack of cash and a backpack with a large amount of marijuana, yet the property wasn't inventoried and there was no record of arrest." [107]

h. On February 8, 2020, uniformed CPD Tact Team members in an unmarked car began following Lamar Bowens. Mr. Bowens observed the men following him, and without knowing they were police officers, feared for his safety. He parked his car and ran into his mother's home, hoping to evade the men. The officers chased him, forced their way into the home, and falsely charged him with gun possession, when their own police report indicated Mr. Bowers was unarmed. Mr. Bowers filed a lawsuit alleging, inter alia, CPD encourages Tact Team members to make arrest, regardless of their constitutionality. The City of Chicago settled Mr. Bower's lawsuit. *Bowens v. Chicago et al*, 21-CV-278 (N.D. Ill.) (Doc. 38).

i. On April 23, 2022, members of the 22nd District Tact Team engaged in an unlawful stop and search. Judge Sharon Coleman described one of the Tact team members as providing uncredible testimony in describing how Tact team members made a decision to engage in a traffic stop based on an unlawful "hunch." *United States v. Jones*, 22-CR-592, 2023 WL 8879171, at *7–8.

165.    In 2016, Eugene Williams, a 36-year veteran of the CPD and one of the candidates the Chicago Police Board recommended to replace former Superintendent Garry McCarthy, said, "I believe that the Chicago Police Department and law enforcement in general have been steeped in a 'warrior mentality' (kicking butts and taking names) for much too long. Collectively, we have been slow if not recalcitrant to change as if we are stuck in a time warp back in the 1980s….This phenomenon has created a dangerous culture in law enforcement."[108]

---

[107] Tom Schuba, Chicago Police Officer Sidelined in Misconduct Probe Now Charged with Lying about Gun Seizure., Sun-Times (Aug. 202).
[108] Phil Rogers, NBC5Chicago, Finalists for Chicago's Next Top Cop Revealed.(March 2016).

166.     Further, on information and belief, Tact Team members including, but not limited to the Defendant Officers seek out arrests pursuant to the practice of trolling.  A 2017 audit conducted by the OIG detailed findings about CPD's practice of trolling, which occurs when officers actively seek "traffic, disorderly conduct or other violations at the end of a shift" or when they "make an arrest at the end of a shift as a result of escalating a situation which would have been in the officer's discretion to dismiss."[109] Officers are encouraged to troll by the promise of receiving financial compensation for additional arrests. Under most circumstances, officers will make "one and one half times" their regularly hourly rate when they accumulate trolling-related overtime, a perverse incentive that does little to improve community-police relations or reduce occurrences of excessive force.[110]

167.     The OIG's 2020 follow-up report documents that the CPD made no effort to remedy trolling related practices.[111] In fact, the OIG reports that CPD failed to acknowledge the existence of trolling even though "CPD management acknowledged the practices during the [OIG] audit."[112]

168.     Upon information and belief, Defendant Officers targeted Dexter in part because they were trolling for arrests in the hopes that they could earn additional overtime.

169.     The National Institute of Policing (NIP) recently promulged best practices for specialized units. The best practices require that specialized units "clearly define the problem they unit aims to address" and evaluate whether a "law enforcement response is required to alleviate the problem."[113] The requirements further state that specialized units should "consider each candidate's work and complaint history and skill set in relationship to the unit's mission and scope

---

[109] Office of Inspector General, *CPD Overtime Controls Audit* (Oct. 3, 2017) ((https://igchicago.org/2017/10/03/cpd-overtime-controls-audit).
[110] *Id.* at 7.
[111] Office of Inspector General, CPD Overtime Controls Audit Follow-up Inquiry (Feb. 2020).
[112] *Id.* at 7.
[113] National Policing Institute, Considerations for Specialized Units, p. xi (2024).

of work."[114] NIP also provides that "agencies should analyze the risk factors for each specialized unit."[115]

170.     CPD's Tact Teams fail to comply with any of the NIP's best practices. Tact Teams are generalist—officers who have demonstrated an aggressive nature but who otherwise engage in many of the same activities as patrol—and frequently Tact Teams respond to calls that do not require a law enforcement response. As demonstrated by the named Defendant Officer's disciplinary history, Tact Team members are not selected based on demonstrated character or restraint. And CPD has entirely failed to adequately supervise and manage the risk presented by Tact Teams.

171.     The City of Chicago has long been on notice about the unlawful activities of these specialized teams -- including more recently the Tactical (Tact) teams -- but repeatedly has failed to take sufficient action to stop them. Indeed, the Consent Decree governing CPD operations is entirely silent on the abusive practices of CPD's notorious Tact teams.

172.     CPD's failures relate directly to Defendant Officers' actions and inactions.  Each named Defendant Officer was a member of a Tact Team and thus governed by the Tact Teams' informal and formal policies, customs and practices, specifically the Tact Teams' ultra-aggressive culture and disregard for constitutional policing requirements directly lead to violations of Dexter's rights.

> E. <u>CPD has a Longstanding Policy and Practice of Encouraging Officers to Point Guns at Community Members without Justification and in Escalatory Ways that Encourage Violence</u>.

173.     Chicago police officers routinely point their guns at people at the first instance of uncertainty, rather than as a measure of last resort. According to CPD's own data, Chicago police

---

[114] *Id.*
[115] *Id.* at xii.

officers point guns at people an average of nearly ten times a day.[116]  Police officers pointed their guns at over 3,500 adults and children in 2022.[117]

174.    Eleven percent of Young Black Men reported having had a gun pointed at them by a Chicago police officer over the past 12 months, over five times the rate of Chicagoans overall (under 2%).[118] Interviews collected by the IMT suggest that, in the vast majority of these incidents, CPD officers act unlawfully when pointing their guns at the young, Black men who responded to this survey.

175.    According to CPD's own data, CPD documented uses of force, including gun pointing has risen significantly over the past several years.[119] From 2022 to 2023, CPD officers were on track to increase instances of gun pointing 19%.[120] From 2022 to 2021 there was also a 22% increase.[121]

176.    Despite this consistent and alarming increase in reportable instances of force, CPD justified the exponential growth in documented police violence by stating "the rise was comparable to an increase in the number of contacts police made with citizens as measured by arrests, Investigatory Stops, Traffic Stops, and Administrative Notice of Violations."[122]

173.    Former City Inspector General Joe Ferguson, who also served as co-chair of the Task Force on Police Accountability, noted that the pointing of a firearm constitutes a "use of force that under the law constitutes an aggravated assault" since it involves the use of "potentially

---

[116] *See* Chicago Police Department 2022 Annual Use of Force Report, p. 6 (3,584 instances were reported in 2022) (https://home.chicagopolice.org/wp-content/uploads/2022-Annual-Use-of-Force-Report-For-Publication.pdf).
[117] *Id.* (This is no doubt underreported as no adequate mechanism currently exists to audit whether CPD officers are actually notifying OEMC each time they point their guns at people.)
[118] https://cpdmonitoringteam.com/wp-content/uploads/2023/05/2023.05.30-IMT-Community-Survey-Report-October-2021-May-2022-filed._-2.pdf, p. 11
[119] Chicago Police Department Tactical Review and Evaluation Division, 2023 Midyear Report (Dec. 2023),  p. 8.
[120] *Id.* at 24.
[121] CPD Tactical Review and Evaluation Division, 2022 Year End Report (June 2023) p.11.
[122] CPD TRED 2023 Midyear Report, at 8.

deadly force."[123] Ferguson opined that such incidents must therefore be "reported, tracked, analyzed, and accounted for[.]"[124] In short, firearm pointing is a serious use of force incident, and should reported as such.

174. Seventh Circuit precedent recognizes that police officers act unreasonably when they point a loaded gun at a person they have no reason to suspect committed any crime.[125]

175. Despite the prevalence of CPD officers pointing guns at Chicago community members, CPD has repeatedly failed to implement policies sufficient to remedy this harm.

176. While the Consent Decree does mandate that CPD officers verbally report when they point a firearm at civilians, the specific requirements of the relevant provisions fall far short of what is required in order to ensure sufficient oversight and accountability.

177. An officer is expected to document his actions, not through a TRR as with any other use of force, but instead by notifying OEMC of all "investigatory stop or arrest occurrences in which [he or she] points a firearm at a person in the course of effecting the seizure." *Id*. at ¶ 190. OEMC will then "notify an immediate supervisor of the identified beat(s) [of the involved officer(s)] each time the pointing of a firearm is reported. *Id*. at ¶ 191. The Decree exempts, without explanation, SWAT team members and "officer[s] assigned to a federal task force during the execution of federal task force duties" from documenting when they point their firearm. *Id*. at ¶ 194. Moreover, the reporting mechanisms kick in only when a CPD officer points a firearm "to detain the person," adding additional ambiguity to a section infused with reporting loopholes. *I*d. at ¶ 189.

---

[123] Fran Spielman, *Ferguson Makes Case for Documenting Police Pointing Guns*, CHI. SUN-TIMES (Jul. 25, 2018) (https://chicago.suntimes.com/news/ferguson-police-pointing-guns-chicago-police-department-lisa-madigan).
[124] *Id.*
[125] *Jacobs v. City of Chicago*, 215 F.3d 758, 774 (7th Cir. 2000).

178. CPD's requirements for documenting gun pointing incidents have proved deficient in both curbing unnecessary instances of gun pointing and in creating a working system of public accountability.

179. Further, CPD has failed to comply with the existing relevant Consent Decree requirements. CPD is not in compliance with relevant gun pointing provisions of the decree, because, in part, supervisors "do not view body-worn camera footage [of gun pointing incidents]; they only make a note of the pointing incidents in their supervisor log."[126] As a result, the IMT documents a need for more effective supervision of pointing incidents.[127] The IMT also states that it has "concerns about firearm pointing incidents at the unit, district, and officer levels, as well as where there may be inordinate numbers."[128]

180. Numerous other jurisdictions, including Ferguson, New Orleans, Newark, and Cleveland, require full use of force reporting whenever an officer points a firearm.[129] However, CPD's failure to require officers to report instances in which they point their guns at people has encouraged officers to continue to routinely point their guns at community members without cause.

181. CPD's failures relate directly to the Defendant Officers' actions and inactions. CPD has failed to promulgate policies, procedures and practices sufficient to prevent officers from unreasonably and unlawfully pointing guns at community members. As a result, the named

---

[126] IMT 8-App. 4 at 102.

[127] *Id.* at 102.

[128] *Id.* at 120.

[129] See Ferguson Consent Decree, *United States of America v. City of Ferguson*, No. 16-cv-180-CDP (E.D. Mo.), ¶ 183(a) (https://www.justice.gov/opa/file/833431/download); Amended and Restated Consent Decree Regarding the New Orleans Police Department, *United States v. City of New Orleans*, No. 12-cv01924 (E.D. La), ¶ 76 (https://www.nola.gov/getattachment/NOPD/NOPD-Consent-Decree/2018-03-15-Amended-and-Restated-NOPD-Consent-Decree-CLEAN.pdf); Consent Decree, *United States of America v. City of Newark*, No. 16-cv-1731-MCA-MAH, Dkt. No. 4-1 (D. N.J. Apr. 29, 2016), ¶ 67(j) (https://www.justice.gov/opa/file/836901/download); Settlement Agreement, *United States of America v. City of Cleveland*, No. 15-cv-1046-SO, Dkt. No. 7-1 (N.D. Ohio Jun. 12, 2015), ¶ 56 (https://www.justice.gov/sites/default/files/crt/legacy/2015/05/27/cleveland_agreement_5-26-15.pdf).

Defendant Officers targeted Dexter with unlawful force when they pointed their guns at him at the very earliest stages of their encounter.

F.  CPD Has a Pattern and Practice of Escalatory Conduct
and Excessive Force.

182.    CPD, as a matter of pattern and practice, relies upon overly aggressive tactics that unnecessarily escalate encounters with individuals, increase tensions, and lead to excessive force. CPD also fails to de-escalate encounters when it would be reasonable to do so.

183.    In 2022, District 11 had the highest total number of use of force allegations. [130]

184.    In encounters with individuals that begin consensually, or in cases in which officers stop individuals purportedly for low-level violations, officers repeatedly use the most intrusive forms of police response possible—including Tasers and guns. They do so even where individuals do not present a threat to the officers or to other bystanders.

185.    Even where some use of force may be justified, CPD officers, as a matter of practice, use a higher level of force than is objectively reasonable.

186.    The DOJ observed this trend of escalation in shootings, finding CPD officers regularly engaged in "unnecessarily escalating confrontations," which resulted in "avoidable uses of force and resulting harm, including deaths." The DOJ also reported that CPD officers regularly use retaliatory force against people who object to being stopped, without cause. [131]

187.    PATF similarly found "many examples of CPD encounters with citizens in routine situations that have gone tragically wrong." The Task Force acknowledged widespread reports from Chicagoans that officers approach "routine situations with an overaggressive and hostile

---

[130] IMT 8-App. 4, p. 16.
[131] DOJ Report, pp. 33, 114.

demeanor, using racially charged and abusive language." Some of these examples have historic resonance.[132]

188.    In 1969, CPD officers executed Black Panther leader and activist Fred Hampton as he slept beside his pregnant girlfriend. Mark Clark, another activist in the apartment raided by the police, was also killed. The six survivors, several of whom were seriously wounded, were beaten by police and arrested. A later investigation revealed the police fired 82 to 99 shots at Hampton and the others in the apartment. In 1982, the City agreed to settle a civil suit filed on behalf of the survivors and relatives of Hampton for $1.85 million.

189.    In 1972, United States Representative Ralph Metcalfe held hearings after receiving reports that police were abusing Black residents of Chicago and that CPD was ignoring these complaints. Metcalfe's panel uncovered many incidents of abusive police conduct, including excessive force, and Black Chicagoans described being beaten for minor infractions. Metcalfe's panel determined "the use of fatal force by police is far more frequent in Chicago than in other major urban centers" and "[i]n serious instances of abusive police conduct, the police consistently place criminal charges to justify their conduct and put the citizen-victim on the defensive." Metcalfe wrote a nearly 90-page report documenting police abuses and demanding reforms. The report called CPD "rotten to the core."

190.    Between 1972 and 1991, former CPD Commander Jon Burge and his midnight crew tortured more than 200 criminal suspects, most of them Black, to obtain confessions. Tactics used by Burge and his crew included beatings, suffocating, burning with cigarettes and radiators, and electric shocks. Ten of the suspects tortured into confessing were sent to Death Row. For years, the City of Chicago turned a blind eye and refused to investigate Burge, despite clear

---

[132] PATF, p. 16.

evidence (including medical evidence) that torture was being used in CPD Areas on the South Side of Chicago.

191. The Consent Decree contains a number of provisions crafted to end CPD's unlawful escalatory violence. However, CPD has failed to fully comply with each relevant provision.

192. Paragraph 153 provides that CPD's use of force policies must comply with relevant law and require "officers apply de-escalation techniques to prevent or reduce the need for force whenever safe and feasible." CPD is not in compliance with this provision because it has not completed related training and has not evaluated its implementation. Of particular concern, CPD supervisors fail to use of force data to review and track officer use of force.[133]

193. Paragraph 155 provides that CPD policy should "reduce the circumstances in which using force is necessary, and to ensure accountability when CPD officers use force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances."[134] CPD has failed to comply with this provision, in part because of the IMT;s concerns about accountability and frontline supervision.

194. Paragraph 156 provides that CPD's policies, training, supervision and accountability systems will ensure *inter alia* that CPD officers "act at all times in a manner consistent with the sanctity of human life; act at all times with a high degree of ethics, professionalism, and respect for the public; use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible." CPD has not complied with this provision because its polices related to "training, supervision, and accountability systems—remained works in progress."[135] The Monitor states "we urge the CPD to pay additional attention to its Use of Force supervision and accountability requirements and systems, as noted in the last two reporting

---

[133] IMT 8-App. 4, p. 4.
[134] *Id.* at 9.
[135] *Id.* at 12.

period."[136] The IMT further documents that "the current implementation of systems does not promote supervision and accountability."[137]

195.     Paragraph 161 provides that in relevant part, "CPD officers must use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible."[138] CPD is not in full compliance with this provision. The IMT notes" public perception of the CPD's de-escalation skills is heading in the wrong direction.  In response to the question, "Over the past 12 months, how good of a job do you think the Chicago Police in your neighborhood are doing on . . . de-escalating tense situations," a higher percentage of respondents in 2022 as compared to 2020 answered "very poor" or "poor" (21.8% to 18.9%) and a lower percentage answered "good" or "very good" (39.9% to 49%)."[139]

196.     Paragraph 167 provides "CPD officers will operate their vehicles in a manner that is consistent with CPD policy and training and with the foremost regard for the safety of all persons involved."[140] CPD has failed to fully comply with this provision because it has failed to implement sufficient training and oversight. [141]

197.     Paragraph 175 provides that "in use of force incidents involving CPD officers, CPD will require CPD officers to provide life-saving aid consistent with their LEMART training to injured persons as soon as it is safe and feasible to do so until medical professionals arrive on scene."[142] CPD is not in compliance with this provision because it has not yet demonstrated that officers are complying with policy and indeed providing lifesaving aid.[143]

---

[136] *Id.* at 13.
[137] *Id.*
[138] *Id.* at 28.
[139] *Id.* at 30.
[140] *Id.* at 46.
[141] *Id.* at 46.
[142] *Id.* at 68.
[143] *Id.* at 70.

198.    Paragraph 192 provides "a designated unit at the CPD headquarters level will routinely review and audit documentation and information collected from all investigatory stop and arrest occurrences in which a CPD officer pointed a firearm at a person in the course of effecting a seizure."[144] CPD has failed to attain compliance with this provision because it has failed to sufficiently staff the use of force review unit, as a result, CPD officer's uses of force are not reviewed in a timely manner.[145]

199.    As a result of CPD ongoing failures related to escalatory conduct and the use of force, hundreds of people experience unlawful violence and other forms of misconduct at the hands of CPD officers—despite the Consent Decree's existence.

200.    In 2021, COPA sustained 732 allegations that CPD officers engaged in a range of misconduct including excessive force and unnecessarily displaying a weapon.[146] In 2022, COPA sustained 905 allegations against CPD officers.[147] And in 2023, COPA sustained 758 allegations.[148] These findings reveal the intransient nature of CPD's systemic, unlawful violence.

201.    CPD's failures relate directly to Defendant Officers' actions and inactions. CPD maintains a policy, practice, and custom of encouraging officers to engage in escalatory conduct and excessive force. When the named Defendant Officers subjected Dexter to unreasonable escalatory conduct and unlawful violence, they did so pursuant to these ongoing policies.

---

[144] *Id.* at 115.
[145] *Id.*
[146] COPA 2021 Annual Report at 28.
[147] COPA 2022 Annual Report at 27.
[148] COPA 2023 Annual Report at 28.

G.  <u>CPD Systematically Fails to Hold Accountable Officers Who Lie or Remain Silent About Police Misconduct, Including Discriminatory Policing.</u>

202.    CPD has maintained a widespread practice of failing to discipline and/or hold accountable Chicago police officers that lie or remain silent about police misconduct—including discriminatory policing, excessive force and Fourth Amendment violations.[149]

203.    CPD trains its officers to incorporate a "code of silence" into their policing. One officer testified to being told repeatedly at the academy that "[W]e do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence." In *Obrycka v. City of Chicago*, 07-CV-2372 (N.D. Ill.), a federal jury found that, as of February 2007, the City of Chicago "had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

204.    In a 2015 speech to Chicago alderpersons, Mayor Emanuel acknowledged CPD uses a "code of silence" to conceal abuses and wrongdoing by their colleagues.

205.    In April 2016, the PATF chaired by soon-to-be Mayor Lori Lightfoot, issued findings relevant to the present matter are the following: PATF found that the code of silence is "institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City." [150]

206.    The DOJ investigation confirmed the code of silence pervades CPD. In its report , the DOJ states the "City, police officers and leadership within CPD and its police officer union

---

[149] DOJ Report, pp. 75–77.
[150] PATF, p. 14.

acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence." One CPD sergeant informed DOJ investigators that "if someone comes forward as a whistleblower in the Department, they are dead on the street." The code of silence extends, as the DOJ found, to sergeants and other supervisors who take affirmative actions to cover up the misconduct of their subordinates. [151]

207.    The DOJ determined the code is "strong enough to incite officers to lie even when they have little to lose by telling the truth." This is because "officers do not believe there is much to lose by lying." [152]

208.    Given the systematic lack of discipline, CPD officers are allowed to amass dozens of complaints without penalty. According to the Citizens Police Data Project, over 8,000 officers acquired ten or more Complaint Registers ("CRs"). These numbers do not reflect the entire disciplinary history (e.g., pre-2007) of these officers. They also underreport the problem. While CPD collects data on officer performance, including complaints and lawsuits, the reported data is often incomplete, and analysis is limited.

209.    The incident at issue occurred in CPD District 11. According to a report from the Civilian Office of Police Accountability (COPA), officers in District 11 had the highest number of incidents resulting in complaints in the entire City by a wide margin. Of the 55 allegations in District 11 in the first quarter of 2022 (most in the City), 15 were for excessive force (most in the City), and 2 were for discharging a firearm with injury (most in the City). [153] District 11 has long been notorious for racking up complaints against CPD officers. In 2019, COPA noted that District 11 is consistently among those with the highest number of complaints and investigations. [154]

---

[151] DOJ Report, pp. 75–77.
[152] DOJ Report, p. 9.
[153] COPA 2022 Annual Report.
[154] COPA 2019 Annual Report.

210.     As described above, each of the named Defendant Officers had a complaint history that should have triggered increased supervisions, informal counseling and in some cases formal disciplinary action. Yet none of the named Defendant Officers faced any consequences for the misconduct they engaged in prior to encountering Dexter.

211.     Although a number of Consent Decree provisions aim to eliminate the code of silence and improve officer accountability, CPD has failed to comply with most of these terms. The City has failed to reach preliminary compliance with the vast majority of provisions related to accountability.[155]

212.     CPD's failures relate directly to Defendant Officers' actions and inactions.  CPD maintains a policy, practice, and custom of failing to discipline, supervise, monitor, and control its officers, including the named Defendant Officers. Consequently, the City allows its officers to believe they can abuse and violate the rights of individuals without consequence. These policies, practices, and customs directly contributed to the code of silence and allowed Defendant Officers to believe that they could violate Dexter's rights with impunity.

H.   CPD's Policies and Practices Violate the Americans
     with Disabilities Act.

213.     Dexter was a qualified person with a disability because he lived with a mental illness, namely post-traumatic stress disorder ("PTSD"), that affected one or more major life activities. Dexter Reed suffered from post-traumatic stress disorder for several years.

---

[155] IMT 8th Report, Appendix 9 (https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-9-Accountability-and-Transparency-2023.11.01.pdf).

214.    Residents of neighborhoods policed by the 11th District CPD station live with heightened rates of PTSD due to hyper-policing, harassment, and violent encounters initiated and escalated by the CPD during minor traffic stops.[156]

215.    A study of adult Chicagoans that live in "urban communities" identified a highly significant association between hypervigilance and a specific type of police violence: traumatic police stops.[157]

216.    CPD's pervasive violent tactics and other forms of misconduct leave a lasting impact on the mental health and wellness of Black communities. This impact, known as community trauma and/or collective trauma, is defined as "an aggregate of trauma experienced by community members or an event that impacts a few people but has structural and social traumatic consequences."[158]

217.    In 2019, 55 million people took off work due to poor mental health that resulted from police shootings and killings in the United States.[159]

218.    Studies show that Black people ages 18 to 29 who encounter police violence experience an increase in anger, depression, and hypervigilance.[160] Hypervigilance is a state of

---

[156] Traffic Stops in Chicago Police District 11 (https://static1.squarespace.com/static/63d2d655b90633181eddd9f3/t/64cefe7e91851131bb4f90e2/1691287173079). D-11+Factsheet.pdf); Independent Monitor Report 8, Appendix 4, p. 16 (https://cpdmonitoringteam.com/wp-content/uploads/2023/11/IMR8-Appendix-4-Use-of-Force-2023.11.01.pdf).

[157] Smith, N. A., Voisin, D. R., Yang, J. P., & Tung, E. L., Keeping Your Guard Up: Hypervigilance Among Urban Residents Affected By Community And Police Violence. *Health affairs (Project Hope)*, *38*(10), 1662–1669 (2019) (https://doi.org/10.1377/hlthaff.2019.00560).

[158] Illinois Criminal Justice Information Authority, Individual and Community Trauma: Individual Experiences in Collective Environments (https://icjia.illinois.gov/researchhub/articles/individual-and-community-trauma-individual-experiences-in-collective-environments) (citing Pinderhughes, H., Davis, R. A., & Williams, M. (2015). Adverse community experiences and resilience: A framework for addressing and preventing community trauma. Prevention Institute. https://bit.ly/2Phz53G).

159 Jacob Bor, Atheendar Venkataramani, David Williams & Alexander Tsai, Police Killings and Their Spillover Effects on the Mental Health of Black Americans: a Population-Based, Quasi-Experimental Study, The Lancet (Dec. 2018 (https://www.thelancet.com/journals/lancet/article/PIIS0140- 6736(18)31130-9/fulltext).

160 Jason Kornwitz , Here's how police violence affects the mental health of Black people aged 18 to 29 (https://www.bc.edu/bc-web/schools/ssw/about/bcssw-news/2021/heres_how_police_violence_affects_the_mental_health_of_young_black_adults.html#:~:text=Black%20people%20age%2018%20to,and%20trauma%20among%20emerging%20adults).

heightened awareness and watchfulness that has been characterized in survivors of trauma and violence.[161]

219.     Dexter demonstrated symptoms of PTSD, including hypervigilance when the CPD stopped him for an alleged traffic violation. For example, Dexter responded to Defendant Officer Giampapa's aggressive questioning by stating that he wasn't doing anything, and then became flustered when she yelled at him further. At one point, Dexter responds "okay, okay I'm trying" to officer's yelling inflammatory language and commands. Dexter had an increased, startled response as CPD officers became increasingly aggressive despite his compliance.

220.     A reasonable officer would know that when stopping people in a neighborhood historically and culturally known for its heightened levels of police harassment and violent traffic stops, there is a strong likelihood that the individual lives with post-traumatic stress disorder symptoms such as hypervigilance.

221.     CPD stopped Dexter Reed, disregarded the likelihood of him living with PTSD, and escalated the encounter by violently detaining him, pointing their guns, and continuing to fire their guns at Dexter when he exited the car with his hands up.

222.     CPD officers could have provided a reasonable accommodation to Dexter at several moments, and they failed to do so at each of those moments. For example, four CPD officers approached Dexter's vehicle, pointed their guns at Dexter, and yelled commands and obscenities at him. This unprofessional behavior by the CPD officers is inflammatory, and the very type of conduct that results in heightened levels of PTSD in Black, westside neighborhoods.

---

161 Nichole A. Smith, Dexter R. Voisin, Joyce P. Yang, and Elizabeth L. Tung; Keeping Your Guard Up: Hypervigilance Among Urban Residents Affected By Community and Police Violence (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7263347).

223.     When Defendant Officer Giampapa ordered Dexter to roll down his window and saw that he complied, she could have refrained from pointing her gun the moment Dexter became flustered and pressed the wrong button. The other Defendant Officers on the scene also could have refrained from drawing their guns and pointing them at Dexter in this moment.

224.     Each Defendant Officers' conduct in each of these moments deprived Dexter—as a qualified individual under the ADA—of safe and constitutional policing by the CPD.

### COUNT I –42 USC § 1983 – Fourth Amendment – Unlawful, Pretextual Traffic Stop
*Defendants Chicago Police Department Officers*
*Giampapa, Pancheco, Spanos, Saint Louis Webb*

225.     Plaintiff incorporates the allegations set forth in all preceding paragraphs as though fully stated herein.

226.     Count I is against Defendant Chicago Police Department Officers Giampapa, Pancheco, Spanos, Saint Louis and Webb.

227.     At all relevant times, Dexter had a constitutional right to be free from unreasonable search and seizure under the Fourth Amendment to the United States Constitution.

228.     Defendant Officers Giampapa, Pancheco, Spanos, Saint Louis and Webb violated Dexters Fourth Amendment rights when they targeted him for an unlawful, pretextual traffic stop as described above.

229.     These Defendants had no reasonable suspicion or probable cause to suspect that Dexter had engaged in any violation when they side-swiped and curbed his car. Instead, they targeted merely Dexter because he was a young, Black man driving a vehicle on the westside of Chicago.

230.     These Defendants' actions and inactions were objectively unreasonable and resulted in violations of Dexter's constitutional rights.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against Defendant Chicago Police Department Officers Giampapa, Pancheco, Spanos, Saint Louis, and Webb, for compensatory and punitive damages, costs, attorneys' fees, interest, and other relief the Court deems fair and just.

### COUNT II –42 USC § 1983 – Fourth Amendment – Excessive Force
*Defendants Chicago Police Department Officers*
*Giampapa, Pancheco, Spanos, Webb and Saint Louis*

231.    Plaintiff incorporates the allegations set forth in all preceding paragraphs as though fully stated herein.

232.    Count II is against Defendant Chicago Police Department Officers Giampapa, Pancheco, Spanos, Saint Louis, and Webb.

233.    At all relevant times, Dexter had a constitutional right to be free from excessive force under the Fourth Amendment to the United States Constitution.

234.    Defendant Officers Giampapa, Pancheco, Spanos, Saint Louis, and Webb violated Dexter's Fourth Amendment rights when, prior to the time any gunshots occurred, they recklessly and unreasonably pointed their guns at Dexter without legal justification thereby escalating the encounter and creating chaos and confusion.

235.    Pursuant to relevant law and professionally accepted standards, gun pointing is a use of force. Police officers are prohibited from pointing firearms at community members unless the act of pointing a weapon is objectively reasonable under the totality of the circumstances.

236.    At the moment these Defendant Officers first pointed their guns at Dexter, no reasonable officer could have considered Dexter a threat. Therefore, these Defendants' actions and inactions were objectively unreasonable and resulted in violations of Dexter's rights.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against Defendant Chicago Police Department

Officers Giampapa, Pancheco, Spanos, Saint Louis, and Webb, for compensatory and punitive damages, costs, attorneys' fees, interest, and other relief the Court deems fair and just.

### COUNT III –42 USC § 1983 – Fourth Amendment – Excessive Force
*Defendants Chicago Police Department Officers Giampapa, Pancheco, Spanos, Webb*

237.    Plaintiff incorporates the allegations set forth in all preceding paragraphs as though fully stated herein.

238.    Count III is alleged against Defendant Chicago Police Department Officers Giampapa, Pancheco, Spanos, and Webb.

239.    At all relevant times, Dexter had a constitutional right to be free from unreasonable search and seizure under the Fourth Amendment to the United States Constitution.

240.    The United States Supreme Court has recognized that apprehension by the use of deadly force represents a "seizure" subject to the Fourth Amendment's requirements of reasonableness.

241.    When Dexter exited his vehicle, he was unarmed, his hands were empty, and he posed no imminent threat to the life or liberty to any of the Defendant Officers or to others.

242.    When Dexter exited his vehicle, unarmed and with his hands empty, Defendant Officers had no factual basis to support a reasonable belief Dexter posed an imminent threat to his safety or to the safety of others.

243.    A reasonable police officer would have known that using deadly force against Dexter, when Dexter was unarmed, and posed no imminent threat of harm constitutes excessive force in violation of the Fourth Amendment.

244.    The conduct of the Defendant Officers Giampapa, Pacheco, Spanos, and Webb, and each of them, in discharging their weapons and using deadly force against Dexter when he was

unarmed and outside his vehicle, was objectively unreasonable and a violation of Dexter's Fourth Amendment rights.

245.    As a direct and proximate result of the conduct of Defendant Officers Giampapa, Pacheco, Spanos, and Webb, Dexter was shot and killed and suffered pain, mental anguish, and loss of his young life.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against Defendant Chicago Police Department Officers Giampapa, Pancheco, Spanos, and Webb, for compensatory and punitive damages, costs, attorneys' fees, interest, and other relief the Court deems fair and just.

## COUNT IV –42 USC § 1983 – Fourth Amendment – Excessive Force
### *Against Defendants Chicago Police Department Officers Pancheco, Spanos*

246.    Plaintiff incorporates the allegations set forth in all preceding paragraphs as though fully stated herein.

247.    Count IV is alleged against Defendants Chicago Police Department Officers Pancheco and Spanos.

248.    At all relevant times, Dexter had a constitutional right to be free from unreasonable search and seizure under the Fourth Amendment to the United States Constitution.

249.    The United States Supreme Court has recognized that apprehension by the use of deadly force represents a "seizure" subject to the Fourth Amendment's requirements of reasonableness.

250.    After he exited his vehicle unarmed, Dexter was shot and collapsed to the street, landing face down, with his head coming to rest underneath his vehicle.

251.    After being shot and collapsing to the street, Dexter remained motionless on the street, face down, with his head coming to rest underneath his vehicle.

252.    After being shot and collapsing to the street, Dexter posed no imminent threat to the life or liberty to any of the Defendant Officers or to others.

253.    After being shot and collapsing to the street, Defendant Officers had no factual basis to support a reasonable belief Dexter posed an imminent threat to his safety or to the safety of others.

254.    A reasonable police officer would have known that using deadly force against Dexter Antonio Reed, when Dexter was unarmed, shot, and lying motionless and facedown on the street,  and posed no threat of imminent harm, constitutes excessive force in violation of the Fourth Amendment.

255.    However, Defendant Officer Pacheco continued to fire at Dexter as he was falling to and/or already fallen to the ground.

256.    Defendant Officer Spanos continued to fire at Dexter as he was falling to and/or already fallen to the ground.

257.    After Dexter fell to the street, landing face down with his head under the back of his vehicle, Defendant Officer Spanos paused, and then began firing another 3 shots at Dexter's motionless body on the ground.

258.    The conduct of the Defendant Officers Pacheco and Spanos, and each of them, in discharging their weapons and using deadly force against Dexter when he was unarmed, had been shot, was falling and/or already had fallen to the ground, was objectively unreasonable and a violation of Dexter's Fourth Amendment rights.

259.    As a direct and proximate result of the conduct of when he was unarmed, had been shot, was falling and/or already had fallen to the ground,, and each of them, Dexter suffered pain, mental anguish, and loss of his young life.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against Defendant Chicago Police Department Officers Pancheco and Spanos, for compensatory and punitive damages, costs, attorneys' fees, interest, and other relief the Court deems fair and just.

### **COUNT V - 42 U.S.C. § 1983 - Fourth Amendment – Denial of Medical Care**
### *Defendants Chicago Police Department Officers Giampapa, Pacheco, Spanos, Webb*

260.    Plaintiffs incorporate the allegations set forth in all preceding paragraphs as though fully stated herein.

261.    Count V is alleged against Defendants Chicago Police Department Officers Giampapa, Pacheco, Spanos, and Webb.

262.    In the manner described above, Defendant Officers Giampapa, Pacheco, Spanos, Webb, each of them, had notice of Dexter's serious medical needs after he was shot, and yet they failed to provide him with necessary medical attention, but instead handcuffed him, and left him on the street to bleed out. They further failed to immediately call for ambulance to provide Dexter with emergency care, in violation of the Fourth Amendment of the United States Constitution.

263.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and/or reckless indifference to Dexter's constitutional rights.

264.    As a result of this misconduct, Dexter experienced pain, suffering, emotional distress, physical injury, and death.

265.    The misconduct described in this Count was undertaken pursuant to the policies and practices of City of Chicago in the manner more fully described above.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against Defendant Chicago Police Department

Officers Giampapa, Pancheco, Spanos, and Webb, for compensatory and punitive damages, costs, attorneys' fees, interest, and other relief the Court deems fair and just.

### COUNT VI - 42 U.S.C. § 1983 – *Monell* – Pattern and Practice of Unconstitutional Traffic Stops
#### *Against Defendant City of Chicago*

266.    Plaintiffs incorporate the allegations set forth in all preceding paragraphs as though fully stated herein.

267.    City of Chicago has a long-standing pattern and practice of conducting unlawful traffic stops.

268.    This pattern or practice had been in place for years prior to the constitutional violations suffered by Dexter, as evidenced by the allegations above.

269.    City of Chicago has been aware of these patterns and practices, and their unlawfulness, and but has failed to implement reasonable and necessary means to address and resolve the pattern and practice of unlawful and pretextual traffic stops that has persisted for years.

270.    The widespread pattern and practice described above and throughout this Complaint was a moving force behind the unlawful and pretextual stop of Dexter.

271.    As a direct and proximate result of the widespread pattern and practice described above and throughout this Complaint, Dexter, was unlawfully stopped, and suffered injuries including but not limited to emotional anguish, fear, and anxiety, as is more fully described throughout this Complaint.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against Defendant City of Chicago, for compensatory damages, costs, interest, and other relief the Court deems fair and just.

**COUNT VII - 42 U.S.C. § 1983 –** *Monell* **– Pattern and Practice of**
**Using Excessive and Escalatory Force and Continued Promotion of Tactical Teams**
*Against Defendant City of Chicago*

272.    Plaintiffs incorporate the allegations set forth in all preceding paragraphs as though fully stated herein.

273.    City of Chicago has a long-standing pattern and practice of using excessive force, including deadly force. Excessive force allegations are particularly pronounced among members of CPD's Tact Teams.

274.    This pattern or practice had been in place for years prior to the shooting of Dexter, as evidenced by the allegations above. Specifically, in 2017, the DOJ documented that CPD TACT team members police Black communities as if they are "on the hunt" and routinely use violent, aggressive practices against Black people. CPD has failed to take any action to address the specific unlawful violence imposed on Black communities by Tact Teams.

275.    City of Chicago has been aware of these patterns and practices, and their unlawfulness, and but has failed to implement reasonable and necessary means to address and resolve the pattern and practice of unlawful home raids and/or the unlawful use of excessive force that has persisted for years.

276.    The widespread pattern and practice described above and throughout this Complaint was a moving force behind the shooting of Dexter and the other violations of his rights.

277.    As a direct and proximate result of the widespread pattern and practice described above and throughout this Complaint, Dexter's rights were violated, he was shot and killed, and suffered pain and injury, including emotional anguish, fear, anxiety, disfigurement, and the loss of life and liberty, as is more fully described throughout this Complaint.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against Defendant City of Chicago, for compensatory damages, costs, interest, and other relief the Court deems fair and just.

### COUNT VIII- 42 U.S.C. § 1983 – *Monell* –Failure to Promulgate Adequately Train, Supervise and Discipline
### *Against Defendant City of Chicago*

278. Plaintiffs incorporate the allegations set forth in all preceding paragraphs as though fully stated herein.

279. A municipality's failure to train supports § 1983 liability where it is done with deliberate indifference to the constitutional rights of the municipality's inhabitants. *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989). The same is true where a municipality fails to hold officers accountable for their actions such that officers believe they can act with impunity.

280. Based upon City of Chicago 's long history of its Police Officers using unreasonable force, including deadly force, it knew that increased and improved training in areas of use of force, effectuating arrests, were necessary.

281. Notwithstanding, City of Chicago 's indifference has persisted, as exemplified by its continued and persistent to provide adequate and appropriate training, supervision and discipline to its Police Officers on use of force, effectuating arrests.

282. Because adequate policies and reforms were not promulgated and implemented, City of Chicago Police Officers were not trained, supervised and disciplined appropriately. This failure on the part of City of Chicago exhibits deliberate indifference to the constitutional rights of City of Chicago inhabitants, including Dexter, because City of Chicago knew that such reforms and training were necessary.

283.    As a direct and proximate result of City of Chicago's deliberate indifference to training and accountability, particularly in the context of unlawful seizures and use of excessive force, Dexter suffered injuries including but not limited, pain, suffering, fear, and mental anguish.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against Defendant City of Chicago, for compensatory damages, costs, interest, and other relief the Court deems fair and just.

## COUNT IX- Illinois Civil Rights Act, 740 ILCS 23/5
### *Against Defendant City of Chicago*

284.    Plaintiff incorporates the allegations set forth in all preceding paragraphs as though fully stated herein.

285.    This Count is against Defendant City of Chicago.

286.    At all relevant times, the City of Chicago and the CPD have known that CPD officers target Black men in the City of Chicago for unlawful, pretextual traffic stops.

287.    At all relevant times, the City of Chicago and the CPD have known that CPD officers target Black men in the City of Chicago for unlawful, excessive and escalatory force, including but not limiting gun pointing.

288.    Despite having full knowledge of these violations, the City of Chicago and the CPD have intentionally failed to take measures reasonably calculated to end or mitigated the harm Black men in Chicago face from unlawful traffic stops and unreasonable uses of force.

289.    As a direct and proximate result of the City of Chicago and the CPD's failure to take appropriate corrective steps, Dexter suffered the violations of his rights further detailed above.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against Defendant City of Chicago, for compensatory damages, costs, interest, and other relief the Court deems fair and just.

## COUNT X – Willful & Wanton Conduct – Survival Action
### Defendants Chicago Police Department Officers
### Giampapa, Pacheco, Spanos, Saint Louis, and Webb

290.    Plaintiff incorporates the allegations set forth in all preceding paragraphs as though fully stated herein.

291.    At all relevant times, Chicago Police Department Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb, and each of them, owed Dexter a duty to refrain from willful and wanton acts and omissions that could cause foreseeable harm.

292.    Chicago Police Officers Department Giampapa, Pacheco, Spanos, Saint Louis, and Webb, and each of them created a hostile, chaotic and threatening situation through their course of conduct that showed utter indifference to or conscious disregard for Dexter's safety through acts and/or omissions including but not limited to, violations of CPD policies, executing an unlawful traffic stop, stopped Dexter's vehicle when there was no reasonable suspicion or probable cause to believe a traffic violation or other crime has been committed, restricting the movement of Dexter's vehicle by angling the unmarked police SUV so to box Dexter in between the curb and a parked vehicle, failing to identify themselves as police officers, failing to provide warnings, surrounding Dexter's while inside his vehicle, drawing and pointing their guns at Dexter while trapped inside his vehicle, with his driver's side window down, causing Dexter to become confused, anxious, and fearful for his own safety and protection.

293.    Chicago Police Department Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb, and each of them created a hostile, chaotic and threatening situation through their course of conduct from which it was reasonably foreseeable Dexter would fell an imminent threat of death or great bodily harm and act to protect himself from such threat.

294.    At all relevant times, Chicago Police Department Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb, and each of them, owed Dexter a duty to refrain from wanton and willful acts and omissions.

295.    At all times relevant, Chicago Police Department Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb, and each of them, engaged in a course of conduct that showed an actual or deliberate intention to cause harm to and/or an utter indifference or conscious disregard for the safety of Dexter, and others.

296.    On March 21, 2024, Chicago Police Department Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb, and each of them, by acting in an intentional manner, willful and wanton manner, and/or with utter indifference and conscious disregard for Dexter's health and safety, breached their duty to Dexter in one or more of the following ways:

    a.    Pulling Dexter over without reasonable suspicion or probable cause to do so;

    b.    Trapping and otherwise restricting the movement of Dexter's vehicle;

    c.    Failing to announce themselves as police officers;

    d.    Failing to advise Dexter of the purpose for stopping and trapping his vehicle;

    e.    Failing to use the least amount of force needed;

    f.    Failing to provide warning prior to use of force;

    g.    Failing to exercise persuasion prior to use of force;

    h.    Failing to provide advise prior to use of force;

    i.    Failing to determine whether he or she may be able to stabilize the situation through the use of time, distance or positioning to isolate and contain;

    j.    Failing to intervene to stop the unlawful seizure;

    k.    Failing to assess and reassess the situation appropriately;

    l.    Failing to intervene to stop the use of excessive force

    m.    Pointing his or her service weapon at Dexter when there was no threat of imminent harm;

    n.    Surrounding Dexter's vehicle with service weapons drawn when there was no threat of imminent harm;

    o.    Failing to implement and adhere to the use of force continuum consistent with that used by law enforcement agencies in Illinois;

p. Failing to implement de-escalation techniques to prevent or reduce the need for force against Dexter where such techniques would have been effective;

q. Failing to establish a zone of safety;

r. Failing to stabilize the situation through the use of time, distance, or positioning;

s. Failing to take any measures that would position himself or herself so that deadly force would not be necessary.

t. Threatening the use of deadly force when there was no threat of imminent harm;

u. Using deadly force when there was no threat of imminent harm;

v. Using deadly force when it was not necessary to protect against an imminent threat to life or to prevent great bodily harm to the member or another person;

w. Using deadly force as an initial measure rather than a last resort;

x. Using force in such a manner that violated the City of Chicago's policies;

y. Discharging a weapon in such a manner as to shoot Dexter in a way that violated Chicago Police Department Policies;

z. Failed to exercise the proper level of force that was warranted under the circumstances;

aa. Used excessive and inappropriate deadly force without justification;

bb. Failing to take appropriate measures prior to firing a weapon that would reduce or eliminate the need to use force;

cc. Handcuffed Dexter without first assessing his need for life-sustaining measures;

dd. Delayed in providing Dexter with life-sustaining measures;

ee. Failing to provide medical attention.

297. In doing so, Chicago Police Department Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb, and each of them, exhibited willful and wanton conduct that caused Dexter Antonio Reed's injuries, which include but are not limited to fear, anxiety, mental anguish, pain, suffering.

298. Plaintiff brings this action pursuant to the provisions of 755 ILCS 5/27-6, commonly known as the Illinois Survival Act.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against Chicago Police Department Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb, for compensatory damages, costs, interest, and other relief the Court deems fair and just.

### COUNT XI – Willful & Wanton Conduct – Wrongful Death
*Defendants Chicago Police Department Officers*
*Giampapa, Pacheco, Spanos, Saint Louis, and Webb*

299.     Plaintiff incorporates the allegations set forth in all preceding paragraphs as though fully stated herein.

300.     As a direct and proximate result of or more of the foregoing willful and wanton acts and/or omissions, Dexter Antonio Reed suffered injuries including, but not limited to, a bullet-punctured chest, which caused Dexter's untimely death on March 21, 2024.

301.     Dexter Antonio Reed is survived by his siblings, mother, father, and other family members.

302.     By reason of the death of Dexter Antonio Reed, his heirs have suffered pecuniary damages, including mental suffering, grief, loss of companionship, support, comfort, love, affection, protection and society of Decedent.

303.     Plaintiff, as Independent Administrator  of the Estate of Dexter Antonio Reed, Deceased, brings this action pursuant to the provisions of 740 ILCS 180/1, *et seq*., commonly known as the Illinois Wrongful Death Act.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against Chicago Police Department Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb, for compensatory and punitive damages, costs, interest, and other relief the Court deems fair and just.

### COUNT XII – Assault
*Defendants Chicago Police Department Officers*
*Giampapa, Pacheco, Spanos, Saint Louis, and Webb*

304.     Plaintiff incorporates the allegations set forth in all preceding paragraphs as though fully stated herein.

305.     In the manner described above, one or more of Chicago Police Department Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb, and each of them, acting under color of law within the scope of their employment, engaged in offensive conduct, and thereby placed Dexter in fear of imminent threat to his life, safety, and security, without justification.

306.     These actions were undertaken intentionally, willfully and wantonly, or recklessly.

307.     The misconduct described in this Count was objectively unreasonable and was undertaken with intentional disregard of Dexter's rights.

308.     As a result of the misconduct of one or more of Chicago Police Department Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb, and each of them, Dexter suffered pain and injury, including emotional anguish, fear, anxiety, disfigurement, and loss of life and liberty.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against Chicago Police Department Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb, for compensatory and punitive damages, costs, interest, and other relief the Court deems fair and just.

## COUNT XIII – Battery
### *Defendants Chicago Police Department Officers Giampapa, Pacheco, Spanos, Webb*

309.     Plaintiff incorporates the allegations set forth in all preceding paragraphs as though fully stated herein.

310.     In the manner described above, Chicago Police Department Officers Giampapa, Pacheco, and Spanos, acting under color of law within the scope of their employment, engaged in offensive physical contact, made without the consent of Dexter, when one or more of them shot at Dexter after he exited his vehicle, unarmed, and with his hands empty.

311.     In the manner described above, one or more of Chicago Police Department Officers Pacheco and Spanos, and each of them, acting under color of law within the scope of their

76

employment, engaged in offensive physical contact, made without the consent of Dexter, when one or more shot Dexter while he lay on the ground, motionless, unarmed, and without justification.

312.    In the manner described above, one or more of Chicago Police Department Officers Giampapa and Webb, and each of them, acting under color of law within the scope of their employment, engaged in offensive physical contact, made without the consent of Dexter, when one or more of handcuffed Dexter while he lay on the ground, and without justification.

313.    These actions were undertaken intentionally, willfully and wantonly, or recklessly.

314.    The misconduct described in this Count was objectively unreasonable and was undertaken with intentional disregard of Dexter's rights.

315.    As a result of the misconduct of one or more of Chicago Police Department Officers Giampapa, Pacheco, Spanos, and Webb, and each of them, Dexter suffered pain and injury, including emotional anguish, fear, anxiety, disfigurement, and loss of life and liberty.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against Chicago Police Officers Giampapa, Pacheco, Spanos, and Webb, for compensatory and punitive damages, costs, interest, and other relief the Court deems fair and just.

### COUNT XIV – *Respondeat Superior*
### *Against Defendant City of Chicago*

316.    Plaintiff incorporates the allegations set forth in all preceding paragraphs as though fully stated herein.

317.    At all times relevant, City of Chicago is the employer of Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb and each of them.

318.    At all times relevant, Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb, and each of them, were acting in the course and scope of his or her employment by City of Chicago  and acting under the color of law.

319.    City of Chicago is vicariously liable for the acts and omissions of Chicago Police Department Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb, and each of them.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against City of Chicago Chicago, for compensatory damages, costs, interest, and other relief the Court deems fair and just.

<u>**COUNT XV – Indemnification**</u>
*Defendant City of Chicago*

320.    Plaintiff incorporates the allegations set forth in all preceding paragraphs as though fully stated herein.

321.    At all times relevant, City of Chicago is the employer of Chicago Police Department Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb, and each of them.

322.    At all times relevant, Chicago Police Department Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb and each of them, were acting in the course and scope of his or her employment by the City of Chicago  and acting under the color of law.

323.    Pursuant to 745 ILCS 10/9-102, City Of Chicago is liable for any judgment for compensatory damages, attorneys' fees, and costs for the acts and omissions of Chicago Police Department Officers Giampapa, Pacheco, Spanos, Saint Louis, and Webb, and each of them.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against City of Chicago, for compensatory damages, costs, interest, and other relief the Court deems fair and just.

## COUNT XVI – Americans With Disabilities Act (ADA), 42 U.S.C. § 12131
### Defendant City of Chicago for Wrongful Seizure of Dexter Reed

324.    The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

325.    This Count XVI is alleged against Defendant City of Chicago.

326.    Dexter Reed was a qualified person with a disability because he lived with a mental illness, namely PTSD, that affected one or more major life activities.

327.    Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

328.    The regulations implementing Title II of the ADA provide that:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

> 28 C.F.R. § 35.130(b)(7).

329.    The City of Chicago through its agents Defendant Officers discriminated against Dexter Reed when they violently detained him at gun point as fully detailed above, and when the CPD failed to adequately train CPD officers regarding how to respond to traffic stops involving communities and people that live with heightened levels of post-traumatic stress disorder.

330.    But for his disability, CPD would not have excluded Dexter from constitutional policing, and wrongfully seized him in a manner that was violent and in violation of Title II of the ADA.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against City of Chicago, for compensatory damages, costs, interest, and other relief the Court deems fair and just.

### COUNT XVII – Americans With Disabilities Act (ADA), 42 U.S.C. § 12131 Against
### *Defendant City of Chicago for Failing to Accommodate Dexter Reed's*
### *Disability During the Traffic Stop*

331. The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

332. This Count XVII is alleged against Defendant City of Chicago.

333. Dexter Reed was a qualified person with a disability because he lived with a mental illness, namely PTSD, that affected one or more major life activities.

334. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

335. The regulations implementing Title II of the ADA provide that:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

> 28 C.F.R. § 35.130(b)(7).

336. The City of Chicago and the Chicago Police Department Officers discriminated against Dexter Reed by engaging in escalating and unconstitutional police practices when they pointed their guns at Dexter Reed, when they continued to fire their guns at Dexter after he exited the car with his hands up and empty, and when the CPD failed to adequately train CPD officers

regarding how to respond to traffic stops involving communities and people that live with heightened levels of post-traumatic stress disorder.

337.    CPD officers' conduct immediately upon stopping Dexter Reed escalated the circumstances of the detention in violation of the ADA. Officer's should have modified their practices to accommodate Dexter Reed's disability and did not do so in violation of Title II of the ADA.

Wherefore, Plaintiff, Nicole Banks, as Independent Administrator of the Estate of Dexter Antonio Reed, Deceased, prays for judgment against City of Chicago, for compensatory damages, costs, interest, and other relief the Court deems fair and just.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all claims herein.

Dated:  April 24, 2024

By: /s/ Andrew M. Stroth_____
  One of the Attorneys for Plaintiff

Andrew M. Stroth, #6276013
ACTION INJURY LAW GROUP, LLC
191 North Wacker Drive, Suite 2300
Chicago, Illinois 60606
Tel: (844) 878-4529
Fax: (312) 641-6866
astroth@actioninjurylawgroup.com

By: /s/ Steven A. Hart_____ One of
the Attorneys for Plaintiff

Steven A. Hart, #6211008
Bradley Kupiec #6346100
HART McLAUGHLIN & ELDRIDGE, LLC
One South Dearborn, Suite 1400
Chicago, Illinois 60603
Tel: (312) 955-0545
Fax: (312) 971-9243
shart@hmelegal.com
bkupiec@hmelegal.com

By: /s/ Sheila A. Bedi
One of the Attorneys for Plaintiff

Sheila A. Bedi #6314970
Kara C. Crutcher
COMMUNITY JUSTICE AND CIVIL RIGHTS
CLINIC Northwestern Pritzker School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
Tel: (312) 503-2492
sheila.bedi@law.northwestern.edu