**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NICOLE BANKS, as Independent | ) | |
| Administrator of the Estate of DEXTER | ) | |
| ANTONIO REED, Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, a municipal | ) | Case No. 24 cv 3271 |
| Corporation, CHICAGO POLICE | ) | |
| DEPARTMENT OFFICERS | ) | Jury Trial Demanded |
| ALEXANDRA GIAMPAPA (Star 13853), | ) | |
| THOMAS SPANOS (Star 3110), VICTOR | ) | The Honorable Jeffrey I Cummings |
| PACHECO (Star 18337), GREGORY | ) | |
| SAINT LOUIS (Star 5153), and | ) | |
| AUBREY WEBB (Star 5105), | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT OFFICERS' 12(b)(6) MOTION TO DISMISS

NOW COMES, Defendants, CHICAGO POLICE DEPARTMENT OFFICERS ALEXANDRA GIAMPAPA (Star 13853), THOMAS SPANOS (Star 3110), VICTOR PACHECO (Star 18337), GREGORY SAINT LOUIS (Star 5153), and AUBREY WEBB (Star 5105), (collectively "Defendant Officers"), by and through their undersigned counsel, BORKAN & SCAHILL, LTD., and for their Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), state as follows:

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ........................................................................................................ 1

PERTINENT ALLEGATIONS AND EVIDENCE FROM BODY WORN CAMERA ... 2

ARGUMENT ............................................................................................................... 6

    I.    This Court May Consider Body Warn Camera And Other Materials Incorporated By Plaintiff As Part Of The Pleadings. ............................... 6

    II.    Plaintiff's Claims For An Unlawful Seizure Are Fatally Defective. ...... 8

        A.  Count I Is Barred By Evidence Of Dark Tinted Windows On Reed's Vehicle. .............................................................................. 9

        B.  In The Alternative, Defendant Officers Are Entitled To Qualified Immunity. ......................................................................... 12

    III.    Claims Based On The "Pointing" Of Firearms At Reed Are Defective. ........... 14

        A.  The Officers' Brief Pointing Of Firearms During This Dangerous Uncontrolled Traffic Stop With A Noncompliant Individual Was Clearly Constitutional. ............................................ 14

        B.  Defendant Officers Are Entitled To Qualified Immunity. ............ 20

    IV.    Plaintiff's Denial of Medical Care Claim Is Legally Defective. ........... 21

        A.  Defendant Officers Reasonably Summoned Medical Care for Reed. ......... 21

    V.    Plaintiff's State Law Claims Fail. .................................................. 24

CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

## Authority from the Supreme Court of the United States

*Anderson v. Creighton*,
    483 U.S. 635 (1987) ...................................................................................................... 13, 21

*Ashcroft v. al-Kidd*,
    131 S. Ct. 2074 (2011) ............................................................................................................ 12

*City & Cnty. of San Francisco, Cal. v. Sheehan*,
    575 U.S. 600 (2015) ........................................................................................................... 16-17

*Graham v. Connor*,
    490 U.S. 386 (1989) ................................................................................................... 15, 16, 17

*Hunter v. Bryant*,
    502 U.S. 224 (1991) ............................................................................................................... 12

*Kisela v. Hughes*,
    138 S. Ct. 1148 (2018) ............................................................................................... 13, 16, 21

*Md. v. Wilson*,
    519 U.S. 408 (1997) ......................................................................................................... 17, 18

*Mich. v. Long*,
    463 U.S. 1032 (1983) ....................................................................................................... 17, 18

*Pearson v. Callahan*,
    555 U.S. 223 (2009) ............................................................................................................... 12

*Penn. v. Mimms*,
    434 U.S. 106 (1977) ......................................................................................................... 17, 18

*Plumhoff v. Rickard*,
    134 S. Ct. 2012 (2014) .......................................................................................................... 16

*Saucier v. Katz*,
    553 U.S. 194 (2001) ............................................................................................................... 13

*Scott v. Harris*,
    550 U.S. 372 (2007) ...................................................................................................... 12, 15-16

*Terry v. Ohio*,
    392 U.S. 1 (1968) ..................................................................................................................... 9

*White v. Pauly*,
    137 S. Ct. 548 (2017) ............................................................................................................. 13

*Whren v. United States,*
    517 U.S. 806 (1996)...................................................................................................9

**Authority from the Circuit Courts of the United States**

*Alvarez v. England,*
    78 Fed. Appx. 313 (5th Cir. 2003) .......................................................................18

*Baird v. Renbarger,*
    576 F.3d 340 (7th Cir. 2009)...............................................................................17

*Bell v. Irwin,*
    321 F.3d 637, 639 (7th Cir. 2003) ......................................................................15

*Bogie v. Rosenberg,*
    705 F.3d 603 (7th Cir. 2013)...............................................................................7

*Brant v. Volkert,*
    72 Fed. Appx. 463 (7th Cir. 2003).......................................................................13

*Brownmark Films, LLC v. Comedy Partners, LLC,*
    682 F.3d 687 (7th Cir. 2012)...............................................................................7

*Burton v. City of Zion,*
    901 F.3d 772 (7th Cir. 2018)...............................................................................16

*Chase v. Nelson,*
    39 Ill. App. 53 (2d Dist. 1980)............................................................................24

*Citadel Grp. Ltd. v. Wash. Reg. Med. Ctr.,*
    692 F.3d 580 (7th Cir. 2012)...............................................................................7

*DeLuna v. City of Rockford, Ill.,*
    447 F.3d 1008 (7th Cir. 2006).............................................................................24

*Dockery v. Blackburn,*
    2018 WL 6629426 (7th Cir. 2018).......................................................................13

*Doe v. Purdue Univ.,*
    928 F.3d 652 (7th Cir. 2019)...............................................................................13

*Donovan v. City of Milwaukee,*
    17 F.3d 944 (7th Cir. 1994)................................................................................13

*Eversole v. Steele,*
    59 F.3d 710 (7th Cir. 1995)................................................................................12

*Florek v. Vill. of Mundelein,*
    649 F.3d 594 (7th Cir. 2011)...............................................................................21

*Hamilton v. O'Leary,*
    976 F.2d 341 (7th Cir. 1992) ............................................................................... 7

*Horton v. Pobjecky,*
    883 F.3d 941 (7th Cir. 2018) ....................................................... 7-8, 15-16, 21

*Jacobs v. City of Chic.,*
    215 F.3d 758 (7th Cir. 2000) ............................................................................. 20

*Johnson v. Rogers,*
    944 F.3d 966 (7th Cir. 2019) ............................................................................. 21

*King v. Hendricks Cnty. Comm'rs,*
    954 F.3d 981 (7th Cir. 2020) ............................................................................. 16

*Landstrom v. Ill. Dep't of Child. and Family Servs.,*
    892 F.2d 670 (7th Cir. 1990) ............................................................................. 13

*Maltby v. Winston,*
    36 F.3d 548 (7th Cir. 1994) ......................................................................... 13, 21

*McDonald v. Haskins,*
    966 F.2d 292 (7th Cir. 1992) ............................................................................. 20

*Ortiz v. City of Chic.,*
    656 F.3d 523 (7th Cir. 2011) ......................................................................... 21, 22

*Rice v. Burks,*
    999 F.2d 1172 (7th Cir. 1993) ........................................................................... 13

*Sallenger v. City of Springfield, Ill.,*
    630 F.3d 499 (7th Cir. 2010) ......................................................................... 21, 22

*Siler v. City of Kenosha,*
    957 F.3d 751 (7th Cir. 2020) ............................................................................. 16

*Sinn v. Lemmon,*
    911 F.3d 412 (7th Cir. 2018) ............................................................................. 12

*Spiegel v. Cortese,*
    196 F.3d 717 (7th Cir. 1999) ............................................................................. 12

*Tatum v. City & Cnty. of San Francisco,*
    441 F.3d 1090 (9th Cir. 2006) ...................................................................... 22-23

*Thompson v. Mercer,*
    762 F.3d 433 (5th Cir. 2014) ............................................................................. 16

*United States v. Avila,*
    2024 WL 3334954 (7th Cir. 2024) .................................................................. 8

*United States v. Beauchamp,*
    2022 WL 964010 (4th Cir. 2022) ................................................................. 10

*United States v. Booker,*
    579 F.3d 835 (7th Cir. 2009) .......................................................................... 9

*United States. v. Cashman,*
    216 F.3d 582 (7th Cir. 2000) .......................................................................... 9

*United States v. Chang,*
    999 F.3d 1059 (7th Cir. 2021) ........................................................................ 8

*United States v. Cole,*
    21 F.4th 421 (7th Cir. 2021) ........................................................................... 9

*United States v. Davis,*
    2023 WL 4575978 (7th Cir. 2023) ......................................................... 8-9, 10

*United States v. Edwards,*
    769 F.3d 509 (7th Cir. 2014) ...................................................................18, 19

*United States v. Grogg,*
    534 F.3d 807 (7th Cir. 2008) .......................................................................... 9

*United States v. Harrell,*
    268 F.3d 141 (2d Cir. 2001) ......................................................................... 10

*United States v. Hernandez-Rivas,*
    513 F.3d 753 (7th Cir. 2008) .......................................................................... 9

*United States v. Hicks,*
    531 F.3d 555 (7th Cir. 2008) .......................................................................... 9

*United States v. Jackson,*
    558 F. App'x 932 (11th Cir. 2014) ............................................................... 11

*United States v. Ocampo,*
    890 F.2d 1363 (7th Cir. 1989) ................................................................17, 19

*United States v. Palmer,*
    820 F.3d 640 (4th Cir. 2016) .................................................................. 10-11

*United States v. Simon,*
    937 F.3d 820 (7th Cir. 2019) .......................................................................... 9

*United States v. Stanfield,*
  109 F.3d 976 (4th Cir. 1997) ...................................................................................... 18

*United States v. Terrell,*
  483 Fed. Appx. 161 (6th Cir. 2012) .......................................................................... 10

*United States v. Weaver,*
  145 F. App'x 639 (11th Cir. 2005) ............................................................................ 11

*Weinmann v. McClone,*
  787 F.3d 444 (7th Cir. 2015) ..................................................................................... 16

*Williams v. Brooks,*
  809 F.3d 936 (7th Cir. 2016) ..................................................................................... 16

*Williams v. Ind. State Police Dep't,*
  797 F.3d 468 (7th Cir. 2015). .................................................................................... 16

*Wilkins v. May,*
  872 F.2d 190 (7th Cir. 1989) ............................................................................... 17, 20

*Ybarra v. City of Chic.,*
  946 F.3d 975 (7th Cir. 2020) ..................................................................................... 24

**Authority from the District Courts of the United States**

*Abdullah v. Lepinski,*
  2023 WL 5515895 (D. Minn. 2023) ............................................................................ 8

*Alcorn v. City of Chic.,*
  631 F. Supp. 3d 534 (N.D. Ill. 2022) ........................................................................ 24

*Allen v. City of Chic.,*
  2019 WL 3003025 (N.D. Ill. 2019) ........................................................................... 24

*Artman v. Gualandri,*
  2021 WL 2254961 (N.D. Ill. 2021) ........................................................................... 25

*Bautista v. City of Glendale,*
  2020 WL 982021 (C.D. Cal. 2020) ............................................................................ 14

*Burdette v. Foote,*
  2020 WL 419394 (N.D. Ind. 2020) ............................................................. 10, 18, 19

*Cuautle v. Tone,*
  851 F. Supp. 1236 (C.D. Ill. 1994) ........................................................................... 10

*Damiani for Estate of Damiani v. Allen,*
  2018 WL 4095080 (S.D. Ind., 2018) ......................................................................... 22

*Dukes v. Freeport Health Network Mem'l Hosp.*,
2022 WL 1085208 (N.D. Ill. 2022) ..................................................................22, 23

*Esco v. City of Chic.*,
651 F. Supp. 3d 917 (N.D. Ill. 2023) .................................................................7, 16

*Flerlage v. Vill. of Oswego*,
2017 WL 5903819 (N.D. Ill., 2017) ..........................................................................22

*Fletcher v. Bogucki, et al.*,
2021 WL 4477968 (N.D. Ill. 2021) ..........................................................................25

*Flowers v. Rustand*,
2012 WL 4567596 (E.D.N.Y. 2012) ..................................................................11, 13

*Gass v. Murphy*,
2013 WL 5488712 (M.D. Pa. 2013) ..........................................................................11

*Gray v. City of Evanston*,
2024 WL 3495009 (N.D. Ill. 2024) ..........................................................................17

*Henderson v. Rangel*,
2020 WL 5642943 (N.D. Ill. 2020) ............................................................................8

*Horton v. Pobjecky*,
2017 WL 5899694 (N.D. Ill 2017) ....................................................................21-22

*Howard v. Ealing*,
876 F. Supp. 2d 1056 (N.D. Ind. 2012) ..............................................................19-20

*Hyung Seok Koh v. Graf*,
2013 WL 5348326 (N.D. Ill. 2013) ........................................................................7, 8

*Jenkins v. United States*,
2020 WL 6940825 (S.D. Ill. 2020) ............................................................................10

*Johnson v. Edwards*,
2024 WL 1116081 (N.D. Ill. 2024) ..........................................................................22

*Johnson v. Israel*,
576 F. Supp. 3d 1231 (S.D. Fla 2021) ..............................................................10, 11-12

*Jordan v. Hynek*,
2022 WL 857030 (N.D. Ind. 2022) ..........................................................................10

*Kudla v. City of Hammond*,
2022 WL 2171229 (N.D. Ind. 2022) ..........................................................................22

*Lampkins v. Jones,*
    2014 WL 12621565 (N.D. Ill. 2014)...........................................................24

*Luczynski v. City of Chic.,*
    2024 WL 310610 (N.D. Ill. 2024) ........................................................7, 16

*Lyles v. Conner,*
    2010 WL 11628790 (E.D. Tex. 2010) ...............................................11, 14

*Manuel v. City of Elkhart,*
    2017 WL 784275 (N.D. Ind. 2017)..........................................................24

*Mendez v. City of Chic.,*
    2022 WL 4466235 (N.D. Ill. 2022) .........................................................15

*Miller v. Lewis,*
    381 F. Supp. 2d 773 (N.D. Ill. 2005) ......................................................19

*O'Brien v. City of Chic.,*
    2023 WL 3947940 (N.D. Ill. 2023) .........................................................19

*Pryor v. Corrigan,*
    2023 WL 1100436 (N.D. Ill. 2023) ...........................................................9

*Seay v. City of Indianapolis,*
    2020 WL 6710799 (S.D. Ind. 2020) .........................................................22

*Shahit v. Tosqui,*
    2005 WL 1345413 (E.D. Mich. 2005) ...............................................11, 14

*United States v. Avila,*
    615 F. Supp. 3d 846 (N.D. Ill. 2022) ......................................................17

*United States v. Edwards,*
    369 F. Supp. 3d 856 (N.D. Ill. 2019) ...............................................17-18, 19

*United States v. Gooch,*
    915 F. Supp. 2d 690 (W.D. Pa. 2012) .....................................................11

*United States v. Johnson,*
    2022 WL 102277 (E.D. Wis. 2022).........................................................10

*United States v. Sanders,*
    2018 WL 3968945 (N.D. Ind. 2018) ......................................................10

*Vu v. Tolvstad,*
    2023 WL 8185517 (N.D. Ill. 2023) ...........................................................9

*Walters v. Nystuen*,
 2023 WL 4541956 (N.D. Ind. 2023) ..................................................................... 18

*Williams v. Seltzner*,
 2024 WL 127020 (W.D. Wis. 2024) ...................................................................... 19

*Williams v. Vill. of Maywood*,
 2016 WL 4765707 (N.D. Ill. 2016) ........................................................................ 24

*Williams v. Wisc. Lock & Load Prisoner Transp., LLC*,
 2016 WL 4124292 (N.D. Ill. 2016) ........................................................................ 25

## Authority from the Illinois Appellate Courts

*Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dir.*,
 2012 IL 112479 (2012) ........................................................................................... 25

*Krywin v. Chic. Tran. Auth.*,
 238 Ill.2d 215 (2010) ............................................................................................. 25

## Statutes & Rules

625 ILCS 5/12-503 ................................................................................................. 9-10

720 ILCS 5/7-5 ........................................................................................................ 24

740 ILCS 180/1 ....................................................................................................... 24

745 ILCS 10/2-202 .................................................................................................. 24

Fed. R. Civ. P. 12(b)(6) ..................................................................................... *Passim*

## **INTRODUCTION**

On March 21, 2024, Plaintiff's decedent, Dexter Reed ("Reed"), unleashed a hail of gunfire with an illegally possessed firearm at several Chicago Police Officers who had conducted a traffic stop of his vehicle.[1] While Reed's violent attack on these officers was quickly ended due to the swift reaction of these officers, one of the officers, Gregory Saint Louis, was severely injured from a gunshot wound during the incident and had his forearm shattered.[2] Reed's gunfire on officers prompted an appropriate response. Several of the officers returned fire in self-defense and defense of their fellow officers, ending Reed's attack on them but fatally wounding Reed. The entirety of this incident was captured on Defendant Officers' Body Worn Cameras ("BWC"). *See* Ex. 1-5.

Plaintiff at this stage of its pleading does not assert claims based on the shooting *per se* (*see* Dckt. No. 35 at fn. 25), but instead seeks to proceed on the alleged illegality of the initial stop of Reed's vehicle, the officers' pre-shooting "pointing" of firearms at Reed, the alleged "denial" of medical care to Reed subsequent to the shooting, as well as several related state law claims for wrongful death, assault and battery, and willful and wanton conduct. Dckt. No.35 at Cts. I-III, VIII-XI. These

---

[1] In a rather felicitous omission from such a lengthy complaint on a well-publicized incident, Plaintiff omits any reference from the body of the Amended Complaint to the fact that Reed fired on the officers, that he was in possession of an illegal gun, or that he did anything untoward during the incident. The references to Reed's own violent conduct are, instead, buried in footnoted references to third party sources. *See* Dckt. No. 35 at fn. 23 (citing https://news.wttw.com/2024/04/09/copa-chief-raises-concerns-about-why-police-pulled-over-dexter-reed-deadly-shooting ("COPA officials said preliminary evidence appeared to confirm that Reed fired on police first after they repeatedly ordered him to roll down his windows and unlock his vehicle's doors. Four of the officers on scene then returned fire, with dozens of shots fired in a matter of seconds.")); *id.* at fn. 25 (citing https://www.axios.com/local/chicago/2024/04/09/dexter-reed-shooting-investigation-police-video ("[P]reliminary evidence from the videos suggests Reed shot first and hit an officer.") and https://pantagraph.com/news/local/chicago-mayor-holds-press-conference-on-dexter-reed-shooting/video_a26df798-2e2a-500e-bd4d-67b20fdda102.html)); *id.* at fn. 26; *id.* at fn. 28. These facts can nonetheless be considered for the purposes of this Motion.

[2] Plaintiff's allegation that this officer was merely "grazed" by a bullet (*see* Dckt. No. 35 at ¶56), while not germane to the viability of any of the claims here, is blatantly contradicted by the same evidence Plaintiff references in the Complaint. The BWC of this incident shows Officer Saint Louis' arm dangling loosely at an unnaturally grotesque 45-degree angle as a result of the bullet ripping through his arm and shattering his wrist/forearm bones in the process. *See* Spanos BWC, attached as Ex. 3 at 02:31-02:40.

claims are either deficient on their face or demonstrably false based upon the BWC incorporated within the Amended Complaint. In sum:

1.  The allegation that a traffic stop is pretextual does not state a colorable claim for unconstitutional conduct under §1983; subjective motivations play no role in whether a seizure is constitutional. And the Amended Complaint and the matters incorporated by reference therein clearly show that the officers were objectively justified in making the stop based, at minimum, on Reed's dark tinted windows.

2.  Plaintiff claims that the officers "pointing" their weapons at Reed and giving him verbal instructions was unreasonable and somehow unconstitutional. However, the officers acted reasonably in drawing their weapons because uncontrolled traffic stops like this are recognized by the Supreme Court as some of the most dangerous situations police encounter and are made more so by noncompliant, evasive behavior by suspects and attempts to obscure the interior of a vehicle from view such as Reed did here.

3.  Plaintiff's claim of a failure to render medical care is not a viable constitutional claim. All that the Constitution requires is that police officers summon medical care in a reasonably prompt fashion which, again, the BWC indicates was done within *seconds* of the shooting. The law also does not require police officers to directly render aid to anyone much less place themselves in peril in order to do so. However, even that was done by officers within minutes.

4.  Plaintiff's supplemental state law claims either are not cognizable in the first place or are fatally defective for the same reasons as his constitutional claims.

Plaintiff's Complaint must be dismissed with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

## <u>PERTINENT ALLEGATIONS AND EVIDENCE FROM BODY WORN CAMERA</u>

On March 21, 2024, at approximately 6:00 p.m., Reed was driving a white vehicle in the Humbolt Park area of Chicago. Dckt. 35 at ¶29. The vehicle had observably dark tinted windows. *Id.* at pp. 10, 13, 15, 19 (photographs of the vehicle), ¶37, fn. 23 (discussing the dark tints on Reed's windows)(citing https://news.wttw.com/2024/04/09/copa-chief-raises-concerns-about-why-police-pulled-over-dexter-reed-deadly-shooting). The weather was clear and it was still daylight. *Id.* at ¶29.

Defendant Officers Giampapa, Spanos, Pacheco, Saint Louis, and Webb were working as plain clothes officers. *See Id.* at pp. 13, 14, 15; Giampapa BWC, attached as Ex. 1 at 1:38-1:42, 1:48-2:02, 2:44-3:02, 3:30-3:54, 5:05-8:01; Pacheco BWC, attached as Ex. 2 at 1:26, 5:17-5:20, 6:00-8:03; Ex. 3, at 0:00-0:10; Webb BWC, attached as Ex. 4 at 1:41-1:43, 2:40-2:50, 3:04, 3:49-3:54, 5:14-5:20. Each

officer was wearing items which identified them as police officers, including bullet proof vests and jackets which said "POLICE" and were emblazoned with each officer's police badge, star numbers, and names on the front of their person. *See* Dckt. 35 at pp. 13, 14, 15; Ex. 1 at 1:38-1:42, 1:48-2:02, 2:44-3:02, 3:30-3:54, 5:05-8:01; Ex. 2 at 1:26, 5:17-5:20, 6:00-8:03; Ex. 3 at 0:00-0:10; Ex. 4 at 1:41-1:43, 2:40-2:50, 3:04, 3:49-3:54, 5:14-5:20. Each officer was wearing operable BWCs. Dckt. 35 at ¶¶41, 91; *see also* Ex. 1-4; Saint Louis BWC, attached as Ex. 5. Each Officer activated their BWC on exiting the police vehicle and this captured both audio and video. Dckt. 35 at ¶¶41, 91; *see also* Ex. 1-5.

The Defendant Officers curbed Reed's car for a traffic stop. Dckt. 35 at ¶¶33, 34. Once Reed's vehicle was stopped, initially only Officer Giampapa and Saint Louis exited the police vehicle. Ex. 1 at 1:10-1:11; Ex. 2 at 1:10-1:27; Ex. 3 at 1:10-1:19; Ex. 4 at 1:05-1:35; Ex. 5 at 1:08-1:15; Dckt. 35 at ¶39. When Officer Giampapa exited, she approached the driver's side door of Reed's vehicle. Dckt. 35 at ¶39. Officer Saint Louis approached the passenger side. Ex. 1 at 1:23; Ex. 3 at 1:31; Ex. 5 at 1:01-1:15; Dckt. 35 at ¶45. Neither Officer Giampapa nor Officer Saint Louis had their gun drawn when they initially approached Reed's vehicle. Ex. 1 at 1:28; Ex. 5 at 1:01-1:35; Dckt. 35 at ¶¶42, 45. Officer Saint Louis approached with an extended baton. Dckt. 35 at ¶45; Ex. 5 at 1:30-1:35. As Officers Giampapa and Saint Louis initially approached the vehicle, Reed's dark tinted windows were rolled up obscuring a view of the interior of the vehicle. Ex. 1 at 01:11; *see also* Dckt. 35 at ¶40.

Officer Giampapa instructed Reed to roll his windows down. Ex. 1 at 1:12; Dckt. 35 at ¶40. She instructed him twice, and Officer Saint Louis verbally instructed him once before Reed started to roll down his driver side window. Ex. 1 at 1:12-1:17; Dckt. 35 at ¶¶40, 41. Reed initially rolled his driver's side window down all the way. Dckt. 35 at ¶40. Reed was then observed to be wearing a black hooded mask, partially obscuring his face. *Id.* at p. 12. As Officer Giampapa started to walk toward the door, she instructed Reed to "roll that one down too," gesturing towards the front passenger side

window. Ex. 1 at 1:18-1:22; Ex. 3 at 1:22; Dckt. 35 at ¶41. Reed did the opposite and began to *roll up* the driver's side window obscuring the interior. Ex. 1 at 1:22-1:23; Dckt. 35 at ¶¶41, 42.

As Reed rolled the driver's window back up, Officer Giampapa tried to open the driver's door. Ex. 1 at 1:23-1:25; Ex. 2 at 1:24-1:25; Ex. 3 at 1:22-1:26; Dckt. 35 at ¶42. The door was locked. Ex. 1 at 1:23-1:28. She repeatedly instructed him "[D]on't roll the window up." *Id.* at 1:23-1:28; Dckt. 35 at ¶¶41, 42. Reed continued to roll up the window until another Officer instructed him not to roll it up. Ex.1 at 1:28-1:30; *see* Dckt. 35 at fn. 23 (interview at 1:20-1:25), ¶45. After Reed refused to roll down the passenger window, and started to roll the driver's window up again, Officer Giampapa unholstered her gun. Ex. 1 at 1:28; Dckt. 35 at ¶41. Officer Giampapa twice ordered Reed to "unlock the doors now." Ex. 1 at 1:30-1:35. Reed did not comply. *Id.*

Officers Webb, Spanos, and Pacheco then exited. Ex. 2 at 1:10-1:27; Ex. 3 at 1:10-1:19; Ex. 4 at 1:05-1:35. Officer Spanos raised his gun and instructed Reed to "put both hands up." Ex. 3 at 1:29-1:31; Dckt. 35 at ¶49. Officer Pacheco exited the police vehicle with his weapon unholstered in his hand and approached Reed's vehicle on the driver's side, his gun in his hand. Ex. 3 at 1:28-1:39. Officer Pacheco ordered Reed to "Do not f---g roll it up…Unlock the f---g door." Dckt. 35 at ¶47.

Officer Giampapa ordered Reed three times to "open the door now" as she stepped back away from the vehicle. Ex. 1 at 1:35-1:38. Reed again did not comply. *Id.* Officer Spanos asked "can you see both of his hands?" Ex. 3 at 1:37-1:39. Then, as Officer Giampapa ordered him the third time, to "open the door now," (Ex. 1 at 1:38-1:42), Reed fired a gun multiple times at the officers. Dckt. 35 at fn. 23 ("COPA officials said preliminary evidence appeared to confirm that Reed fired on police first after they repeatedly ordered him to roll down his windows and unlock his vehicle's doors", interview at 1:30-2:28, 6:30-6:38); Ex. 1 at 3:30-4:00, *see* Ex. 2 at 3:15-3:20, 3:52, 4:20-4:25; Ex. 3 1:40-1:42, 2:27-3:30; Ex. 4 at 2:40-2:43, 3:34-3:36; Ex. 5 at 1:25-1:42. Reed opened fire less than one minute after the officers approached his vehicle and within seconds of the officers drawing their guns. *See* Ex.

4

1 at 1:11-1:42. After Reed started to shoot at the officers, a series of gun shots proceeded for just under a minute. *See* Ex 1 at 1:38-2:21. From the time the officers first drew their weapons, to when Reed fired his first shot, less than 30 seconds elapsed. *See id.* at 1:20-1:42.

During the exchange of gunfire, Reed rammed his vehicle into a parked car on the side of the road, stopping with his right tire against the curb. Ex. 2 at 3:48-3:50; Ex. 3 2:02-2:10. After his vehicle stopped, Reed exited the vehicle in the small space between his vehicle and the officers' vehicle and proceeded to move quickly toward the officers on foot. *See* Ex. 1 at 2:25; Ex. 2 at 2:13-2:15; Ex. 3 at 2:16-2:18. Once behind his car, Reed fell to the ground and rolled to his stomach. Ex. 2 at 2:15-2:19, 3:48-3:50; Ex. 3 at 2:02-2:10, 2:18-2:21; Dckt. 35 at ¶71. As Reed was on the ground, Officer Giampapa yelled "Let me see your hands" twice and then used her police radio to request an ambulance. *Id.* at 2:20-2:34. She proceeded to order Reed to show his hands, as she approached him with her gun drawn and pointed at Reed. *Id.* at 2:34-2:41. Officer Giampapa called out to the other officers "who's got me?" *Id.* at 2:41-2:43. Officer Webb responded that he did, and Officer Giampapa continued to approach Reed, ordering "don't f…g move." Ex. 1 at 2:43-2:47; Ex. 4 at 2:43-2:47; Dckt. 35 at ¶72.

Officer Giampapa then stated, "he's still breathing," and holstered her weapon. Ex.1 at 3:03-3:09; Dckt. 35 at ¶72. Officer Webb yelled out "we need the ambulance here now" with his hand on his radio attached to his vest and then also holstered his weapon. Ex. 1 at 3:02-3:09; Ex. 4 at 3:02-3:09; Dckt. 35 at ¶72. With their weapons holstered, Officers Webb and Giampapa asked other officers to "watch us" and to confirm that they "got us" as they continued to approach Reed. Ex. 1 at 3:09-3:11; Ex. 4 at 3:09-3:11. Officer Pacheco confirmed that he was covering Officers Giampapa and Webb as they approached Reed. Ex. 1 at 3:09-3:15; Ex. 2 at 3:09-3:15; Ex. 4 at 3:09-3:15.

Reed was laying on the ground, with his back facing up. Ex. 1 at 2:41-3:30. His hands were obscured under his body. *Id.* Once it was confirmed that the officers had cover to approach Reed, Officer Giampapa and Webb continued in their approach in an attempt to secure Reed's weapon. *Id.*

at 3:09-3:11; Ex. 3 at 3:09-3:11; Ex. 4 at 3:09-3:11. Officer Giampapa ordered Reed "do not f---g move." Ex. 1 at 3:11-3:15; Dckt. 35 at ¶73. Officer Giampapa reached down to Reed, and started to search him. Ex. 1 at 3:15-3:20. She then instructed him repeatedly to "let go of the gun" as she tried to gain control of his hands. Ex. 1 at 3:20-3:28; Dckt. 35 at ¶73. The Officers were able to pull both hands out, and confirm he was no longer holding the gun. Dckt. 35 at ¶73. From the time the last shot was fired and the officers were able to confirm Reed was no longer armed, less than 90 seconds elapsed. *See* Ex. 1 at 2:22-3:30. Reed was then handcuffed. *Id.* at 3:28-3:30; Dckt. 35 at ¶¶73, 84, 75.

Other officers began to arrive. Ex. 1 at 3:32; Ex. 2 at 2:55-3:34; Ex. 4 at 3:32. Once Reed was searched by Officers Giampapa and Webb, other officers stepped in, while Officer Giampapa and Webb stepped back. Ex. 1 at 3:32; Ex. 2 at 2:55-3:34; Ex. 4 at 3:32. Less than 90 seconds after it was confirmed that Reed was no longer armed, a non-defendant officer confirm he was providing aid to Reed. Ex. 1 at 5:02. These responding officers asked for gloves and started to render aid to Reed, including chest compressions. *Id.* at 4:50-5:11; Ex. 2 5:24-5:39; Ex. 3 at 5:09-5:12; Dckt. 35 at ¶79. Dispatchers on the radio confirmed that an "ambulance has been called for the offender." Ex. 3 at 4:06 4:35. An ambulance arrived at the scene within several minutes. *Id.* at 7:33.

## ARGUMENT

### I. This Court May Consider Body Warn Camera And Other Materials Incorporated By Plaintiff As Part Of The Pleadings.

Defendants have attached the BWC from the Defendant Officers from the underlying incident and referenced other materials cited in the Amended Complaint. *See* Ex. 1-5. Plaintiff's Amended Complaint makes repeated references to incidents depicted on the BWC and on surveillance video as the bases for the claims made in this case. *See* Dckt. No. 35 at ¶¶33, 36 ("Surveillance camera footage reflects that Defendants lacked reasonable suspicion to suspect Dexter of any traffic violation. Defendant Officers had no legal justification to target, stop, and detain Dexter."), 37 ("After evaluating available video evidence regarding this traffic stop, Andrea Kersten, the Chief Administrator of the

Civilian Office of Police Accountability ("COPA") wrote to CPD Superintendent Snelling documenting concerns with the Defendant Officers' credibility and justification for stopping Dexter. Specifically, 'COPA is uncertain how the officers could have seen this seat belt violation given their location relative to (Reed's) vehicle and the dark tints on (his) vehicle windows."), 40, 41 ("Body camera footage suggests Dexter became flustered and, in an effort to comply with Defendant Officer Giampapa's commands, mistakenly partially rolled up the driver's side window instead of rolling down the vehicles' other windows…"), 42, 45, 49, 65, 91. Plaintiff also uses still frames from these video sources to bolster the central claims. *Id.* at ¶¶33, 40, 42, 45, 49, 65.

In considering a motion under Rule 12(b)(6), district courts are free to consider "'any facts set forth in the complaint that undermine the plaintiff's claim.'" *Hamilton v. O'Leary*, 976 F.2d 341, 343 (7th Cir. 1992). This includes documents referenced in the pleading if they are central to the claim. *See Citadel Grp. Ltd. v. Wash. Reg. Med. Ctr.*, 692 F.3d 580, 591 (7th Cir. 2012)("In deciding a motion to dismiss for failure to state a claim we may consider documents attached to or referenced in the pleading if they are central to the claim."); *Luczynski v. City of Chic.*, 2024 WL 310610, *2 (N.D. Ill. 2024)(considering BWC on motion to dismiss); *Esco v. City of Chic.*, 651 F. Supp. 3d 917, 922 (N.D. Ill. 2023)(considering BWC on motion to dismiss and dismissing claims based on footage); *Hyung Seok Koh v. Graf*, 2013 WL 5348326, *8 (N.D. Ill. 2013). When video of the relevant events is incorporated by reference into the complaint and are central to the claims, courts need not accept factual allegations as true if they are blatantly contradicted by the videos. *See Bogie v. Rosenberg*, 705 F.3d 603, 608-09 (7th Cir. 2013)(courts can consider video recordings referenced in complaint and central to claims; to the extent the video conflicts with the complaint, the video controls); *Brownmark Films, LLC v. Comedy Partners, LLC*, 682 F.3d 687, 690-91 (7th Cir. 2012)(stating it makes "eminently good sense" to extend the incorporation-by-reference doctrine to video); *Luczynski*, 2024 WL 310610, at *2 (consideration of BWC was proper on a motion under Rule 12(b)); *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir.

2018)("When video footage firmly settles a factual issue, there is no genuine dispute about it, and [courts] will not indulge stories clearly contradicted by the footage."); *Henderson v. Rangel*, 2020 WL 5642943 (N.D. Ill. 2020)(BWC was incorporated by reference into complaint); *Koh*, 2013 WL 5348326 at *9 (concluding "it is likely that the Supreme Court would likewise have considered the video had they heard the case at the motion-to-dismiss stage."); *Abdullah v. Lepinski*, 2023 WL 5515895, *1 (D. Minn. 2023)(considering BWC referenced in complaint was proper on a motion to dismiss). Here, it is proper for this Court to rely on the BWC attached in adjudicating this Motion because it has been repeatedly referenced and incorporated by Plaintiff in the Amended Complaint. Where BWC contradicts allegations in the Amended Complaint, the video controls for purposes of this Motion.

## II.  **Plaintiff's Claim For An Unlawful Seizure Is Fatally Defective.**

Count I is styled as a claim under the Fourth Amendment for "Unlawful, Pretextual Traffic Stop." *See* Dckt. No. 35 at Ct. I. To this end, Plaintiff's Amended Complaint contains a lengthy exposition about the alleged societal ills caused by "pretextual" traffic stops citing numerous policies, studies, graphs, pie charts, news articles, and other such related non-legal fare. *See id.* at ¶¶1, 5, 9-11, 25-29, 52, 90, 93, 99, 108, 110-111, 114, 115-116, 127, 134. None of this has any bearing on this claim because the analysis of a traffic stop under the Fourth Amendment is governed by an objective standard of reasonableness and not the subjective intent of police officers.[3]

---

[3] Plaintiff suggests that the Defendant Officers have claimed that the traffic stop was for a seat belt violation as opposed to tinted windows. *See* Dckt. No. 35 at ¶ 37. Plaintiff does not allege this is false but, rather, insinuates the officers could not have seen a seatbelt violation because of his dark tinted windows. *Id.* To be clear, Reed was observed not wearing a seat belt. Indeed, on the BWC, Reed's over the shoulder belt can be seen hanging vertically and not fastened over his body. *See* Ex. 1 at 01:22. However, given the resolution of the video and vantage points therein, it is difficult to conclusively see this through Reed's windows on the BWC as opposed to how it appeared to a naked eye. *See United States v. Avila*, 2024 WL 3334954, *7 (7th Cir. 2024)("Even though the still images of the officers' body camera footage suggest that the windows were opaque, the court reviewed this evidence and permissibly concluded that the video footage did not show everything the human eye could see."). Given the standard on this Motion, Defendants do not posit this as a basis for dismissal but reserve the right to do so at any later stage as necessary.

**A. Count I Is Barred By Evidence Of Dark Tinted Windows On Reed's Vehicle.**

There is no such thing as a claim for a "pretextual" traffic stop in violation of the Fourth Amendment because "[s]ubjective intentions play no role" in deciding the lawfulness of a stop under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *see also United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021)("We…do not consider Trooper Chapman's subjective motivations for deciding to conduct a traffic stop."); *United States v. Chang*, 999 F.3d 1059, 1066 (7th Cir. 2021)("[A] court need not delve into the subjective motivations of the officer who effectuated the detention."); *United States v. Davis*, 2023 WL 4575978, *3 (7th Cir. 2023)("The pertinent question is whether the traffic stop was objectively justified by facts known to the officers before stopping the car; nothing turns on their subjective motivation."); *Pryor v. Corrigan*, 2023 WL 1100436, *10 (N.D. Ill. 2023)(same).

Traffic stops do not require probable cause, only reasonable suspicion. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968); *United States v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008); *United States v. Booker*, 579 F.3d 835, 838 (7th Cir. 2009). Reasonable suspicion is evaluated under the totality of the circumstances. *United States v. Hicks*, 531 F.3d 555, 558 (7th Cir. 2008). "[T]he question is whether defendants had a reasonable basis to believe" some legal violation has occurred. *Vu v. Tolvstad*, 2023 WL 8185517, *3 (N.D. Ill. 2023); *United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019)("If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient basis to pull him over without violating the constitution."). A detention via a traffic stop can be for a minor traffic offense. *United States v. Hernandez-Rivas*, 513 F.3d 753, 758-59 (7th Cir. 2008)(stop permissible if officer "has an objectively reasonable basis to believe a traffic law has been violated…even a minor traffic offense."); *United States v. Cashman*, 216 F.3d 582, 596 (7th Cir. 2000)(same).

Under Illinois law, "[n]o window treatment or tinting shall be applied to the windows immediately adjacent to each side of the driver." 625 ILCS 5/12-503(a-5). The law allows for exceptions for tinting front windows, if none of the back windows are tinted, but even then, at most

9

only allowing a tint up to 50% visibility. 625 ILCS 5/12-503(a-5)(1)(2). Observably dark tints (even ones that might later be determined to be *lawful*) are a valid basis to make a traffic stop. *See Davis*, 2023 WL 4575978 at *3 (reasonable suspicion to stop vehicle based on tints despite claims it would have been difficult to see degree of tint at sunset and claims of pretext)*; Cuautle v. Tone*, 851 F. Supp. 1236, 1240 (C.D. Ill. 1994)(tinted windows barred claim of illegal stop); *Jordan v. Hynek*, 2022 WL 857030, *2 (N.D. Ind. 2022)("[B]ecause Jordan's window tint was near the legal limit, Capt. Hynek had an objectively reasonable basis to initiate a traffic stop to determine Jordan's compliance with the window tinting statute."); *Jenkins v. United States*, 2020 WL 6940825, *5 (S.D. Ill. 2020)(valid basis for stop because officer's "observation of the vehicle's window tint"); *Vu*, 2023 WL 8185517 at *4 (existence of tinted windows barred Fourth Amendment claim despite evidence of pretext); *United States v. Johnson*, 2022 WL 102277, *3 (E.D. Wis. 2022)("The initial, pretextual traffic stop regarding the window tint was constitutional because the officers had probable cause to believe that Johnson had committed a traffic violation."); *Burdette v. Foote*, 2020 WL 419394, *1 (N.D. Ind. 2020)("Before stopping [plaintiff], [defendant] observed that the vehicle had…illegally tinted windows. Because Indiana law…prohibits windows that are tinted to a certain degree, this observation constituted probable cause to believe that Burdette committed a traffic violation."); *United States v. Sanders*, 2018 WL 3968945, *6 (N.D. Ind. 2018)("[E]ven if the Court accepts the Defendant's version of the facts— that Officer Norton could not have seen the Defendant's face due to the Defendant's heavily tinted windows—Officer Norton still would have had probable cause to detain the Defendant for [tinted window violation]."); *see also United States v. Beauchamp*, 2022 WL 964010, *1 (4th Cir. 2022)("[I]llegally tinted windows are alone sufficient to justify a traffic stop."); *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016)(same); *United States v. Harrell*, 268 F.3d 141 (2d Cir. 2001)(tinted windows were sufficient basis for stop, even though the officer did not rely on tint); *United States v. Terrell*, 483 Fed. Appx. 161, 164-65 (6th Cir. 2012)(existence of tint justified traffic stop even though tint not tested at

scene); *Johnson v. Israel*, 576 F. Supp. 3d 1231, 1245-46 (S.D. Fla. 2021); *Shahit v. Tosqui*, 2005 WL 1345413, *10 (E.D. Mich. 2005)(rejecting that stop was unlawful because tinting was legal and noting officers "need not make a precise assessment in order to stop the vehicle"); *Flowers v. Rustand*, 2012 WL 4567596, *4 (E.D. N.Y. 2012)("No case yet has required police to carry a tint-o-meter, and a reasonable officer could well believe that it is within his discretion to make a determination of whether the tint is sufficient to warrant a stop."); *United States v. Gooch*, 915 F. Supp. 2d 690, 704 (W.D. Pa. 2012)(reasonable suspicion where trooper observed tint on windows even though car was in a minimally lit area at night); *Gass v. Murphy*, 2013 WL 5488712, *5 (M.D. Pa. 2013)("There is no dispute that the plaintiff's windows were tinted, therefore, [the trooper] had reasonable suspicion to pull him over to investigate whether the windows were so tinted as to prevent a person from looking through them."); *Lyles v. Conner*, 2010 WL 11628790 (E.D. Tex. 2010)(tint justified stop and "[t]roopers are not required to know to a certainty whether the tint is too dark before pulling [a driver] over."); *United States v. Jackson*, 558 F. App'x 932, 934-35 (11th Cir. 2014)("Even if the windows did not turn out to violate Florida law, a stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment."); *United States v. Weaver*, 145 F. App'x 639, 641 (11th Cir. 2005)(officer can stop a car for tint "when he reasonably believes the statute is being violated" and to require certainty "would force police to ascertain conclusively whether a violation had occurred before they would have the probable cause to investigate it").

As explained in *Johnson v. Israel*, even borderline darkness is sufficient to justify a traffic stop regardless of the actual technical legality of the tints:

> In our case, Johnson concedes that his truck had "tinted windows." And, while Johnson claims that the truck's tinting fell "within the lawful limits," that fact—standing alone—isn't dispositive. Instead, what matters is whether "an objective officer under the circumstances could have believed reasonably that [Johnson's] car was in violation of Florida's window-tint statute." And, unfortunately, Johnson has alleged no facts from which we might reasonably infer that the Deputies lacked a reasonable basis to believe that his tints violated the statute… For all these reasons, he hasn't plausibly alleged that the Deputies pulled over his admittedly

tinted truck without probable cause… It isn't enough, in short, for Johnson to allege that his windows were lawfully tinted. *Id.*, 576 F. Supp. 3d 1231, 1245-46 (S.D. Fla. 2021).

Here, it is undisputed that Reed had dark tints on both the front side and back side windows. Indeed, it is apparently Plaintiff's theory that these tints were so dark as to be obstructive of the inside of the vehicle. *See* Dckt. No. 35 at ¶37. The darkness of the tints can also be observed in the still frames Plaintiff includes in the Complaint and the BWC (attached hereto) referenced in it. *Id.* at ¶¶40, 42, 49, 65 (still frames of Reed's vehicle showing tint); Ex 1-5. While the objective evidence strongly indicates that these tints were in fact illegal, it does not matter for the purposes of this Motion whether this is true or not. The windows are clearly dark enough to satisfy the low standards for performing a traffic stop based on governing law. As a result, Count I is legally defective.

### B. In The Alternative, Defendant Officers Are Entitled To Qualified Immunity.

Defendant Officers are also entitled to Qualified Immunity. Qualified Immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Scott v. Harris*, 550 U.S. 372, 376, n. 2 (2007). The Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stand in litigation." *Id.*; *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Qualified immunity protects police "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011); *Eversole v. Steele*, 59 F.3d 710, 717-18 (7th Cir. 1995). Qualified Immunity applies regardless of whether an error is "a mistake of law, a mistake of fact, or a mistake based on mixed question of law and fact." *Pearson*, 555 U.S. at 231. The burden of defeating Qualified Immunity rests with a plaintiff. *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999); *Sinn v. Lemmon*, 911 F. 3d 412, 418 (7th Cir. 2018). This is "a rather heavy burden, and appropriately so because qualified immunity is designed to shield from

civil liability all but the plainly incompetent or those who knowingly violate the law." *Donovan v. City of Milwaukee*, 17 F.3d 944, 952 (7th Cir. 1994).

Two questions must be considered in determining qualified immunity: (1) do the facts alleged show the officer's conduct violated a constitutional right?; and (2) was the right was clearly established? *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Overly generalized conceptions of constitutional rights are not appropriate bases on which to deny Qualified Immunity. *See White v. Pauly*, 137 S. Ct. 548, 551-52 (2017). Specifically:

> [The Supreme Court] has issued a number of opinions reversing federal courts in qualified immunity cases. The Court has found this necessary both because qualified immunity is important to "society as a whole," and because as "an immunity from suit," qualified immunity "is effectively lost if a case is erroneously permitted to go to trial," Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality." As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.*

Particularity is especially important in Fourth Amendment cases which are highly fact specific and context dependent. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Thus, a plaintiff may not simply point to the fact that an unreasonable seizure is clearly established as unconstitutional. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Maltby v. Winston*, 36 F.3d 548, 554 (7th Cir. 1994). The burden is on plaintiff to show case law which proves the specific conduct at issue had already been found unconstitutional. *Rice v. Burks*, 999 F.2d 1172, 1174-75 (7th Cir. 1993); *Brant v. Volkert*, 72 Fed. Appx. 463, 465 (7th Cir. 2003); *Dockery v. Blackburn*, 2018 WL 6629426, *6 (7th Cir. 2018). A complaint may be dismissed under Rule 12(b)(6) on qualified immunity grounds. *See Doe v. Purdue Univ.*, 928 F.3d 652, 665 (7th Cir. 2019); *Landstrom v. Ill. Dep't of Child. and Family Servs.*, 892 F.2d 670, 674 (7th Cir.1990).

There is no case holding it clearly unconstitutional for police to make traffic stops based on apparently darkly tinted windows even if the windows were technically legal. *See Flowers*, 2012 WL 4567596 at *4 ("No case yet has required police to carry a tint-o-meter, and a reasonable officer could well believe that it is within his discretion to make a determination of whether the tint is sufficient to warrant a stop. Under these circumstances, [defendant] would be entitled to qualified immunity even

if there was not probable cause to have stopped the vehicle."); *Bautista v. City of Glendale*, 2020 WL 982021, *8 (C.D. Cal. 2020)("[E]ven if Defendant's action in impounding the vehicle [as a result of a tinted window violation] was found to be unreasonable under the Fourth Amendment, Defendant would nonetheless be entitled to qualified immunity because his conduct did not violate clearly established statutory or constitutional rights of which a reasonable officer would have known at the time of the alleged violation."); *Lyles*, 2010 WL 11628790 at *6 ("Defendants were mistaken in their conclusion that the window tint was too dark. However, police officers who reasonably but mistakenly conclude that probable cause is present are entitled to qualified immunity."); *Shahit*, 2005 WL 1345413 at *10 (apparently violative tints were sufficient for reasonable suspicion even if technically legal). At minimum, Defendant Officers are entitled to Qualified Immunity.

**III.   Claims Based On The "Pointing" Of Guns At Reed Are Defective.**

Count II is a Fourth Amendment "Excessive Force" claim based on allegations that the Defendant Officers "point[ed] their guns" at Reed "without legal justification. *See* Dckt. No. 35 at Ct. II. This claim must be dismissed because: (1) the brief pointing of guns at Reed was well-within constitutional limits; or, (2) in the alternative, Defendant Officers are entitled to Qualified Immunity.

**A.   The Officers' Brief Pointing Of Firearms During This Dangerous Uncontrolled Traffic Stop With A Noncompliant Individual Was Clearly Constitutional.**

The BWC conclusively shows there is no constitutional infirmity in the officers "pointing" firearms in Reed's direction for several seconds before Reed unleashed a hail of gunfire at the officers. Because the entirety of the interaction leading to the pointing of the weapons at Reed is captured from multiple angles on BWC, this Court has all the information needed to dismiss this claim. Indeed, given what occurred within seconds thereafter, the officers' vigilance in having their weapons at the ready likely saved their lives from Reed's ambush.

The circumstances leading to some of the officers pointing their weapons in Reed's direction were rapidly evolving and extremely harrowing for the Defendant Officers. *See supra* at 4-5 (citing

record and BWC). Reed was in the driver's seat of a vehicle with very dark tinted windows in both the front seat and backseat obstructing the officers' view of the interior. *Id.* The officers approached Reed's vehicle and instructed him to roll his window down. *Id.* Reed initially rolled the driver's side window down. *Id.* After Reed partially rolled down his dark tinted windows, the officers could see that Reed was wearing a hooded mask that appeared designed to obstruct much of his face. *Id.* No gun was pointed at Reed at this point. *Id.* The officers then instructed Reed to also roll down the passenger side window as well so that the officers could see into the vehicle. *Id.* Reed disregarded this order and, instead, began rolling his window back up concealing the interior again. *Id.* One of the officers then attempted to open the door of the vehicle but the door was locked. *Id.* The officers then began ordering Reed to unlock his vehicle. *Id.* Again, Reed did not comply nor did he roll his window back down. *Id.* Only then did the officers begin pointing their weapons at Reed. *Id.* The officers then followed with additional commands for him to open the door and Reed did not comply. *Id.* This gun pointing lasted several seconds at most. *Id.* Immediately thereafter, Reed began firing his gun at the officers. *Id.* The officers began returning fire. *Id.* All of this transpired in less than 30 seconds. *Id.* There is no constitutional infirmity in the Defendant Officers' actions prior to the shooting.

Judges, rather than juries, determine what limits the Constitution places on official conduct for purposes of a §1983 claim alleging the excessive force. *Bell v. Irwin*, 321 F.3d 637, 639 (7th Cir. 2003). "Permitting the jury freedom to determine for itself whether particular conduct was reasonable within the meaning of the fourth amendment would introduce the *ex post* reassessment that *Graham* [*v. O'Connor*, 490 U.S. 386 (1989)] decried." *Id.* at 640.

A conclusive video allows a court to know what happened and decide the legal consequences. *See Scott*, 550 U.S. at 380, 386. Where "[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened[,]" a court must view "the facts in the light depicted by the videotape" rather than "adopt[ing] a plaintiff's

characterization of the facts where unaltered video evidence contradicts that account." *Id.* at 378-81; *Thompson v. Mercer*, 762 F.3d 433, 435 (5th Cir. 2014)("'[The court] will not adopt a plaintiff's characterization of the facts where unaltered video evidence contradicts that account."); *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016); *Mendez v. City of Chic.*, 2022 WL 4466235, *5 (N.D. Ill. 2022)("Because video footage from the Officers' bodycams is in the record,…we may consider this footage without favoring the non-moving side if it 'clearly contradicts' the non-moving side's claims."); *Horton*, 883 F.3d at 944 ("When video footage firmly settles a factual issue, there is no genuine dispute about it, and we will not indulge stories clearly contradicted by the footage."); *Esco*, 651 F. Supp. 3d at 922 (considering BWC on motion to dismiss and dismissing claims based thereon); *Luczynski*, 2024 WL 310610, at *2 (same).

A Fourth Amendment violation for excessive force occurs only when an officer uses force that is not objectively reasonable. *Graham*, 490 U.S. at 395-96. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 984-85 (7th Cir. 2020)(quoting *Graham*, 490 U.S. at 396-97); *see also Kisela*, 138 S. Ct. at 1152; *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 473 (7th Cir. 2015). Thus, the Court's analysis of reasonableness must be "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Weinmann v. McClone*, 787 F.3d 444, 449 (7th Cir. 2015) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014)); *see also Graham*, 490 U.S. at 396-97; *Burton v. City of Zion*, 901 F.3d 772, 777 (7th Cir. 2018). The court considers "the information known to the officer at the time of the encounter; the duration of the encounter; the level of duress involved; 'and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstance.'" *Siler v. City of Kenosha*, 957 F. 3d 751, 759 (7th Cir. 2020); *see also Graham*, 490 U.S. at 396. "Law enforcement officers on the scene do not have the luxury of knowing the facts as they are known to us, with all the benefits of hind-sight, discovery, and careful analysis." *Siler*, 957 F. 3d at 759. "This is true even when, judged with the benefit

of hindsight, the officers may have made 'some mistakes.'" *City & Cnty. of San Francisco, Cal. v. Sheehan*, 575 U.S. 600 (2015).

The pointing of the gun *may* qualify as a seizure depending on the specific circumstances. *Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009). However, in the context of an investigatory stop, it is not unreasonable *per se* to point a gun at a suspect. *Wilkins v. May*, 872 F.2d 190, 194 (7th Cir. 1989). To determine whether the force used is excessive, the court examines the totality of the circumstances, including "the countervailing government interests at stake." *Id.* As explained by Judge Seeger in another recent "gun pointing" case, this standard is incredibly burdensome on a plaintiff and gives police significant breathing room in deciding whether a situation gives "reason to fear" for their safety:

> The Seventh Circuit has held that "gun pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment." But "no danger" is a pretty big caveat. Sometimes it is hard to know if there is "no danger." Especially in the heat of the moment, when your neck is potentially on the line and on the receiving end of any danger. Sometimes figuring out if there is "no danger" is the whole point of the interaction with the police. It is all too easy to declare that there was "no danger" after knowing how the story ended. Judges have that luxury. Police officers in the heat of the moment do not. Officers encounter real-world situations in real-time, with blood pumping and adrenaline flowing, as events unfold right in front of them. Officers live the story without the benefit of knowing the final chapter. For that reason, police officers may point their guns at individuals "when there is reason to fear danger." None of those words require certitude. A police officer can point a weapon when there is "reason" to "fear" potential "danger." Reasonable suspicion isn't the world's highest bar, and for good reason. After all, law enforcement is responsible for public safety. Sometimes police officers have to act based on imperfect information, in the interest of keeping people safe. There are real-world consequences if police officers are too tentative to act. *Gray v. City of Evanston*, 2024 WL 3495009, *4 (N.D. Ill. 2024)(citing *Baird*, 576 F.3d at 345).

The Supreme Court has long recognized the dangerous nature of traffic stops for police officers. *Penn. v. Mimms*, 434 U.S. 106, 110 (1977)(recognizing "inordinate risk confronting an officer as he approaches a person seated in an automobile."); *Mich. v. Long*, 463 U.S. 1032, 1049 (1983)(noting "roadside encounters between police and suspects are especially hazardous"); *Md. v. Wilson*, 519 U.S. 408, 413 (1997); *United States v. Avila*, 615 F. Supp. 3d 846, 869 (N.D. Ill. 2022)("Traffic stops are 'especially fraught with danger to police officers'…Staying alive is part of the mission. The Fourth Amendment does not require officers to put themselves in personal peril. Quite the opposite – the

Constitution gives officers the time and space that they need to protect themselves when carrying out their duties. When it comes to a traffic stop, a bedrock part of the mission is keeping the people who are performing the mission alive. Officer safety is mission critical.").

The inherent dangers to police officers of tinted windows and otherwise obscured views of the interior of vehicles during traffic stops has also been repeatedly recognized. *Unted States v. Ocampo*, 890 F.2d 1363, 1369 (7th Cir. 1989); *United States v. Edwards*, 369 F. Supp. 3d 856, 865 (N.D. Ill. 2019); *Burdette*, 2020 WL 419394 at *2; *Walters v. Nystuen*, 2023 WL 4541956, *3 (N.D. Ind. 2023); *Alvarez v. England*, 78 Fed. Appx. 313, 314 (5th Cir. 2003)(force reasonable when offender did not comply with police orders and because tinted windows obstructed view of interior of vehicle); *United States v. Stanfield*, 109 F.3d 976, 981-82 (4th Cir. 1997). The Fourth Circuit put these dangers in stark terms in *United States v. Stanfield*:

> Even where the interiors of vehicles are fully visible, "roadside encounters between police and suspects are especially hazardous," with as many as "30% of police shootings occur [ing] when a police officer approache[s] a suspect seated in an automobile," In fact, as the Court noted recently in [*Wilson*, 519 U.S. 408], in 1994 alone, 5,762 assaults on police officers occurred during the course of traffic pursuits or stops. Thus, "it [is]'too plain for argument'" that the governmental interest in officer safety during traffic stops is substantial.
>
> ***When, during already dangerous traffic stops, officers must approach vehicles whose occupants and interiors are blocked from view by tinted windows, the potential harm to which the officers are exposed increases exponentially, to the point, we believe, of unconscionability. Indeed, we can conceive of almost nothing more dangerous to a law enforcement officer in the context of a traffic stop than approaching an automobile whose passenger compartment is entirely hidden from the officer's view by darkly tinted windows.*** As the officer exits his cruiser and proceeds toward the tinted-windowed vehicle, he has no way of knowing whether the vehicle's driver is fumbling for his driver's license or reaching for a gun; he does not know whether he is about to encounter a single law-abiding citizen or to be ambushed by a car-full of armed assailants. He literally does not even know whether a weapon has been trained on him from the moment the stop was initiated. As one officer put the obvious: "If the suspect has a weapon, I might not see it until he rolls down the window. He may just shoot me through the window." ***If, as the Court has noted, officers face an "inordinate risk" every time they approach even a vehicle whose interior and passengers are fully visible to the officers, the risk these officers face when they approach a vehicle with heavily tinted windows is, quite simply, intolerable.*** *Id.* (citing *Long*, 463 U.S. at 1049; *Mimms*, 434 U.S. at 110; *Wilson*, 519 U.S. at 411)(emphasis added).

In addition to the inherent danger of uncontrolled traffic stops, courts consider whether a suspect has shown resistance, disregarded police commands, whether the officer's view of an area in which a weapon might be concealed is obstructed, and whether a suspect makes furtive movements or attempts to conceal the interior from view. *See Ocampo*, 890 F.2d at 1369 (pointing of gun during traffic stop when officer did not have full view of interior of vehicle and occupant obstructed view of contents of interior was constitutionally reasonable); *O'Brien v. City of Chic.*, 2023 WL 3947940, *5 (N.D. Ill. 2023)("Police officers are permitted to point their weapons at someone who presents a risk of harm to others. No jury could find that these officers didn't reasonably suspect that [plaintiff] posed a risk by reaching his hand out of view while resisting arrest. It was dark at the time of the arrest, the officers were on foot in the road, they kept their weapons out for a minute only, and neither their verbal threats nor their pointing weapons at [plaintiff] violated his Fourth Amendment rights."); *Edwards*, 369 F. Supp. 3d at 865 ("It is undisputed that the stop in question occurred after dark, while Edwards was driving a vehicle with tinted windows. It is further undisputed that Edwards failed to fully comply with Officers' instructions to unlock the doors to his car or to keep his hands out the window. In these circumstances, the presence of four officers with weapons at the ready was not unreasonable in light of their belief that Edwards might be armed."); *Williams v. Seltzner*, 2024 WL 127020, *8 (W.D. Wis. 2024)("[P]ointing a gun during a valid investigatory stop – let alone as part of an attempted arrest – is not per se unreasonable, and courts rarely find constitutional violations for gun pointing when there is a reasonable threat of danger or violence to the police."); *Burdette*, 2020 WL 419394 at *2 (pointing gun at person who refused officer's commands to exit vehicle and shielded interior of vehicle from view was reasonable); *Miller v. Lewis*, 381 F. Supp. 2d 773, 787 (N.D. Ill. 2005)(officer did not use excessive force when he pointed gun for a handful of seconds after plaintiff assumed a conflict-ready stance); *Howard v. Ealing*, 876 F. Supp. 2d 1056, 1067-68 (N.D. Ind.

2012)(pointing gun during traffic stop not unreasonable because "there is no evidence that [defendants] made any kind of accompanying threats of violence, such as a threat to pull the trigger.").

Cases which recognize valid claims of unreasonable gun pointing generally involve officers who have already secured an incident and nonetheless keep guns trained on a compliant subject for long periods accompanied by verbal threats to shoot. *See Jacobs v. City of Chic.*, 215 F.3d 758, 764, 774 (7th Cir. 2000)(gun pointed at head of a 60 year old man who posed no threat during a search warrant execution); *McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992)(officer held gun to head of nine year old who posed no threat and threatened to pull trigger); *Wilkins*, 872 F.2d at 194 (officer held gun to head of arrestee who was unarmed, handcuffed, and cooperating).

These examples are nowhere close to this case. The situation here is *precisely* the kind of highly dangerous situation contemplated by the courts where the pointing of firearms is wholly permissible. The BWC clearly shows that these officers had every reason to fear for their lives given Reed's repeated noncompliant behavior, his apparently intentional attempts to shield the interior of his vehicle from their view, and the inherently dangerous nature of uncontrolled traffic stops such as this one. And, while not directly germane to this issue, it bears repeating again that the seconds *following* these actions proved the officers had every reason to fear for their lives as Reed almost immediately subjected the officers to a hail of gunfire resulting in one being seriously injured and endangering the lives of the others. Thus, there is no claim under the Fourth Amendment.

### B. Defendant Officers Are Entitled To Qualified Immunity.

The Defendant Officers are also entitled to Qualified Immunity on any claim arising from the pointing of gun at Reed. Again, the entirety of the incident leading to the pointing of guns is captured from five different BWC angles and, thus, this issue is uniquely suitable for resolution as a matter of law. As noted above, the courts have been crystal clear that police officers in uncontrolled traffic stops with a noncompliant subject and obscured view of a vehicle interior may treat the situation as

exceedingly dangerous. As set forth above, case after case in even far less dangerous situations have sanctioned the brief pointing of firearms during traffic stops. The Supreme Court and the Seventh Circuit repeatedly hold that denying qualified immunity based on a high level of generality as opposed to requiring an exceedingly similar case with the same relevant facts is not proper. *Kisela*, 138 S. Ct. at 1152; *Anderson*, 483 U.S. at 639; *Maltby*, 36 F.3d at 554; *Johnson v. Rogers*, 944 F.3d 966, 968-69 (7th Cir. 2019). It was not established by any case remotely similar to this one that the actions of the officers were clearly unconstitutional. This is Plaintiff's burden to show to defeat this Motion and this cannot be done for the reasons set forth above. At minimum, the Defendant Officers are entitled to Qualified Immunity.

IV.  **Plaintiff's Denial of Medical Care Claim Is Legally Defective.**

Count III of Plaintiff's Complaint alleges a claim for Denial of Medical Care under the Fourth Amendment. *See* Dckt. No. 35 at Ct. III. This claim fails because the undisputed evidence shows the Defendant Officers requested medical attention for Reed well-within constitutional limits or, in the alternative, are entitled to Qualified Immunity.

A. **Defendant Officers Reasonably Summoned Medical Care for Reed.**

The Fourth Amendment reasonableness standard applies "to the medical needs of a person under arrest who has not yet had a judicial determination of probable cause." *Horton v. Pobjecky*, 2017 WL 5899694, *7 (N.D. Ill 2017)(quoting *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 503 (7th Cir. 2010)). "There are four factors to determine whether an officer's actions regarding medical care were objectively unreasonable: (1) whether the officer had notice of the medical needs; (2) the seriousness of the medical needs; (3) the scope of the requested treatment; and (4) police interest that might inhibit providing treatment." *Horton*, 883 F.3d at 953 (citing *Ortiz v. City of Chic.*, 656 F.3d 523, 530 (7th Cir. 2011)); *Florek v. Vill. of Mundelein*, 649 F.3d 594, 600 (7th Cir. 2011). "Police interests" addressed in

the fourth prong, include things such as "administrative penological, or investigatory concerns that might inhibit affording that treatment." *Horton*, 2017 WL 5899694 at \*7 (citing *Ortiz*, 656 F.3d at 530).

The Fourth Amendment requires a reasonable response, not an immediate one, *Sallenger*, 630 F.3d at 504, and the reasonableness inquiry "takes into account the sufficiency of the steps that officers did take." *Florek*, 649 F.3d at 600. Police officers are not required to directly provide medical care to injured persons but, rather, fulfill any duties by summoning an ambulance in a reasonable amount of time. *See id.* at 601 (calling an ambulance will typically qualify as reasonable under the Fourth Amendment); *Dukes v. Freeport Health Net. Mem'l Hosp.*, 2022 WL 1085208, \*17 (N.D. Ill. 2022)("[C]ourts have indicated that an officer's duty is exhausted when that officer calls an ambulance."); *Johnson v. Edwards*, 2024 WL 1116081, \*10 (N.D. Ill. 2024)("[P]romptly calling an ambulance after being notified of an arrestee's medical need 'will typically qualify as reasonable,' That is, in effect, what happened here: first responders arrived to provide medical care a mere six minutes after the medical need was identified and 13 minutes after the initial injury."); *Kudla v. City of Hammond*, 2022 WL 2171229, \*5 (N.D. Ind. 2022)("Promptly calling an ambulance after being notified of an arrestee's medical need "will typically qualify as reasonable."); *Damiani for Estate of Damiani v. Allen*, 2018 WL 4095080, \*17 (S.D. Ind. 2018)(no failure to render medical assistance claim because officers "summoned medical attention immediately, and the medical team arrived less than 5 minutes after the shooting."); *Seay v. City of Indianapolis*, 2020 WL 6710799, \*8 (S.D. Ind. 2020)(where officers called ambulance and did not interfere with medical treatment provided claim must be dismissed); *Flerlage v. Vill. of Oswego*, 2017 WL 5903819, \*10 (N.D. Ill. 2017)("Plaintiffs agree that [defendant] radioed for medical aid right after he and [co-defendant] subdued [plaintiff]…Promptly calling an ambulance 'will typically qualify as reasonable." Officers dealing with arrestee's medical issues 'will either procure treatment, provide treatment, or both.' Here, [defendant] procured treatment."); *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006)("[A] police officer who promptly summons the

necessary medical assistance has acted reasonably for purposes of the Fourth Amendment, even if the officer did not administer CPR.").

The actions of the Defendant Officers in summoning medical care to the scene is nowhere even remotely close to unconstitutional. Within 10 seconds of the shooting ceasing, the Defendant Officers summoned an ambulance to the scene. *See supra* at 6-7 (citing record and BWC). This request was repeated numerous times demanding an ambulance come immediately. *Id.* There is neither any allegation nor any evidence on the BWC that any Defendant Officer interfered with any medical care provided to Reed once an ambulance arrived. *Id.* What slight delay there was in directly administering medical care to Reed was entirely reasonable under the circumstances and under the law. After unleashing a hail of gunfire at the officers, Reed exited the vehicle, began proceeding toward the officers and was shot falling to the ground. *Id.* at 5-6. He remained breathing but had the front of his body shielded from the officer's view. *Id.* Once again, the officers knew Reed was armed mere seconds prior, had violent intentions toward them and Reed was face down shielding the front of his body. *Id.*

Nonetheless, within approximately one minute after the shooting ceased, CPD officers can be seen attempting to provide medical care to Reed. *Id.* at 5-6. Less than 90 seconds after it was confirmed that Reed was no longer armed, a responding officer confirms that he was providing aid to Reed. *Id.* Dispatchers on the radio confirmed that an "ambulance has been called for the offender." *Id.* Officers then are seen donning gloves and doing chest compressions until emergency personnel arrived, only approximately 2 ½ minutes after the last shot was fired, and less than 90 seconds after it was confirmed that Reed was no longer armed. *Id.* An ambulance arrived at the scene several minutes later. *Id.*

At minimum, given the quick timing and concerns about the safety of the officers given Reed's violence mere seconds previous, the Defendant Officers are entitled to Qualified Immunity. *Dukes*, 2022 WL 1085208 at *17-18 (qualified immunity to officers who did not perform medical treatment and that summoning an ambulance within minutes was all that was needed to immunize officers);

*Allen v. City of Chic.*, 2019 WL 3003025, *5 (N.D. Ill. 2019). It is Plaintiff's burden to show an analogous case holding these actions to be clearly unconstitutional and no such case exists.

## V. **Plaintiff's State Law Claims Fail.**

Plaintiff also includes a host of related state law claims as well for Willful and Wanton Conduct, Wrongful Death, Assault, and Battery. None of these claims can survive either.

First, state law claims based upon the same essential facts as related constitutional claims rise and fall based upon the validity of the constitutional claims under Illinois state law's use of force statute (720 ILCS 5/7-5) as well as the Tort Immunity Act's willful and wanton conduct requirements in 745 ILCS 10/2-202. *See Ybarra v. City of Chic.*, 946 F.3d 975, 981 (7th Cir. 2020); *DeLuna v. City of Rockford, Ill.*, 447 F.3d 1008, 1011-13 (7th Cir. 2006); *Williams v. Vill. of Maywood*, 2016 WL 4765707, *4 (N.D. Ill. 2016); *Lampkins v. Jones*, 2014 WL 12621565, *4-5 (N.D. Ill. 2014); *Manuel v. City of Elkhart*, 2017 WL 784275, *3 (N.D. Ind. 2017)("If an officer uses 'unnecessary or excessive force, the officer may commit the tort of assault and battery.' The state standard 'effectively parallels the federal standard' applied to Mr. Manuel's §1983 claim, and the court has already determined that the nature and extent of the force used to restrain Mr. Manuel can't be found to be objectively unreasonable under the circumstances."). Because Plaintiff cannot establish viable constitutional claims, Plaintiff's state law claims in Counts VIII, IX, X, XI based on the same actions cannot proceed either.

Second, insofar as Plaintiff has excised claims relating to the actual shooting of Reed, Plaintiff cannot proceed with a wrongful death claim insofar as it is obviously undisputed that the shooting is what caused the death. *See* 740 ILCS 180/1; *Alcorn v. City of Chic.*, 631 F. Supp. 3d 534, 549 (N.D. Ill. 2022)(wrongful death claim can only be sustained if defendant's actions caused death); *Chase v. Nelson*, 39 Ill. App. 53, 57 (2d Dist. 1890)("[T]he plain and manifest meaning of this statute is that 'the wrongful act, neglect, or default' must be the direct cause of the death.").

Third, insofar as Plaintiff attempts to fashion a generalized willful and wanton conduct claim premised on a list of self-serving alleged transgressions untethered to any recognized state law tort (*see* Dckt. No. 35 at Ct. VIII, ¶274), this is plainly defective. Under Illinois law, "there is no separate, independent tort of willful and wanton conduct." *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dir.*, 2012 IL 112479, ¶19 (2012); *Krywin v. Chic. Tran. Auth.*, 238 Ill.2d 215, 235 (2010). Because there is no standalone claim for willful and wanton conduct under Illinois law, Count XI does not state a claim. *See Fletcher v. Bogucki, et al.*, 2021 WL 4477968, *8 (N.D. Ill. 2021). Plaintiff cannot use this claim to fashion made-up new torts based on a laundry list of generalized transgressions untethered to the elements of any actual recognized tort (i.e. assault, battery, etc.). *See Artman v. Gualandri*, 2021 WL 2254961, *6 (N.D. Ill. 2021)("Plaintiff argues that she does not need to allege an underlying tort claim [to proceed with a willful and wanton conduct claim], but that is clearly incorrect under applicable Illinois law."); *Williams v. Wisc. Lock & Load Prisoner Transp., LLC*, 2016 WL 4124292, *4 (N.D. Ill. 2016)("In Illinois, a willful and wanton conduct claim must allege elements of a recognized tort because a willful and wanton conduct claim cannot stand alone.").

## CONCLUSION

WHEREFORE Defendant Officers pray this Court dismiss Plaintiff's Amended Complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) and for whatever other relief this Court deems fit.

Respectfully submitted,

Timothy P. Scahill                                    By: s/ Timothy P. Scahill
Steven B. Borkan                                     Special Assistant Corporation Counsel
Whitney N. Hutchinson
Special Assistants Corporation Counsel
Borkan & Scahill, Ltd.
20 S. Clark Street, Suite 1700
Chicago, Illinois 60603
312-580-1030
Tscahill@borkanscahill.com
*Counsel for Defendant Officers Giampapa,*
*Saint Louis, Webb, Pacheco, and Spanos*

25