**INTRODUCTION**

On March 21, 2024, Chicago Police Department (CPD) Officers and individual Defendants targeted Dexter Reed with a predatory, violent unlawfully, pretextual and racially discriminatory traffic stop. Defendants did not act in vacuum. Instead, they acted pursuant to the CPD's longstanding policies and practices that promote brutally violent, militarized policing tactics. This lawsuit, filed by Mr. Reed's mother, alleges *Monell* claims against the City of Chicago, seeking to hold it accountable for maintaining a series of policies and practices that encourage CPD officers to prey on Chicago's young Black men and target them with unreasonable traffic stops and unjustifiable, escalatory force. The Complaint also alleges violations of the Americans with Disabilities Act (ADA) and the Illinois Civil Rights Act (ICRA). The City now moves to dismiss all claims alleged against it. None of its arguments holds water. As a threshold matter, the City repeatedly asserts that the Plaintiff's Complaint fails because the City disagrees with the Plaintiff's factual assertions. That's not an option at the pleading stage. *Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 878 (7th Cir. 2006)(At the pleading stage, courts "read the complaint liberally, in its entirety, and with every inference drawn in favor [of the plaintiff].). On this basis alone, the City's Motion should be dismissed.

The City does attempt to assert a few legal arguments. They fare no better. The City argues that Plaintiff's *Monell* claims regarding unlawful and discriminatory traffic stops and escalatory force are insufficiently pled. The City is wrong. Plaintiff's *Monell* allegations are grounded in CPD's own statistics, governmental reports, and other high-profile instances of CPD misconduct. Allegations like these easily carry Plaintiff's *Monell* burden at the pleading stage. See *Sledd v. Lindsay*, 102 F.3d 282, 289 (7th Cir. 1996)(*Monell* allegations are sufficient when based in part on CPD's history and other incidents of harm the history). The City also argues that the mere existence of a federal consent decree governing CPD operations is sufficient to defeat deliberate indifference allegations. This isn't the law. See *Cosby v. Rodriquez*, 711 F. Supp. 3d 983, 1010 (N.D. Ill. 2024)(Consent Decree does not defeat Plaintiff's *Monell*

claim for excessive force.). Finally, the City asserts that Plaintiff has failed to allege plausible elements of ADA and ICRA claims. But Plaintiff has alleged each element required. This Court should deny the City's Motion to Dismiss.

## STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits." *Chatman v. City of Chicago*, 2015 WL 1090965, at *4 (N.D. Ill. Mar. 10, 2015). To survive a 12(b)(6) motion, a complaint must "state a claim that is plausible on its face." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### I. PLAINTIFF'S FOURTH AMENDMENT *MONELL* CLAIM CHALLENGING CPD'S MASS TRAFFIC STOP PROGRAM SHOULD PROCEED

The City urges this Court to dismiss the Plaintiff's *Monell* claim based on the City's policy and practice of unconstitutional traffic stops. It asserts that the Plaintiff's Complaint failed to identify the constitutional violation animating this claim. Def. Mot. at 5. This argument is based on an intentional misreading of the Complaint. It, therefore, fails. Plaintiff's Complaint alleges that Count IV is grounded in CPD's patterns and practices of Fourth Amendment violations.[1] The City's claim that it cannot understand Plaintiff's traffic stop *Monell* claim strains credulity. If the City were legitimately baffled by the contours of Plaintiff's traffic stop related *Monell* claim, it should have filed a Motion for a More Definitive Statement pursuant to Fed. R. Civ. P. 12(e), not dismissal under Fed. R. Civ. P.

---

[1] See First Am. Compl. ¶10 (reference to unlawful, pretextual traffic stops); Id. at ¶ 93 (allegations about CPD's longstanding mass traffic stop program); Id. at ¶ at 110 ( CPD officers "fish for non-traffic related criminal activity without reasonable articulable suspicion); Id. at ¶115-116 (CPD's traffic stop program exists for the purpose of inter alia, intimidating community members); Id. at ¶ 203(CPD fails to hold accountable officers who engage in Fourth Amendment Violations); Id. at ¶244-247 (CPD has a pattern and practice of unlawful and pretextual traffic stops).

12(b)(6).[2] Instead, the City filed a detailed brief responding to Plaintiff's claims—thus undermining their assertions of confusion. This argument is no bar to Plaintiff's claims.[3]

### A. Defendants Violated Mr. Reed's Fourth Amendment Rights During the Unlawful, Pretextual Traffic Stop. [4]

Officers may execute a traffic stop when "they have a reasonable, articulable suspicion that criminal activity is afoot." *Whren v. United States*, 517 U.S. 806, 810 (1996). Plaintiff adequately pled each factor needed to allege that – when Defendants seized Mr. Reed prior to obtaining facts that amount to reasonable suspicion – they engaged in an unlawful seizure in violation of Mr. Reed's Fourth Amendment rights[5] *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990)(factual disputes irrelevant to evaluating a Motion to Dismiss.)

### B. Plaintiff adequately pleads a pattern and practice of unlawful traffics stops

To state a *Monell* claim against the City, Plaintiff must allege suffered injuries caused by the Chicago Police Department's official policies or customs. See *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Additionally, Plaintiff must show that the City's policymakers were "deliberately indifferent as to the known or obvious consequences." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). To allege a Fourth Amendment *Monell* violation, Plaintiff must allege the CPD maintains a pattern and practice of engaging in traffic stops without probable cause to believe that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810 (1996). Plaintiff's complaint challenges the CPD's "longstanding practice of engaging in u*nlawful* traffic stops."[6] The Complaint further alleges the Defendant Officer's unlawful actions were required by CPD's official and unofficial policies and

---

[2] See Fed. R. Civ P. 12(e)(" A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response.").

[3] It is true, that Plaintiff's *Monell* claims do not include the phrases "Fourth Amendment" or "Equal Protection." But, as described in detail throughout this brief, Plaintiff's factual allegations underlying these claims are detailed. Should the City's arguments here be well taken, Plaintiff would seek leave to add the words "Fourth Amendment and Equal Protection" in the *Monell* count.

[4] Plaintiff incorporates by reference her response to the Defendant Officer's Motion to Dismiss.

[5] First Am. Compl. ¶¶ 228, 229, 230, 231.

[6] First Am. Compl. ¶9. Despite the Defendant's protestations to the contrary, The term unlawful traffic stop or unlawful pretextual traffic stop appears 13 times throughout the complaint.

3

practices.[7]

Specifically, the Complaint relies on statistics regarding pretextual, minor traffic stops demonstrating that such stops are highly prevalent in Chicago's Black communities.[8]  These racial disparities are significant to the Fourth Amendment analysis because they suggest a likelihood that officers' true motivation for the stops are to 'fish' for non-traffic related criminal activity" without reasonable articulable suspicion.'"[9] The Complaint also documents that CPD imposed traffic stop quotas on CPD officers[10] and created financial incentives for officers to engage in traffic stops during the end of their shifts.[11] It includes government report about CPD's long history of unlawful traffic stops and of targeting Black communities with traffic.[12] It alleges how CPD fails to adequately train, supervise, and discipline CPD officers regarding their Fourth Amendment obligations despite having notice about these widespread violations.[13]

Courts routinely permit challenges to police departments' Fourth Amendment policies and practices to proceed on these sorts of allegations. For example, in *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 753 (N.D. Ill. 2015), a class of Black and Latino men challenged CPD's policies and practices related to unlawful *Terry* stops pursuant to the Fourth and Fourteenth Amendments. The *Smith* Plaintiffs' Fourth Amendment *Monell* claim relied on CPD's history of unlawful *Terry* stops, prior

---

[7] See First Am. Compl. ¶7 (Defendant Officers are all members of one of CPD's notorious tactical or "Tact" teams which the United States Department of Justice concluded engaged in persistent unlawful conduct, including racial profiling and brutal unlawful force); Id. at ¶9-10 (Defendant officers have a history of making unconstitutional traffic stops pursuant to CPD policy and quota requirements.); Id. at ¶28 (Defendant Officers operated pursuant to CPD's Mass Traffic Stop Program and attempted to achieved quotas imposed upon them); FAC Id. at ¶104 (CPD Mass traffic stop program is not aimed at roadway safety); Id. at ¶110 .

[8] See First Am. Compl.¶ 9 (Free to Move Coalition provides data that CPD traffic stops have been comprised of 51.2% Black drivers; despite the city's Black residents being less than 30%); Id. at ¶ 28 (Officers that stopped Dexter Reed operated pursuant CPD"s Mass Traffic Stop Program and imposed quotas); Id. at ¶ 108 (CPD traffic stops have been based on minor, non-moving violations since 2016)[9] Id. at ¶ 110

[9] Id. at ¶ 110

[10] Id. at ¶ 10 (District 11 Commander encouraged documentation and increased traffic stops); ¶ 28. (CPD Mass Traffic Stop Program encourages increased pretextual traffic stops to achieve quotas).

[11] Id. at ¶ 163. (Officers receive financial compensation for additional arrests).

[12] Id. at ¶¶ 93-97.

[13] Id. at ¶ 260. (CPD exhibited deliberate indifference to implementing reforms and necessary training).[14] *See also Freeman v. City of Milwaukee*, 994 F. Supp. 2d 957, 965 (E.D. Wis. 2014)(*Monell* claim alleging that police had a policy and practice of encouraging unreasonable searches and seizures and wrongful arrests was allowed to proceed where Plaintiff alleged that department received prior complaints about similar incidents which it ignored, department encouraged unlawful searches and  even issued commendations to officers who engaged in unlawful behavior).

lawsuits alleging *Terry* violations, civilian complaints and public advocacy materials. *Id.* at 754. Then District Court Judge Amy St. Eve found these allegations sufficient to support a claim that CPD operated with a "widespread practice of suspicionless stops and frisks." *Id.* at 753.[14]

Similarly, in *Floyd v. City of New York*, 959 F. Supp. 2d 540, 602 (S.D.N.Y. 2013), the Court found that Plaintiff proved that New York City Police engaged in unlawful *Terry* stops in violation of the Fourth Amendment. The *Floyd* Plaintiffs presented evidence that NYPD officers were subject to productivity quotas and pressured to target Black and brown communities. *Id.* at 561. Further, NYPD failed to convey to officers the importance of limiting stops to constitutional circumstances. *Id.* at 613. The *Floyd* Court found that these factors were "a predictable formula for producing unjustified stops." *Id.* at 560.[15] Accordingly, Plaintiff's allegations clearly establish the City's *Monell* liability pursuant to the Fourth Amendment.

Plaintiff also easily passes the deliberate indifference test. The City has long been on notice about CPD's unlawful traffic stop-related policies and practices and rather than require a fix—CPD required that officers implement the Mass Traffic Program.[16] See *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 753 (N.D. Ill. 2015)(allegations that the City allowed and acquiesced to unconstitutional practices demonstrated deliberate indifference).

---

[14] *See also Freeman v. City of Milwaukee*, 994 F. Supp. 2d 957, 965 (E.D. Wis. 2014)(*Monell* claim alleging that police had a policy and practice of encouraging unreasonable searches and seizures and wrongful arrests was allowed to proceed where Plaintiff alleged that department received prior complaints about similar incidents which it ignored, department encouraged unlawful searches and even issued commendations to officers who engaged in unlawful behavior).

[15] See also *Shaw v. Jones*, No. CV 19-1343-KHV, 2020 WL 2101298, at *8 (D. Kan. May 1, 2020(statistics, media reports, and law enforcement training materials supported plaintiff's claim that law enforcement implemented a policy and practice of unlawful prolonged detentions and drug searches in violation of the Fourth Amendment.).

[16] First Am. Compl. Id. At ¶110 (large number reported of stops for minor equipment or licensing reasons can be indicative of pretextual stops because the need for a law enforcement traffic safety response is remote; Id. at ¶111 (City has admitted publicly that it has policy, practice and custom of saturating higher-crime areas with pretextual traffic stops, purported as a way to decrease crime); Id. at ¶115 (a District Strategy Plan shows that between 2021 and 2023, CPD used traffic stops to counter every kind of crime listed as priority in every Chicago Police District).

II. **PLAINTIFF'S FOURTH AMENDMENT MONELL CLAIM RELATED TO CPD'S POLICIES AND PRACTICES OF USING UNREASONABLE AND ESCALATORY VIOLENCE SHOULD PROCEED**

A. **Plaintiff's Complaint Sufficiently Alleges that Defendants' Gun Pointing was Objectively Unreasonable**

The City attempts to escape *Monell* liability by asserting that Defendants reasonably use force against Mr. Reed. Def. Mot. at 8. This is yet another factual dispute introduced by the City at the pleading stage and should therefore be disregarded. To determine whether a use of force is lawful, courts evaluate "[1] the severity of the crime at issue, [2] whether the suspect posed an immediate threat to the safety of the officers or others, and [3] whether he was actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Courts routinely recognize that when an officer points their gun at a community member, a serious use of force occurs. "Gun pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment," *Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009). As explained fully in Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss,[17] Plaintiff adequately pleads each *Graham* factor to support her excessive force claim against Defendants.

B. **Plaintiff's Detailed *Monell* Allegations Assert CPD has a Longstanding Pattern and Practice of Using Unlawful, Escalatory Force.**

The City attempts to defeat Plaintiff's *Monell* claim here by suggesting that its allegations rests solely on decades-old incidents. Def. Mot. at 11. This is false. Plaintiff alleges that CPD has both a pattern and practice of unlawful force and insufficient polices to protect communities from CPD's unlawful violence[18]. Plaintiff's claims rely, *inter alia*, on recent data and focus group reports[19] regarding increased incidents of police gun pointing,[20] and recent statistics demonstrating that CPD officers use

---

[17] Plaintiff incorporates by reference all arguments asserted in response to the Defendant Officer's brief.
[18] First Am. Compl. ¶ 251.
[19] Id. at ¶ 152 (Participants described officers' behaviors as "aggressive" and verbally and physically abusive).
[20] Id. at ¶ 172 (CPD data shows a 22% increase in gun pointing in 2022 and a projected 19% increase in 2023).

of force targeting Black neighborhoods.[21] These allegations also rely on the USDOJ's conclusions that Tact Teams engage in persistent unlawful conduct, including brutal, escalatory unlawful force.[22] The Plaintiff's allegations here create a plausible claim that CPD promulgates a persistent pattern and practice using excessive escalatory force against community members. *see Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017)(*Monell* Plaintiff must plead facts that permit a reasonable inference that the challenged practice constitutes a custom).[23]

Plaintiff connects the harm Mr. Reed suffered with the young Black men and Consent Decree focus group attendees who recently attested that CPD officers frequently approach them with aggression and physical violence.[24] And the complaint then connects the experiences of Mr. Reed and the focus group men to CPD's long history of unlawful violence targeting Black Chicagoans.[25] The City suggests that historical allegations weaken Plaintiff's *Monell* claim. Def. Mot. at 11. It is wrong. CPD's long history of permitting its officers to use excessive force with impunity bolsters Plaintiff's claims. And Courts routinely find that historical allegations[26] support *Monell* allegations and almost uniformly permit Monell claims to proceed on allegations that are identical to the Plaintiff's. see *Sledd v. Lindsay*, 102 F.3d 282, 289 (7th Cir. 1996)(district court wrongly dismissed a *Monell* claim where allegations focused on the history of CPDs disciplinary process and the systemic failures in officer

---

[21] Id. at ¶ 12 (2022 Chicago OIG analysis shows Black people are overrepresented in stops that led to uses of force and that CPD officers are more likely to use serious and harmful force against Black people); Id. at ¶ 150 (2022 Chicago OIG analysis shows Black people comprise 78% of District 11's population but 93% of all uses of force incident to a traffic stop).
[22] Id. At ¶ 7.
[23] Defendant also take issue with the inferences the Plaintiff makes in relation to Civilian Police Oversight Authority(COPA) data. Def. Mot. at 12. These objections are nothing more than (yet another) factual dispute asserted as a Motion to Dismiss argument. This Court should thus disregard the City's argument that centers on a disagreement between the parties regarding how to interpret COPA's data..
[24] Id. at ¶ 152 (Participants described officers' behavior during traffic stops as aggressive, intimidating, and verbally or physically abusive).
[25] Id. At ¶ 155.
[26] *Savory v. Cannon*, 532 F. Supp. 3d 628, 639–40 (N.D. Ill. 2021); Compl. ¶ 128 (Dkt. No. 1)(relying on allegations in the plaintiff's complaint dating back to 1959 regarding instances of coerced confessions and fabrication of evidence to deny the defendants' motion to dismiss plaintiff's *Monell* claim against the Peoria Police Department.); *Hill v. Cook County*, 463 F. Supp. 3d 820, 843 (N.D. Ill. 2020); Hill v. Cook County, 18-cv-08228 (N.D. Ill.) First Amend. Compl. at ¶ 55 (Dkt. No. 50); (the court denied a motion to dismiss when a plaintiff relied on evidence from 1978—twenty-seven years before the allegations in the complaint—to buttress Monell claims against the Cook County Sheriff's Department for a practice of suppressing and manufacturing evidence.); *see also Vega v. Chicago Park District*, 954 F.3d 996, 1011 (7th Cir. 2020) (considering evidence from fifteen years prior to the suit related to a Monell claim alleging widespread discrimination).

discipline.);[27]

The City further claims that Plaintiff's assertions regarding the 2017 U.S. Department of Justice Report "USDOJ Report" are stale "for the purposes of establishing a current pattern or practice." Def. Mot. at 11. As explained in detail above, Plaintiff's *Monell* allegations are not exclusively centered on the USDOJ Report.[28] But the USDOJ report provides important support for Plaintiff's claims. Not just for general assertions about CPD's long history of preying on Black neighborhoods with unlawful violence. But also because, in 2017, the DOJ denounced CPD's Tact Teams as overly aggressive and documented dangerous vehicle maneuvers aimed at boxing in suspect's cars.[29] The DOJ also noted that CPD officers regularly, and unnecessarily escalated confrontations with community members and used retaliatory force against people who objected to being stopped without cause.[30] The DOJ decried these tactics as unlawful and potentially lethal in 2017. Yet, in 2023, Defendants used each one, as if pulling methodically from a playbook, when interacting with Mr. Reed.[31]

Clearly, the USDOJ Report is especially material to Plaintiff's *Monell* claims here. But even without such a direct through line, courts in this district recognize that the 2017 DOJ Report remains important to today's *Monell* claims. In fact, in *Williams-Saddler v. Lancaster*, the case cited by the Defendants, the court refused to strike the DOJ report from the Plaintiff's complaint alleging excessive force in 2023, because the report put the city on "express notice" about the CPD's pattern and practice of excessive force. 2024 WL 1677407, at *2. The Plaintiff's reliance on the DOJ report is both permissible and appropriate. *See Taylor v. City of Chicago*, No. 21 CV 2197, 2021 WL 4523203, at *2

---

[27]" *Cosby v. Rodriquez*, 711 F. Supp. 3d 983, 1010 (N.D. Ill. 2024)(*Monell* excessive force proceeded where allegations included CPD's history of unlawful force, the USDOJ report, and other instances of unlawful force);*Williams v. City of Chicago*, 315 F. Supp. 3d 1060, 1079 (N.D. Ill. 2018)(*Monell* allegations should include facts probative of a widespread practice or custom.").

[28] First Am. Compl. ¶ 14 (Citing a 2023 IMR report); Id. at 149 (Citing a 2022 Chicago OIG report); Id. at ¶ 154 (Citing the 2021-2022 IMT Community Survey Report); Id. at ¶ 170 (Citing CPD's 2022 Use of Force Report); Id. at 172 (Citing CPD TRED 2023 Midyear Report); Id. at ¶ 201 (Citing COPA 2023 Annual Report); Id at ¶ 215 (Citing IMR's 2023 report).

[29] First Am. Compl. ¶158.

[30] First Am. Compl. ¶ 187.

[31] First Am. Compl. ¶ 38, 157, 158 (Defendant Officers aggressively boxed in Mr. Reed's car, and engaged in violent threatening and escalatory tactics).

(N.D. Ill. Oct. 4, 2021) ( DOJ Report and the Independent Monitoring Team (IMT) Report on the Consent Decree—could "buttress a *Monell* claim." if Plaintiff connects the dots between these reports and her injuries).[32]

### C. CPD's Failed Promises to Reform Demonstrate Deliberate Indifference

Next, the City argues that because it is "diligently working to reform and improve its services" pursuant to the Consent Decree, it cannot be found deliberately indifferent. Def. Mot. at 13. The City also inappropriately argues with the Complaint's Consent Decree related factual allegations. *Id.* And it asks this Court to take notice of the most recent Consent Decree Monitor's Report—a document not included in Plaintiff's allegations. The City's factual arguments have no place in a Motion to Dismiss. The City essentially argues that this Court should take its word that it's complied with the Consent Decree and fully reformed the CPD. Def. Mot. Def. Mot. at 13. That's not how federal pleading standards work. This Court (and the City) must credit Plaintiff's allegations that the City has consistently broken its Consent Decree related promises. [33] That said, should this Court accept the City's invitation to consider this Monitor's Report it would find that it bolster Plaintiff's *Monell*'s claims. [34], In short, neither the existence of the Consent Decree nor the CPD's non-compliance with its terms shield the City from *Monell* liability. *See Treadwell v. Salgado*, 19 C 3179, 2021 WL 3129290, at *6 (N.D.

---

[32] See also *Simmons v. City of Chicago*, No. 14-CV-9042, 2017 WL 3704844, at *8 (N.D. Ill. Aug. 28, 2017) (admitting the DOJ Report over the defendant's objection); *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 989 (N.D. Ill. Sept. 29, 2017) ("hearsay contents of the PATF and DOJ reports are admissible as 'factual findings from a legally authorized investigation'" (citations omitted)); see also *Cazares v. Frugoli*, No. 13 C 5626, 2017 WL 1196978, at *18 (N.D. Ill. Mar. 31, 2017) (admitting the PATF and DOJ reports); *Taylor v. Norway*, No. 20-CV-7001, 2021 WL 4133549, at *4 (N.D. Ill. Sept. 10, 2021) ("the allegations about these reports and statements [in the complaint] are appropriate to support the plaintiff's Monell claim at … this early stage of the case"); *Baskins v. Gilmore*, No. 17 C 07566, 2018 WL 4699847, at *5-8 (N.D. Ill. Sept. 30, 2018) (considering the DOJ report when declining to dismiss a *Monell* claim); *Arrington v. City of Chicago*, No. 17 C 5345, 2018 WL 620036, at *4 (N.D. Ill. Jan. 30, 2018) ("[W]here Plaintiff alleges that the City enables or condones a custom or practice of excessive force among its police officers, the DOJ Report citing evidence that such a custom or practice does in fact exist is a sufficient basis for Plaintiff's claim to proceed.").

[33] First Am. Compl. ¶180(CPD fails to comply with gun pointing consent decree provisions); ¶192 (CPD fails to comply with provisions that purport to remedy CPD's escalatory and unlawful violence; ¶195 (CPD's violation regarding supervision and accountability).

[34] For example, the 9th IMT Report Appendix 4: Use of Force Compliance Assessments reflect that the IMT remains concerned about CPD's ability to "ensure accountability when CPD officers use force that is not objectively reasonable." (p.1). This report also documents that CPD's use of force is on an upward trajectory (p.2) and that the use of force oversight unit failed to evaluate whether CPD officers engaged in appropriate de-escalation in 97% of all uses of force (p.2).

Ill. July 23, 2021)(rejecting argument that City's reforms defeated plaintiff's Monell claim as inappropriate at the motion to dismiss stage, and concluding that the complaint, read as a whole, sufficiently alleged a Monell claim). Instead, the Consent Decree (and the City's failure to comply with the vast majority of its provisions) are powerful evidence that the City has long been on notice regarding CPD's policy and practice failures and has failed to take action to remedy these violations.

## III.  PLAINTIFF HAS SUFFICIENTLY ALLEGED *MONELL* CLAIMS RELATED TO CPD'S FAILURES TRAIN, SUPERVISE AND DISCIPLINE

To prove municipal liability under §1983 for failure to train, supervise or discipline, the plaintiff must show the training represented "deliberate indifference" to the constitutional rights of the municipality's inhabitants. Additionally, the inadequacy of the training or supervision must be closely related to the actual injury. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 381 (1989). To prove deliberate indifference, the plaintiff must show the defendant (1) neglected "to provide adequate training in light of foreseeable consequences"; or (2) failed "to act in response to repeated complaints of constitutional violations by its officers." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006). The City argues that the presence of a Consent Decree and the City's preliminary compliance with a few select provisions torpedoes this *Monell* claim. But as explained above, the mere existence of the Decree is not, in and of itself, evidence of a remedy or reform. The City would have to *actually comply* with the terms of the Consent Decree and implement substantive reforms to correct its unconstitutional conduct. Plaintiff alleges that, at the time of the events in question, the CPD entirely failed to comply with relevant Consent Decree provisions. This is sufficient to allege deliberate indifference. *See Hendrick v. Bryant,* No. 20-CV-00249, 2021 WL 4502159, at *4 (N.D. Ill. Sept. 30, 2021) (allowing a *Monell* claim to proceed where allegations asserted that "the defendant municipality had knowledge of a problem with its policies, agreed to remedy the problem, and then failed to remedy the problem.").

The City made an identical argument in *Cosby v. Rodriquez*, 711 F. Supp. 3d 983, 1011–12 (N.D. Ill. 2024), a case alleging *Monell* claims on behalf of a 2020 protester who was brutalized by CPD

officers. The City argued that the Consent Decree defeated Plaintiff's deliberate indifference allegations. Then-Chief Judge Pallmeyer rebuffed this assertion: The Consent Decree does not require "dismissal of Plaintiff's Monell claim. . . nor does it defeat a finding that the CPD in fact engaged in other policies or widespread practices." 711 F. Supp. 3d 983, 1011–12. In short, no case law supports the contention that a defendants' promise to change can defeat a *Monell* claim. [35]

## IV. PLAINTIFF'S ALLEGATIONS REGARDING CPD'S MASS TRAFFIC STOP PROGRAM AIMED AT BLACK COMMUNITIES AND CPD'S PRACTICES OF TARGETING BLACK PEOPLE WITH UNREASONABLE AND ESCALATORY FORCE SUFFICIENTLY ALLEGE *MONELL* EQUAL PROTECTION CLAIMS AND ICRA VIOLATIONS

### A. Plaintiff alleges each element required for an Equal Protection/ICRA disparate treatment claim.

Plaintiff's Equal Protection *Monell* and disparate treatment ICRA claims requires a showing that race was the motivating factor behind the challenged practice. *Midwest Fence Corp. v. U.S. Dep't of Transp.*, 84 F. Supp. 3d 705, 719 (N.D. Ill. 2015). [36] A claim of "selective enforcement of the law based on considerations such as race" meets Plaintiffs' burden of pleading discriminatory purpose. *Whren v. United States*, 517 U.S. 806, 813 (1996); *King v. City of Chicago*, No. 22 C 4605, 2023 WL 4473017, at *1 (N.D. Ill. July 11, 2023) (allegations that CPD officers initiated a stop pursuant to a de facto policy of disproportionately targeting Black drivers in baseless, pretextual stops alleges an equal protection

---

[35] Defendants' reliance on *Anderson v. Allen* is misplaced. Def. Mot. at 15. In *Anderson*, a Plaintiff asserting a false arrest-related *Monell* claim attempted to rely on reports regarding CPD's investigatory stops—but not false arrests. Because the Plaintiff failed to plead sufficient facts connecting CPD's investigatory stop practices to those related to false arrests, the court dismissed Plaintiff's *Monell* claim. *Anderson v. Allen*, No. 19-cv-2311, 2020 WL 5891406, at *3 (N.D Ill. Oct. 5, 2020). The *Anderson* court noted in a footnote that even if it considered the investigatory stop reports relevant to a false arrest *Monell* claims, Plaintiff's claim would fail because the reports at issue demonstrated that CPD had "drastically reduced and reformed" investigatory stop practices. *Id.* Plaintiff here relies upon Consent Decree related reports that demonstrate CPD's ongoing failures to comply with constitutional mandates and connects those failures to his injuries. And prior to April 2023, no Consent Decree related report contained evidence of "drastic[] reform[]" that undermined the *Anderson* Plaintiff's claims.

[36] At this stage, Plaintiff alleges Equal Protection *Monell* claims against the City but not the Defendant Officers. When *Monell* claims challenge widespread policies and practices (as opposed to training) and *Monell* liability would not create an inconsistent verdict, *Monell* claims may proceed absent allegations against officers. See *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010); *Avina v. Bohlen*, No. 13-C-1433, 2014 WL 5505253, at *2 (E.D. Wis. Oct. 30, 2014)(Equal Protection *Monell* claim against police department could proceed absent a finding of officer liability because the City's policies could have caused Plaintiff's injuries; *Novick v. Vill. of Bourbannais*, No. 22-CV-02259, 2024 WL 1906431, at *6 (C.D. Ill. May 1, 2024)(*Monell* claim could proceed where officers responded pursuant to agency policy and thus may be entitled to qualified immunity).

violation.). Plaintiff here alleges that racial disparities in CPD's traffic stops, and escalatory use of force are widespread, persistent, and well-documented.[37] These allegations are sufficient to plead the City's discriminatory purpose. As *King* reasoned, the existence of "numerous studies" showing "an overwhelming [racial] disparity" in CPD traffic stop rates, including the same Inspector General report alleged here (*id.* at ¶ 12,149-52), suffices to plead discriminatory purpose at this stage. 2023 WL 4473017, at *3; see generally *Washington v. Davis*, 426 U.S. 229, 242 (1976) ("An invidious discriminatory purpose may often be inferred from . . . the fact, if it is true, that the [practice] bears more heavily on one race than another."). The City asserts statistical allegations of that racial disparities "alone" generally are not enough to "prove" discriminatory purpose. Def. Mot. at 24. This is a misguided effort to impose proof requirements at the pleading stage, see *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 755 (N.D. Ill. 2015). And it ignores that, as explained in detail above acute racial disparities are only one part of Plaintiffs' discriminatory-purpose allegations.

Plaintiff alleges that the City has perpetuated the mass traffic stop program and patterns of discriminatory force despite being on notice for years about the harms imposed upon Chicago's Black communities.[38] The fact that the City has—quite literally for generations—been on notice about CPD targeting Black people with unlawful traffic stops and unreasonable, escalatory force, but has failed to take action is sufficient to carry Plaintiff's burden here. *See Smith*, 143 F. Supp. 3d at 756 (finding plaintiffs pled discriminatory purpose based on allegations that City and CPD officials knew about and

---

[37] First Am. Compl.. ¶ 134 (CPD's mass traffic stop program caused disparities and discrimination among Black drivers); Id. at ¶ 137 (CPD concentrates traffic stops in Black neighborhoods); Id. at ¶140 (Racially motivated patterns are particularly relevant to Plaintiff's case because District 11 had the highest number of traffic stops in the city); Id. at ¶141-2 (Pursuant to the Illinois Appellate Court's test Defendants targeted Mr. Reed because he was Black, consistent with the phenomena known as driving while Black; Id. at ¶149-50 (Inspector General Report documenting CPD disparities in traffic stops and use of force "cannot be explained entirely by different patterns of officer behavior in the Districts that CPD defines as "high crime"); Id. at ¶154 (racial disparities in police interactions where Black Chicagoans were four times more likely than white Chicagoans to have been stopped in a vehicle and CPD officers were five times more likely to point firearms at young Black men than any other Chicagoan); Id. at ¶183-202 (CPD's escalatory violence targets Black people and includes racially charge language.) Despite having knowledge of Defendants' history of violating the right of Black community members, Defendants' CPD supervisors failed to take any action to redirect, counsel or otherwise supervise Defendants in an effort to stop violent, pretextual and racially discriminatory traffic stops." Id. at ¶ 24.

[38] First Am. Compl. ¶ 90.

failed to rectify racially disparate *Terry* Stops).

Plaintiff's complaint clearly alleges that Defendants stopped and used force against Mr. Reed because of his race—and more specifically that Defendants acted pursuant to CPD's longstanding policies and practices including the Mass Traffic Stop Program.[39] The Complaint also alleges that Defendants targeted Mr. Reed for an unlawful traffic stop and escalatory, unreasonable force because they used neighborhood and location as a proxy for race.[40]

These allegations are sufficient to create a reasonable inference that—pursuant to the City's longstanding policies—Defendants targeted Mr. Reed because he is Black. Defendants argue that because Plaintiff's complaint does not allege that Defendants viewed Mr. Reed's race prior to initiating the traffic stop, Plaintiff's ICRA claim fails. Judge Mary M. Rowland already disposed of this argument in *Wilkins v. City of Chicago*, No. 23-CV-04072, 2024 WL 2892840, at *4 (N.D. Ill. June 10, 2024), a class action lawsuit challenging CPD policies and practice of targeting Black communities with unlawful traffic stops. There, Judge Rowland found Plaintiff's allegations that CPD intentionally targets people of color using racially segregated neighborhoods as proxy for race supported an inference of impermissible racial motive. See *Williams v. Dart*, 967 F.3d 625, 638 (7th Cir. 2020)(The facially neutral criteria of neighborhoods raises an inference of discriminatory intent because Chicago's extreme segregation, neighborhood criteria allows racial targeting with "almost surgical precision.").

Finally, Plaintiff alleges that CPD's unlawful mass traffic stop program and pattern of targeting Black people with unreasonable, escalatory force has persisted for many decades.[41] Courts in this

---

[39] Id. ¶ 25

[40] Defendants targeted their unlawful enforcement activities in the overwhelmingly Black community surrounding CPD police District 11. First Am. Compl. ¶¶ 137, 150 (Defendant Officers have a history of making unconstitutional police traffic stops in District 11, where Black people comprise 78% of the population); Id. at ¶¶83-85 (Defendant Officers have at least 41 complaints alleging they engaged in unlawful traffic stops in District 11.); Id. at ¶ 155 ("CPD subjects Black Chicagoans to various forms of violence escalation and excessive force. The Defendants violated Dexter's rights pursuant to this well-documented pattern and practice."); Id. at ¶ 169 ("Each named Defendant Officer was a member of a Tact Team and thus governed by the Tact Teams' informal and formal policies, customs and practices, specifically the Tact Teams' ultra-aggressive culture and disregard for constitutional policing requirements directly lead to violations of Dexter's rights.")

[41] First Am. Compl. ¶¶ 138, 160, 161, 172, 191.

District recognize the long historical patterns can give rise to *Monell* claims. *Smith*, 143 F. Supp. 3d at 756 (holding that Black and Latino Chicagoans sufficiently stated Equal Protection Clause race-discrimination claim based on CPD's "stop and frisk policy");*Casimir v. City of Chicago*, No. 15 C 3771, 2018 WL 1695362, at *8 (N.D. Ill. Apr. 6, 2018) (same).

The City asserts that *Singleton v. City of E. Peoria*, No. 15-CV-1503, 2016 WL 1408059, at *1 (C.D. Ill. Apr. 8, 2016) dooms Plaintiff's ICRA claim. It argues that *Singleton* stands for the proposition that Black Plaintiffs alleging a racially discriminatory traffic stop must plead that—prior to the stop— officers knew definitively they were targeting a Black person. It does no such thing. First, it is an unpublished, pre-*Williams* decision that is no longer good law. Second, a CPD officer often does not need to see the race of the individual driver in order to commit racial discrimination, because the officer is carrying out a systemic program that uses Chicago's residential segregation to target Black and Latino drivers "with almost surgical precision." See *Williams*, 967 F.3d at 638. Third, *Singleton* is easily distinguishable from the instant case. In *Singleton*, the Plaintiff pleaded in the "barest of ways" that he was Black and that the Peoria police disproportionately initiate traffic stops against Black people. But he did not allege officers targeted him because of his race. *Singleton*, 2016 WL 1408059, at *6. Unlike here, the *Singleton* Plaintiff failed to allege that police used neighborhood as a proxy for race. Nor did the *Singleton* Complaint include detailed allegations of Defendant Officers' prior racially discriminatory actions. *Singleton* is simply no bar to Plaintiff's ICRA claim.

The City also falsely asserts that Plaintiff's allegations regarding CPD's policies and practices "fall short of alleging discriminatory intent because they are "presented in largely race neutral terms." Def. Mot. at 24. Here, the City points to three paragraphs that do not mention race. *Id.* But it ignores dozens of paragraphs containing clear allegations about CPD's discriminatory intent.[42] The City's

---

[42] These paragraphs including allegations about CPD's targeting of Black neighborhoods with an unlawful traffic stop program, a persistent pattern of CPD using unreasonable and escalatory force against Black people , CPD supervisors refusing to hold accountable officers who engage in discriminatory policing and CPD's refusal to comply with Consent Decree provisions aimed at remedying these harms. See e.g., First Am. Compl. 12, 14, 28, 134, 139, 143, 155,

selective reading of Plaintiff's allegations provides no basis to dismiss Plaintiff's claims. They should proceed.

### B. Plaintiff alleges each element required for an ICRA disparate impact claim

To state a disparate impact claim under the Illinois Civil Rights Act (ICRA), Plaintiff must allege that an Illinois governmental entity used "methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender." 740 ILCS 23/5. Plaintiff's disparate impact claim alleges that CPD's traffic stops program and its patterns of using excessive and escalatory force against Black people constitute unlawful disparate impact. To state a disparate impact claim under ICRA, a plaintiff must "identify a specific [] practice" and "allege its causation of the disparate impact." *McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 907 (N.D. Ill. 2011). Plaintiff carries this burden easily. The Complaint alleges that CPD targets Black neighborhoods with an unlawful traffic stop program; imposes traffic stop quotas, and fails to remedy the practice of trolling, which provides financial compensation for officers who make an arrest or traffic stop at the end of their shift.[43] The Complaint also alleges that CPD has a practice of targeting Black drivers with escalatory conduct and unjustified violence.[44] The Complaint directly connects these practices to the harm Mr. Reed experienced when he encountered Defendants.[45]

The standard for pleading "causation of the disparate impact" at the Rule 12(b)(6) stage is not demanding. *McQueen*, 803 F. Supp. 2d at 906. The allegations summarized above are sufficient to permit Plaintiff to proceed with a disparate treatment ICRA claim at this stage. See *Huskey v. State Farm Fire & Cas. Co.*, No. 22 C 7014, 2023 WL 5848164, at *8 (N.D. Ill. Sept. 11, 2023) (At the pleading stage, disparate impact claims require Plaintiffs to allege facts sufficient for a plausible inference that the

---

[43] First Am. Compl. ¶¶ 10, 93-133, 163.
[44] First Am. Compl. ¶¶ 149-169.
[45] First Am. Compl. ¶¶ 13, 142, 169.

adverse action suffered was connected to a protected characteristic).[46]

## V. IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, CPD FAILED TO MODIFY POLICIES AND PRACTICES TO ACCOMMODATE PEOPLE, WHO LIKE MR. REED, LIVE WITH DISABILITIES.

To allege a Title II claim under the Americans with Disabilities Act, a Plaintiff must assert that: (1) he is a qualified individual with a disability; (2) who was denied benefits or otherwise discriminated against by a public entity; and (3) the discrimination was disability-based. *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996). Plaintiff here easily carries this burden.

### A. The ADA Should have Protected Mr. Reed Because his PTSD Substantially Affected Major Life Activities.

Plaintiff alleges that Mr. Reed lived with Post-Traumatic Stress Disorder ("PTSD"), and that it substantially affected one or more major life activities." First Am. Compl. ¶ 214. More specifically, Plaintiff alleges that Mr. Reed's PTSD affected his ability to work, process and remember information, and communicate. Id. at ¶ 3. These allegations establish that the ADA protected Mr. Reed. U.S. Code of Federal Regulations, 29 C.F.R. § 1630.2. (It should easily be concluded that. . . post-traumatic stress disorder substantially limit(s) brain function. [This impairment] "may substantially limit additional major life activities...").[47]

Defendants argue that *Robinson v. Colvin*, No. 13 C 2006, 2016 BL 90983, at *13 (N.D. Ill. Mar. 24, 2016), dooms Plaintiff's ADA claim. This case is inapplicable. *Robinson* concerned a Motion for Summary Judgement, where, after discovery, the plaintiff offered only hearsay evidence about his

---

[46] See also *Cnty. of Cook v. Bank of Am. Corp.*, 181 F. Supp. 3d 513, 523 (N.D. Ill. 2015) (Whether statistics establish a prima facie case of disparate impact cannot be decided at the pleading stage); *Cnty. of Cook v. Bank of Am. Corp.*, No. 14 C 2280, 2018 WL 1561725, at *9 (N.D. Ill. Mar. 30, 2018), aff'd sub nom.; *Cnty. of Cook, Illinois v. Bank of Am. Corp.*, 78 F.4th 970 (7th Cir. 2023) (permitting disparate impact claim to proceed where Plaintiff alleged a statistical race-based disparity and a specific, multifaceted policy with a robust causal connection to that disparity.).

[47] See *Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 728–29 (7th Cir. 2020) (Sherriff officer living with PTSD who was protected by the ADA because his symptoms substantially interfered with [a]major life activity."); *Jaromin v. Town of Yorktown*, 697 F. Supp. 3d 816, 849–50 (S.D. Ind. 2023) (Police officer who testified under oath he had been diagnosed with PTSD, but who provided no supportive medical evidence presented enough evidence to defeat summary judgement in his ADA claim.); *Thomas v. Dart*, No. 17 C 4233, 2018 BL 302875, at *4 (N.D. Ill. Aug. 22, 2018) (Plaintiff with PTSD who lives with reoccurring nightmares is protected by the ADA).

PTSD diagnosis and no evidence regarding whether the conditions limited a major life activity. *Id.* Here, Plaintiff clearly alleges that Mr. Reed's PTSD substantially limits his brain function.[48] This allegation is sufficient to allow Plaintiff's ADA claim to proceed at the pleading stage. See *White v. Watson*, Case No. 16-cv-560-JPG-DGW, 2016 BL 359201, at *7 (S.D. Ill. Oct. 26, 2016) (Whether an alleged disability "actually severely limited a major life activity can only be determined after an individualized examination of the condition's actual impact on [Plaintiff's] life, a matter which can be fleshed out on summary judgment or at trial.")

**B. Title II of the ADA Requires Police to Modify Policies and Practices to Accommodate People with Disabilities.**

It is well established that ADA protections extend to community members' interactions with police officers during enforcement actions. See, e.g., *Lange v. City of Oconto*, No. 18-C-821, 2020 WL 1032240, at *7 (E.D. Wis. Mar. 3, 2020)(Title II applies to an arrest where arrestee requested a sign language interpreter); *Ravenna v. Vill. of Skokie*, 388 F. Supp. 3d 999, 1004 (N.D. Ill. 2019)(permitting ADA challenge to Skokie police arrest procedures to proceed); *Spencer v. Dawson*, No. 04 C 5048, 2006 WL 3253574, at *11 (N.D. Ill. Nov. 7, 2006) (explaining types of ADA claims arising from arrests);*Sheehan v. City & Cnty.* of S.F., 743 F.3d 1211, 1232 (9th Cir. 2014), rev'd in part on other grounds ("We agree with the majority of circuits to have addressed the question that Title II applies to arrests."); *Gorman v. Bartch*, 152 F.3d 907, 913 (8th Cir. 1998) (Title II applies to police treatment of arrestee during transport); S*alinas v. City of New Braunfels*, 557 F. Supp. 2d 777, 781 (W.D. Tex. 2006) (Title II applies to a municipality's 911 services); *Schorr v. Borough of Lemoyne, 243 F. Supp.* 2d 232, 235 (M.D. Pa. 2003) (ADA extends to "the lawful exercise of police powers, including the appropriate use of force by government officials acting under color of law"); *Jones v. Lacey*, 108 F.Supp.3d 573, 588 (E.D. Mich. 2015) (Title II applies to a police detention during a traffic stop).[49]

---

[48] First Am. Compl. at ¶ 3
[49] See also U.S. Department of Justice, <u>Commonly Asked Questions about the ADA and Law Enforcement</u>. (updated Feb. 28, 2020)("The ADA affects virtually everything officers do. ..including enforcing laws.")

The City argues that Title II is inapplicable here because of "exigent circumstances" related to Mr. Reed disregarding "direct orders." Defs. Mot. at 17. Again, the City introduces a factual dispute wholly inappropriate at the pleading stage. Plaintiff's complaint repeatedly alleges that Mr. Reed complied with the Defendant Officer's commands.[50] The City's argument here is based almost entirely on their false characterizations of Mr. Reed's behavior during initial seconds of the traffic stop. On this basis alone, their argument fails.

The City attempts to bolster their position here by citing *Hainze v. Richards*, 207 F.3d 795, 797 (5th Cir. 2000), but that case has been rejected by courts across the country in its application of the ADA to police interactions.[51] In *Hainze*, the court held that the ADA imposed no affirmative obligations on officers when they confronted an armed suspect walking rapidly towards them, whom they knew to be under the influence of various substances and who had previously expressed a desire to commit "suicide by cop." *Id.* When the suspect refused the officer's commands to stop, the officers shot and killed the suspect. *Id.* Based on these facts, the Fifth Circuit granted summary judgement to law enforcement. But *Hainze* is no bar to this case proceeding. Plaintiff's complaint does not allege any of the exigent circumstances that doomed the *Hainze* Plaintiff. And even the *Hainze* Plaintiff's claims survived the pleading stage. Plaintiff's claims here must also proceed. See *Earl v. Espejo*, No. 17 C 195, 2017 BL 301119, at *4 (N.D. Ill. Aug. 28, 2017)(denying motion to dismiss where CPD argued that exigent circumstances prevent it from providing a reasonable accommodation during an arrest because

---

[50] See First Am. Compl. ¶ 29 (Mr. Reed complied with all traffic regulations); Id. at ¶ 40 (Mr. Reed complied with officer commands to roll down the window); Id. at ¶¶ 41-43 (Mr. Reed in a confused panic, partially rolled up one window and told the officers he was trying to comply with their commands).

[51] Every other Circuit to address this issue, however, has rejected the blanket exception to the ADA described in *Hainze*. Although those Circuits take into account whether exigent circumstances exist in determining whether a potential accommodation was reasonable, they have found that the ADA does not categorically exclude pre-arrest police encounters. See, e.g., *Sheehan*, 743 F.3d at 1232 ("The ADA therefore applies to arrests, though we agree with the Eleventh and Fourth Circuits that exigent circumstances inform the reasonableness analysis . . . ."); *Roberts v. City of Omaha*, 723 F.3d 966, 973 (8th Cir. 2013) ("[T]he ADA and the Rehabilitation Act apply to law enforcement officers taking disabled suspects into custody."); *Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 339 (4th Cir. 2012) ("[T]he ADA applies to the investigation of criminal conduct."); *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1084 (11th Cir. 2007) (Title II prohibits discrimination by public entities, including by failing to make reasonable accommodations during arrest); *Gohier*, 186 F.3d at 1221 ("a broad rule categorically excluding arrests from the scope of Title II . . . is not the law").

"viewing the record from [Plaintiff's] perspective, there was no exigent threat.").

### C. The City is Liable for the ADA Violations that Harmed Mr. Reed as Demonstrated Through the City's Policy Failures

Plaintiff's ADA claim asserts that the City failed to ensure that CPD promulgated adequate policies and trainings to protect people with disabilities despite being on notice that people with disabilities risk serious harm when they interact with CPD officers. Defendants' interactions with Mr. Reed demonstrate the harm resulting from the City's failures.[52] The City's attempts to muddy Plaintiff's claims by arguing that this claim is about vicarious liability is simply wrong. Def. Mot. at 18. The Seventh Circuit has articulated three distinct routes to liability for discrimination under Title II: "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Wisconsin Cmty. Servs., Inc.*, 465 F.3d at 753. Here, Plaintiff's claims related to disproportionate impact and failure to accommodate.

Under the ADA, disparate impact discrimination occurs when an entity's policies and practices are "facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by [a nondiscriminatory] necessity." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003). Here, CPD's policies and practices of engaging in violent and escalatory conduct when conducting routine policing activities have a disproportionate impact on Chicagoans living with disabilities.[53] Further, Black Chicagoans living in neighborhoods targeted by CPD's unlawful traffic stop and escalatory force have disproportionately high rates of Post Traumatic

---

[52] See First Am. Compl. ¶¶ 214-218 (alleging Mr. Reed's PTSD disability and City's notice of heightened PTSD rates in areas subject to aggressive policing); Id. at ¶¶ 223-225 (asserting City's failure to implement adequate policies and training for interacting with disabled individuals); Id. at ¶¶ 38-43 (describing officers' aggressive approach and escalation during initial encounter with Mr. Reed); Id. at ¶¶ 220-222 (alleging Mr. Reed exhibited PTSD symptoms during stop and officers disregarded likelihood of his disability).

[53] See First Am. Compl. ¶¶ (detailing racial disparities in CPD's traffic stops, particularly in District 11); Id. at 149-154 (describing OIG report findings on racial disparities in CPD's use of force during traffic stops); Id. at 170-174 (highlighting disproportionate gun pointing incidents by CPD officers against young Black men).

Disorder.[54] These increased rates of PTSD are largely related to CPD's own actions.[55] In sum, CPD's unlawful, violent policing practices target communities living with high rates of PTSD. And communities develop high rates of PTSD largely because of CPD's escalatory violence and unlawful intrusions. Further, as of April 2023, CPD entirely failed to comply with the Consent Decree provision requiring that officers "provid[e] reasonable accommodations, to the extent safe and feasible, in order to facilitate CPD officer encounters with individuals with a disability."[56] These allegations are sufficient to carry Plaintiff's burden at the pleading stage. See *Bhandari v. Outagamie County*, No. 23-C-986, 2024 BL 77922, at *8 (E.D. Wis. Mar. 8, 2024) (Police department's failure to implement policies ensuring the safe transport of people with mobility impairments gave rise to an ADA disparate impact claim) *Powell v. Illinois*, No. 18 CV 6675, 2019 BL 371624, at *16 (N.D. Ill. Sept. 30, 2019) (refusing to dismiss ADA disparate impact claim where Black children in Chicago living with PTSD alleged that the Illinois' gun related regulations and lack thereof disproportionately impacts them and other persons with disabilities.); *McDaniel v. Bd. of Educ. of Chi.*, No. 13 C 3624., 2013 BL 197839, at *6 (N.D. Ill. July 25, 2013)(Plaintiff sufficiently pled ADA disparate impact claim challenging school closure policy.).

The City's failure to provide reasonable modifications during arrests to address the disparate impact is also an independent basis for liability under the ADA. The ADA regulations require the affirmative provision of "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.1 30(b)(7). This theory requires allegations that the CPD "failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that

---

[54] See First Am. Compl. ¶ 215.

[55] See First Am. Compl. ¶ 216 ("[H]ypervigilance is correlated with a specific type of police violence: traumatic police stops"); see also Smith et al., *Keeping Your Guard Up: Hypervigilance Among Urban Residents Affected By Community And Police Violence*, 38 Health Affairs 1662-1669 (2019), https://www.healthaffairs.org/doi/epdf/10.1377/hlthaff.2019.00560 (finding a significant association between exposure to police violence and symptoms of trauma, including hypervigilance, in urban communities).

[56] See First Am. Compl. ¶ 148 (citing the Consent Decree provision that requires CPD officers to provide reasonable accommodations for individuals with disabilities during encounters and noting CPD's failure to comply with this provision as of April 2023).

process than other arrestees." *Ravenna v. Vill. of Skokie*, 388 F. Supp. 3d 999, 1009 (N.D. Ill. 2019);

*Gohier v. Enright*, 186 F.3d 1216, 1222 (10th Cir. 1999)(Plaintiff's allegations that police department

failed to train officers to recognize and accommodate people living with mental disabilities stated an

ADA reasonable accommodation claim.);*Cyrus v. Town of Mukwonago*, Case No. 07-C-1035., 2009 BL

89461, at *17 (E.D. Wis. Apr. 24, 2009)(same)[57]

    Specifically, Plaintiff alleges that CPD's refusal to modify its policies and procedures to address

the risks people with disabilities face when encountering CPD officers violates the ADA.[58] These

failures enabled Defendants Officers' escalatory conduct and failures to recognize Mr. Reed as a person

with a disability.[59] More pointedly, CPD's failure to accommodate people with disabilities during

enforcement actions is perhaps best demonstrated by its failure to promulgate sufficient policies as

required by the Consent Decree.[60]

    The City argues Defendants had no reason to know that Mr. Reed lived with a disability. Def.

Mot. at 19. Plaintiff's Complaint asserts otherwise. It details how Defendants had significant experience

conducting traffic stops in communities with high rates of PTSD.[61] It alleges that, from the beginning

of his encounter with Defendants, Mr. Reed exhibited symptoms of PTSD and that a reasonable officer

would have recognized this fact.[62].Here, again, the City improperly argues for dismissal because it

disagrees with Plaintiff's assertions. This is not the law.[63]

    Further, the fact that Defendants failed to recognize Mr. Reed as a person with a disability

---

[57]See also *Gorman v. Bartch*, 152 F.3d 907, 910-14 (8th Cir. 1998)(arrestee with paraplegia sufficiently alleged an ADA claim after suffering an injury in a police van that was not equipped with wheelchair restraints); *Butchino v. City of Plattsburg*, No. 8:20-cv-796 (MAD/CFH), 2022 BL 14882, at *13 (N.D.N.Y. Jan. 14, 2022)(Plaintiff alleged a post-arrest reasonable accommodation claim where officers forcibly removed his clothes )..

[58] See First Am. Compl. ¶¶ 214-225 (outlining the City's alleged systemic failures to implement ADA-compliant policies and training for police interactions with disabled individuals)..

[59] See First Am. Compl. ¶ ¶ 83-92 (documenting Defendants' complaint histories and patterns of conduct in high-stress communities).

[60] See First Am. Compl. ¶ 148 (discussing the Consent Decree's requirements for disability accommodation and CPD's alleged non-compliance with these mandates).

[61] See First Am. Compl. ¶¶ 83-92 (describing Defendants' extensive experience with traffic stops in communities known for high PTSD rates).

[62] First Am. Compl. ¶¶ 220-21.

[63] See, e.g., *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (holding that when ruling on a motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint).

bolsters Plaintiff's claim. In *Clemons v. Dart*, 168 F. Supp. 3d 1060, 1070 (N.D. Ill. 2016), a wheelchair amputee detained at the Cook County Jail alleged that Sherriff Dart was deliberately indifferent to his ADA rights when the jail failed to provide him with reasonable accommodations. Dart attempted to defeat these claims by arguing that the Plaintiff could have requested assistance at any time, and therefore Plaintiff's ADA related harms were unforeseeable. The Court soundly rejected this argument, reasoning that "the Sheriff cannot prevail by pointing to legally insufficient compliance measures as a reason that harm resulting from non-compliance was not foreseeable." 168 F. Supp. 3d 1060, 1070. The City makes a similar circular argument here. It asserts that Defendants' failures to recognize Mr. Reed as a person with a disability destroys this claim. Def. Mot. at 19. But Plaintiff alleges that Defendants' failure to recognize Mr. Reed as a person with a disability and offer him a reasonable accommodation stems from the City's failed ADA related policies and practices. Put another way, the City's systemic failures cannot shield it from ADA liability.

Plaintiff's ADA claim hinges not on the intentional conduct of Defendants, but on the City's actions (and lack thereof). The relevant inquiry here isn't just about what the individual Defendant Officers' knew about Mr. Reed's disability. Instead, the primary question centers on the City's deliberate indifference to the rights of people with disabilities whom CPD officers target with unlawful traffic stops and unreasonable violence. "Intentional discrimination against the disabled does not require personal animosity or ill will. Rather, intentional discrimination may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy . . . or custom." *Phipps v. Sheriff of Cook Cnty.,* 681 F. Supp. 2d 899, 918 (N.D. Ill. 2009) (denying summary judgement where detainees with paraplegia alleged jail failed to provide them with accommodations).

Deliberate indifference requires "both (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." *McDaniel v. Syed*, No. 20-2946, 2024 WL 4197357, at *11 (7th Cir. Sept. 16, 2024). As described in detail above, the City has long been on

notice that CPD's traffic stop and force related policies and procedures impose significant, disproportionate harm on people with disabilities. Additionally, the City has steadfastly refused to take action to remedy these harms. Plaintiff's burden here is met. See *Mendoza v. Dart*, 638 F. Supp. 3d 898, 902 (N.D. Ill. 2022) (County's multi-year history of failing to provide ADA compliant facilities to detainees suggested deliberate indifference).

The City relies on *Jenkins v. Bartlett*, 487 F.3d 482, 493 (7th Cir. 2007), to allege that Plaintiff has failed to plead deliberate indifference. *Jenkins* provides no support for the City's arguments. There, the Seventh Circuit evaluated whether Plaintiff carried her *Monell* burden *at summary judgment*. The Appellate Court held that Plaintiff failed to raise a "genuine issue of material fact with respect to any deficiency in the City's training that could give rise to direct liability for a failure to train adequately its officers." Id.at 492. Unlike *Jenkins*, the instant case is at the pleading stage, and Plaintiff's allegations[64] directly connect CPD's ADA related training deficiencies with the harm suffered by Mr. Reed. ADA claims routinely proceed to discovery on allegations far less detailed than those here. See *Powell v. Illinois*, No. 18 CV 6675, 2019 WL 4750265, at *13 (N.D. Ill. Sept. 30, 2019). So should Plaintiff's.

## VI. Plaintiff Has Properly Alleged Respondeat Superior and Indemnification Claims Against the City

In Count XII, Plaintiff seeks to hold the City liable for the state law torts committed by Defendants within the scope of their employment. Plaintiff has asserted a state law claim against the individual Defendants, and, as their employer, the City is liable. *See Wright v. City of Danville*, 675 N.E.2d 110, 118 (Ill. 1996). Accordingly, Plaintiff's state law claim for respondeat superior should not be dismissed.

---

[64] These allegations include: First Am. Compl. ¶¶ 145-146 (CPD failed to comply with Consent Decree requirements regarding officer interactions with people with disabilities and has failed to "document any improvements in officers street level behavior and decision making); Id. at ¶ 148, CPD failed to revise policies requiring officers to provide reasonable accommodations to people with disabilities; Id. at ¶¶ 192-195 (CPD failed to comply with Consent Decree requirements regarding de-escalation and the public perception of CPD's de-escalation skills is headed in the wrong direction."); Id. at ¶¶ 215-219 (CPD intentionally targets with unlawful stops and unreasonable violence, neighborhoods that have disproportionately high rates of PTSD.).

**CONCLUSION**

Plaintiff respectfully requests the Court deny Defendants Officers' motion to dismiss, in its entirety, and in the alternative, allow Plaintiff leave to amend to cure any deficiencies found by the Court.

Dated: September 30th, 2024                    Respectfully submitted:

/s/ *Sheila Bedi*
_____

Sheila Bedi #6314970
Community Justice and Civil Rights Clinic
Northwestern Pritzker School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
(312) 503-2492

/s/ *Andrew M. Stroth*
_____

Andrew M. Stroth #6276013
ACTION INJURY LAW GROUP
1 S. Dearborn, Suite 1400
Chicago, IL 60603
(844) 878-4529

/s/ *Steven A. Hart*
_____

Steven A. Hart, #6211008
Julie A. Murphy, #6290303
HART MCLAUGHLIN & ELDRIDGE, LLC
1 S. Dearborn, Suite 1400
Chicago, IL 60603
(312) 955-0545
jmurphy@hmelegal.com