**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NICOLE BANKS, as Independent Administrator of the Estate of DEXTER ANTONIO REED, Deceased, | |
| Plaintiff, | Case No. 24-cv-3271 |
| v. | Judge Jeffrey Cummings |
| CITY OF CHICAGO, *et al.*, | |
| Defendants. | |

**DEFENDANT CITY OF CHICAGO'S MOTION TO DISMISS
COUNTS IV-VII, XII, AND XIV-XV OF PLAINTIFF'S SECOND AMENDED
<u>COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................................................iii

INTRODUCTION ............................................................................................................1

FACTS ............................................................................................................................3

LEGAL STANDARD .......................................................................................................5

ARGUMENT ...................................................................................................................5

I.      Plaintiff fails to plead a *Monell* claim for unconstitutional traffic stops (Count IV). ...............................................................................................................................5

      A.    Plaintiff does not adequately identify the constitutional provision at issue. ..................................................................................................................5

      B.    There is no underlying Fourth Amendment violation. ....................................6

      C.    Plaintiff insufficiently pleads a pattern and practice of unlawful traffic stops under the Fourth Amendment. ...............................................................7

II.     Plaintiff fails to plead a Fourth Amendment excessive force *Monell* claim (Count V). .................................................................................................................. 10

      A.    The Defendant Officers' gun pointing was reasonable and did not violate Reed's constitutional rights, precluding Plaintiff's *Monell* claim. ....... 10

      B.    Plaintiff fails to allege a *current* pattern and practice of excessive force that was the "moving force" leading to Reed's alleged injuries. ................... 12

      C.    In light of the City's reform efforts, Plaintiff has not plausibly alleged that the City was deliberately indifferent to Reed's constitutional rights. ............................................................................................................ 14

III.    Plaintiff fails to plead a *Monell* claim for failure to train and maintain adequate accountability systems (Count VI) because of her failure to plead deliberate indifference. ................................................................................................................ 15

IV.    Plaintiff's ADA claims (Counts XIV-XV) should be dismissed because Title II does not apply to the police activity at issue and, even if Title II could apply, Plaintiff fails to state a claim against the City. .................................................... 17

      A.    Title II does not apply to the factual scenario alleged in the SAC. ............. 18

      B.    Plaintiff has not alleged that Reed was "substantially limited" in major life activities. .................................................................................... 19

      C.    The City cannot be vicariously liable under the ADA for the Defendant Officers' actions. ...................................................................... 20

      D.    Plaintiff cannot plead ADA claims against the City where the Defendant Officers lacked the requisite knowledge of Reed's disability. ................................................................................................... 20

      E.    Plaintiff fails to state ADA claims for failure to train. ................................ 22

# TABLE OF CONTENTS
(continued)

**Page**

V.   Plaintiff's ICRA claim (Count VII) should be dismissed because she fails to plausibly allege that the traffic stop or gun pointing were motivated by Reed's race. ............................................................................................................ 24

VI.  Plaintiff's *respondeat superior* Claim (Count XII) should be dismissed because it fails to allege an independent claim. ............................................................. 26

CONCLUSION ................................................................................................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alston v. City of Madison*,
    853 F.3d 901 (7th Cir. 2017)....................................................................................26

*Anderson v. Allen*,
    No. 19-cv-2311, 2020 WL 5891406 (N.D. Ill. Oct. 5, 2020)...................................... 16, 17

*Arita v. Wexford Health Sources, Inc.*,
    No. 15-CV-01173, 2016 WL 6432578 (N.D. Ill. Oct. 31, 2016).......................................9

*Arkansas v. Sullivan*,
    532 U.S. 769 (2001) ....................................................................................................7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).....................................................................................................5

*Baird v. Renbarger*,
    576 F.3d 340 (7th Cir. 2009)................................................................................ 10, 13

*Becker v. Elfreich*,
    821 F.3d 920 (7th Cir. 2016)......................................................................................10

*Bell v. Pappas*,
    No. 22 C 7061, 2024 WL 1702691 (N.D. Ill. Apr. 19, 2024) ...........................................24

*Bey v. City of Chicago*,
    No. 21-CV-00611, 2022 WL 952741 (N.D. Ill. Mar. 30, 2022) .........................................4

*Cary v. Ne. Ill. Reg'l Commuter R.R. Corp.*,
    No. 19 C 03014, 2020 WL 1330654 (N.D. Ill. Mar. 22, 2020) ........................................24

*Chavez v. Illinois State Police*,
    251 F.3d 612 (7th Cir. 2001).....................................................................................26

*City of Canton, Ohio v. Harris*,
    489 U.S. 378 (1989).............................................................................................. 15, 23

*Connick v. Thompson*,
    563 U.S. 51 (2011)................................................................................................ 15, 16

*Culp v. Caudill*,
    140 F.4th 938 (7th Cir. 2025) ....................................................................................18

*Czosnyka v. Gardiner*,
    21-CV-3240, 2021 WL 4951517 (N.D. Ill. Oct. 25, 2021)................................................17

*Devenpeck v. Alford*,
   543 U.S. 146 (2004)................................................................................................7

*Doe v. Bd. of Ed. of City of Chicago*,
   611 F. Supp. 3d 516 (N.D. Ill. 2020) ..................................................................20

*Dunn v. City of Elgin*,
   347 F.3d 641 (7th Cir. 2003)...............................................................................22

*S.H. ex rel. Durrell v. Lower Merion School Dist.*,
   729 F.3d 248 (3d Cir. 2013) ................................................................................22

*First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*,
   988 F.3d 978 (7th Cir. 2021)...............................................................................15

*Gill v. City of Milwaukee*,
   850 F.3d 335 (7th Cir. 2017)...............................................................................12

*Gohier v. Enright*,
   186 F.3d 1216 (10th Cir. 1999) ..........................................................................21

*Graham v. Connor*,
   490 U.S. 386 (1989).............................................................................................10

*Gray v. City of Evanston*,
   No. 23-CV-1931, 2024 WL 3495009 (N.D. Ill. July 22, 2024) .........................10

*Gray v. Cummings*,
   917 F.3d 1 (1st Cir. 2019)...................................................................................21

*Hainze v. Richards*,
   207 F.3d 795 (5th Cir. 2000).........................................................................18, 19

*Harris v. City of Chicago*,
   No. 24 CV 3215, 2025 WL 2044020 (N.D. Ill. July 21, 2025)................9, 22, 24

*Higginbotham v. Baxter Intern., Inc.*,
   495 F.3d 753 (7th Cir. 2007)................................................................................9

*Huff v. Reichert*,
   744 F.3d 999 (7th Cir. 2014).............................................................................6, 7

*J.H. ex rel. J.P. v. Bernalillo County*,
   806 F.3d 1255 (10th Cir. 2015) ..........................................................................21

*Jackson v. Inhabitants of Town of Sanford*,
   No. 94-12-P-H, 1994 WL 589617 (D. Me. Sept. 23, 1994) ...............................21

*Jenkins v. Bartlett,*
    487 F.3d 482 (7th Cir. 2007) ........................................................................................22

*Lacy v. Cook County, Illinois,*
    897 F.3d 847 (7th Cir. 2018) ........................................................................................22

*Lankamer v. Lalley,*
    No. 24 C 506, 2024 WL 4119152 (N.D. Ill. Sept. 9, 2024) .........................................23

*Lapre v. City of Chicago,*
    911 F.3d 424 (7th Cir. 2018) ........................................................................................15

*Lewis v. Truitt,*
    960 F. Supp. 175 (S.D. Ind. 1997) ..............................................................................21

*McCauley v. City of Chicago,*
    671 F.3d 611 (7th Cir. 2011) .......................................................................................5, 9

*Moore v. City of Chicago,*
    No. 02 C 5130, 2007 WL 3037121 (N.D. Ill. Oct. 15, 2007) ......................................15

*Moore v. Western Ill. Corr. Ctr.,*
    89 F.4th 582 (7th Cir. 2023) .................................................................................. 17, 18

*Pennsylvania v. Mimms,*
    434 U.S. 106 (1977) ......................................................................................................11

*Petropoulos v. City of Chicago,*
    448 F. Supp. 3d 835 (N.D. Ill. 2020) ..................................................................... 22, 24

*Petty v. City of Chicago,*
    754 F.3d 416 (7th Cir. 2014) .......................................................................................6, 11

*Puffer v. Allstate Ins. Co.,*
    675 F.3d 709 (7th Cir. 2012) ........................................................................................24

*Ravenna v. Village of Skokie,*
    388 F. Supp. 3d 999 (N.D. Ill. 2019) ...........................................................................20

*Estate of Robey v. City of Chicago,*
    No. 17-cv-2378, 2018 WL 688316 (N.D. Ill. Feb. 2, 2018) ........................................19

*Robinson v. Colvin,*
    No. 13 C 2006, 2016 WL 1161272 (N.D. Ill. Mar. 24, 2016) .....................................19

*Rodriguez v. United States,*
    575 U.S. 348 (2015) ......................................................................................................10

*Ruiz-Cortez v. City of Chicago,*
   931 F.3d 592 (7th Cir. 2019)...........................................................................22

*Sallenger v. City of Springfield,*
   No. 03–3093, 2005 WL 2001502 (C.D. Ill. Aug. 4, 2005)....................... 18, 19

*Scherr v. Marriott Int'l, Inc.,*
   703 F.3d 1069 (7th Cir. 2013) ...........................................................................3

*Singleton v. City of East Peoria,*
   No. 15-CV-1503, 2016 WL 1408059 (C.D. Ill. Apr. 8, 2016) ................... 25, 26

*Smith v. City of Chicago,*
   340 F.R.D. 262 (N.D. Ill. 2021) .....................................................................8, 20

*Smith v. Metro. School Dist. Perry Twp.,*
   128 F.3d 1014 (7th Cir. 1997) ...........................................................................20

*Strauss v. City of Chicago,*
   760 F.2d 765 (7th Cir. 1985)..............................................................................13

*Swanson v. Citibank, N.A.,*
   614 F.3d 400 (7th Cir. 2010)...............................................................................6

*Taylor v. City of Chicago,*
   No. 21 CV 2197, 2021 WL 4523203 (N.D. Ill. Oct. 4, 2021)............................12

*TBS Group, LLC v. City of Zion,*
   No. 16-cv-5855, 2017 WL 5129008 (N.D. Ill. Nov. 6, 2017)............................26

*Thomas v. Cook Cty. Sheriff's Dep't,*
   604 F.3d 293 (7th Cir. 2010)..............................................................................13

*United States v. Avila,*
   615 F. Supp. 3d 846 (N.D. Ill. 2022) ..............................................................8, 11

*United States v. Cole,*
   21 F.4th 421 (7th Cir. 2021) ............................................................................6, 7

*Whren v. United States,*
   517 U.S. 806 (1996)...........................................................................................7, 8

*Wilkins v. City of Chicago,*
   No. 23-CV-04072, 2024 WL 2892840 (N.D. Ill. June 10, 2024)......................25

*Williams-Saddler v. City of Chicago,*
   No. 23 C 4815, 2024 WL 1677407 (N.D. Ill. Apr. 18, 2024) ...................... 12, 15

*Wilson v. Edward Hosp.*,
   981 N.E.2d 971 (Ill. 2012) ............................................................................26

*Winchester v. Marketti*,
   No. 11-cv-9224, 2012 WL 2076375 (N.D. Ill. June 8, 2012)............................9

*Winn v. City of Chicago*,
   No. 20 C 5246, 2022 WL 80272 (N.D. Ill. Jan. 6, 2022) ...................................26

**Statutes**

625 ILCS 5/11-203.............................................................................................11

625 ILCS 5/12-503(a-5)....................................................................................3, 7

625 ILCS 5/12-603.1 ...........................................................................................3

740 ILCS 23/5...................................................................................................24

42 U.S.C. § 12102(1)(A)(B) ...............................................................................19

42 U.S.C. § 12132........................................................................................ 17, 20

42 USC § 1983 ...........................................................................................7, 20, 22

**Other Authorities**

29 C.F.R. § 1630.2(j)(4)(ii)..................................................................................19

Consent Decree,
   https://www.chicago.gov/content/dam/city/sites/police-
   reform/docs/Consent%20Decree.pdf .........................................................14

COPA, Log# 2024-0003052,
   https://www.chicagocopa.org/case/2024-0003052/ ...................................3, 5

COPA 2021-2023 Annual Reports,
   https://www.chicagocopa.org/news-publications/publications/annual-reports/........................13

5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1215 (3d
   ed. 2004) ........................................................................................................6

Fed. R. Civ. P. 8(a)(2) .........................................................................................6

Fed. R. Civ. P. 12(b)(6)....................................................................................5, 25

FSR (Log No. 2024-2691),
   https://www.chicagocopa.org/wp-content/uploads/2025/04/2024-
   0002691_FSR.pdf...........................................................................................9

FSR (Log No. 2024-2779),
  https://www.chicagocopa.org/wp-content/uploads/2025/04/2024-
  0002779_FSR.pdf .......................................................................................................... 9

IMT Report 8, Appendix 2 (Impartial Policing),
  https://cpdmonitoringteam.com/wp-content/uploads/2024/06/IMR8-
  Appendix-2-Impartial-Policing-2023.11.01.pdf ....................................................... 23

IMT Report 8, Appendix 4 (Use of Force),
  https://cpdmonitoringteam.com/wp-content/uploads/2024/06/IMR8-
  Appendix-4-Use-of-Force-2023.11.01.pdf ............................................................... 23

IMT Report 9,
  *Illinois v. City of Chicago,* No. 17-cv-6260 (N.D. Ill. May 23, 2024), Dkt. 1172 ......................... 14, 15

IMT Report 9, Appendix 4 (Use of Force),
  https://cpdmonitoringteam.com/wp-content/uploads/2024/06/IMR9-
  Appendix-4-Use-of-Force.pdf ............................................................................. 16, 24

## INTRODUCTION

This action arises from an incident in which Chicago Police Department ("CPD") officers lawfully stopped Dexter Reed and pointed their guns at him only after he refused to comply with their commands. Reed then discharged a firearm striking Defendant Officer Saint Louis. The City now moves to dismiss this lawsuit.

In her fifteen-count Second Amended Complaint (the "SAC"), Plaintiff Nicole Banks, on behalf of the Estate of Dexter Reed ("Plaintiff"), asserts claims against five individual CPD officers involved in the incident (the "Defendant Officers" or "Officers") for a pretextual traffic stop, excessive force, and denial of medical care, all in violation of the Fourth Amendment (Counts I-III), in addition to state-law claims (Counts VIII-XI). Plaintiff seeks to hold the City liable on these individual claims, alleging counts for indemnification and *respondeat superior* (Counts XII-XIII). Plaintiff also asserts *Monell* claims based on the City's alleged pattern and practice of unconstitutional traffic stops (Count IV), use of excessive force (Count V), and failure to train as to the use of force (Count VI), as well as claims under Title II of the Americans With Disabilities Act ("ADA") (Counts XIV-XV) and the Illinois Civil Rights Act ("ICRA") (Count VII). Significantly, Plaintiff limited her excessive force claims against the Defendant Officers to gun pointing. (*See* SAC (Dkt. 93) ¶¶ 266-71.)

Plaintiff's 86-page SAC is replete with generalized criticism of CPD's policing techniques, along with a recounting of various historical incidents that have little to do with the traffic stop that occurred in March of 2024. What is missing from the SAC, however, are critical allegations about the event and what officers knew at the time it occurred that could serve as predicates for claims against the City. For example, there are no allegations that Defendant Officers knew Reed was Black when they pulled over his SUV with rolled-up tinted windows. Nor are there any plausible allegations that Reed was behaving in such a way that the Defendant Officers knew he suffered from PTSD. Further, the facts that Plaintiff does plead regarding the incident—including that Reed refused to comply with

the Defendant Officers' commands to roll down his windows—demonstrate that she cannot state any claims against the City and that the SAC should be dismissed.

Turning first to Plaintiff's *Monell* claims, Plaintiff's claim based upon a pattern and practice of "unconstitutional traffic stops" (Count IV) fails because she does not identify which constitutional provision is at issue. To the extent Count IV is based on the Fourth Amendment, Plaintiff fails to plead the requisite underlying constitutional violation (i.e., that the officers lacked just cause to stop Reed), and further, fails to allege a pattern and practice of objectively unreasonable traffic stops conducted without reasonable articulable suspicion. Plaintiff's *Monell* claim based upon excessive force under the Fourth Amendment (Count V) likewise fails. Here, the gun pointing alleged in the SAC was reasonable and constitutional under the circumstances where Reed refused to comply with officers' instructions during a traffic stop in a high-crime area. Further, Plaintiff fails to allege a current pattern and practice of excessive force that was the "moving force" behind Reed's injuries, relying instead on outdated incidents and generalized findings that are untethered to the alleged gun pointing at issue. Moreover, Plaintiff does not—and cannot—allege that the City was deliberately indifferent to the excessive force alleged in Count V or that the City failed to train officers on excessive force (Count VI) in light of the City's use of force reform efforts under the Consent Decree.

Plaintiff's other claims also fall short. With respect to Plaintiff's ADA claims (Counts XIV and XV), the ADA does not apply to police activity in the presence of exigent circumstances. Even assuming the ADA does apply, Plaintiff has not plausibly alleged Reed was a qualified individual under the ADA as the SAC lacks allegations that Reed's PTSD substantially limited his major life activities. Moreover, vicarious liability does not attach to the City under the statute. Nor has Plaintiff plausibly alleged that the Officers knew of his PTSD, or that the City was on notice of a pattern or obvious potential for officers violating the ADA in encounters with persons with PTSD within the 11th District, such that its alleged failure to train constituted deliberate indifference. As to Plaintiff's ICRA

2

claim (Count VII), Plaintiff fails to plausibly allege that the traffic stop or gun pointing were race motivated. For these and other reasons, the claims against the City should be dismissed.

## FACTS

On the evening of March 21, 2024, the Defendant Officers were patrolling CPD's 11th District, a known high-crime area, in an unmarked SUV. (*See* SAC ¶ 31; *see also id.* ¶ 160.) The Officers stopped Reed, whom they observed was not wearing a seatbelt[1] and driving an SUV with rolled up, heavily tinted windows, on the 3800 block of West Ferdinand Street. (*See id.* ¶ 38; *see also* COPA, Log# 2024-0003052, BWC 1 | Shooting Officer 1 ("BWC 1"), available at https://www.chicagocopa.org/case/2024-0003052/ (last visited January 22, 2026).)[2] Plaintiff alleges there was no reason for the traffic stop. (SAC ¶ 37.) Under Illinois law, however, driving without a seat safety belt is unlawful. 625 ILCS 5/12-603.1. It is also generally unlawful to have observably dark front window tinting like Reed's. *See* 625 ILCS 5/12-503(a-5). This tinting can be seen throughout the BWC footage:

---

[1] Plaintiff alleges that, while the Defendant Officers have claimed that the traffic stop was for a seat belt violation, the dark tints on the vehicle's windows raise concerns. (*See* Dkt. 93 at ¶ 38.) Plaintiff insinuates the Officers could not have seen a seatbelt violation because of his dark tinted windows. *Id.* Reed, however, was observed not wearing a seat belt. Specifically, on the BWC, Reed's over the shoulder belt can be seen hanging vertically and not fastened over his body. (*See* BWC 1 at 1:21-1:22; SAC ¶ 42, still shot.) Given the standard on this Motion, the City does not posit this as a basis for dismissal but reserves the right to do so at any later stage as necessary.

[2] Herein, all citations to "BWC" refer to the publicly available body-worn camera videos on the COPA website, of which this Court may take judicial notice. *See Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073 (7th Cir. 2013). The relevant timeframe for each video is: (1) BWC 1, 1:10-3:30; (2) BWC 2 | Shooting Officer 2 ("BWC 2"), 1:18-4:40; (3) BWC 3 | Shooting Officer 3 ("BWC 3"), 1:18-3:30; (4) BWC 4 | Shooting Officer 4 ("BWC 4"), 1:25-3:30; and (5) BWC 5 | Injured Officer ("BWC 5"), 1:00-3:30. BWC 1 is Officer Giampapa's BWC. BWC 2 is Officer Pacheco's BWC. BWC 3 is Officer Spanos's BWC. BWC 4 is Officer Webb's BWC. BWC 5 is Officer Saint Louis's BWC.



(*See* BWC 1 at 1:11.)[3]

According to the SAC, Officer Alexandra Giampapa exited the vehicle and approached Reed's SUV. (*See* SAC ¶¶ 41-42.) There is no allegation that Giampapa or any other Officer could determine or had knowledge of Reed's race. Giampapa instructed Reed to roll down his window, and Reed proceeded to roll down his front driver's side window. (*Id.* ¶ 42.) No guns were drawn at this time. (*See id.* ¶¶ 42-43.) Giampapa then instructed Reed to roll down his other windows, but instead, Reed began to roll up the front driver's side window. (*Id.* ¶ 43.) Giampapa commanded "do not roll the window up" and instructed Reed to unlock his doors. (*Id.* ¶¶ 44-45; BWC 1.) When Reed did not do so, Giampapa unholstered her gun and pointed it at Reed while she attempted to open his driver's side door. (SAC ¶ 44.) Plaintiff alleges that Reed demonstrated "hypervigilance," a symptom of PTSD, because he became flustered when Officer Giampapa shouted at him, and that he said he was "trying" to roll down the windows. (*Id.* ¶ 254.)

Officer Gregory Saint Louis approached Reed's SUV at the same time as Giampapa and similarly instructed Reed to roll down his windows. (*Id.* ¶ 47.) He drew his baton only after Reed did not comply. (*See id.*; BWC 5.) Officers Victor Pacheco and Thomas Spanos approached the vehicle after Giampapa and Saint Louis and drew their guns after Reed had failed to comply with the

---

[3] Plaintiff incorporates still shots of the BWC in the SAC. *See, e.g.,* SAC ¶¶ 42, 44; *see also Bey v. City of Chicago*, No. 21-CV-00611, 2022 WL 952741, at *4 (N.D. Ill. Mar. 30, 2022) (Plaintiff "directly references the dash-cam footage in his complaint—and the officers took Bey up on his invitation and included that footage as an exhibit [and] the dash-cam footage directly contradicts Bey's assertion.").

instructions to roll down his windows. (*See* SAC ¶¶ 49, 51.) The SAC does not specifically address gun pointing by Officer Aubrey Webb, the driver of the police SUV.

The SAC is conspicuously silent on aspects of Reed's own actions during the traffic stop. After Officers ordered Reed to lower his windows, "Reed then discharged a firearm toward the passenger side of his vehicle, striking Officer Saint Louis in the arm." (*See* COPA letter to CPD Superintendent Snelling, *Relief of Powers Request* (April 1, 2024), cited at SAC ¶ 38 n.16 and attached as **Exhibit A**; *see also* COPA, Log# 2024-0003052, 3rd party 1 | Residence | Shows OIS, available at https://www.chicagocopa.org/case/2024-0003052/ (last visited January 22, 2026)). The Officers returned fire at Reed, who was shot and killed. (*See* SAC ¶ 58.)

## LEGAL STANDARD

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requires that the complaint include factual allegations that plausibly suggest, and are not merely consistent with, an entitlement to relief. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). Although all well-pleaded facts are accepted as true, "legal conclusions and conclusory allegations merely reciting the elements of the claim" receive no presumption of truth. *Id.* The requisite level of factual specificity necessary to survive dismissal rises with the complexity of the claims. *Id.*

## ARGUMENT[4]

**I.    Plaintiff fails to plead a *Monell* claim for unconstitutional traffic stops (Count IV).**

**A.    Plaintiff does not adequately identify the constitutional provision at issue.**

"A pleading that states a claim for relief must contain: . . . a short and plain statement of the

---

[4] The City incorporates by reference all arguments in the Defendant Officers' Motion to Dismiss to the extent applicable.

claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff must state a claim for relief "with brevity, conciseness, and clarity." 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1215 at 165-73 (3d ed. 2004); *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("A complaint must give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." (cleaned up)). Count IV fails at the start because Plaintiff provides no notice of which constitutional provision is being violated by the City's alleged "long-standing pattern and practice of unlawful traffic stops." (*See* SAC ¶¶ 278-83.) This Court and the City are left to speculate as to which theory of liability Plaintiff seeks to bring against the City. Because Count IV fails to identify the constitutional violation at issue, it fails to put the City on notice of the claim against it and the grounds upon which that claim rests and, therefore, must be dismissed.

### B. There is no underlying Fourth Amendment violation.

A *Monell* claim fails where there is no underlying constitutional violation. *Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014). Taking into account the allegations in the SAC and the BWC, Plaintiff fails to adequately plead any constitutional violation. Therefore, even if Count IV could be construed as pleading a *Monell* claim predicated on a violation of the Fourth Amendment—paralleling Plaintiff's claim against the Defendant Officers—the claim must be dismissed because the Officers' stop of Reed was constitutional.

The Fourth Amendment permits a traffic stop where an officer has reasonable articulable suspicion to believe that a traffic violation has occurred. *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (en banc) (providing that traffic stops "require only reasonable suspicion of a traffic violation—not probable cause"); *see Huff v. Reichert*, 744 F.3d 999, 1004 (7th Cir. 2014) ("The Fourth Amendment permits pretextual traffic stops as long as they are based on an observed violation of a traffic law.") (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). Thus, there is no Fourth Amendment claim for a "pretextual" traffic stop rooted in objectively reasonable articulable suspicion

because "[s]ubjective intentions play no role" in deciding the lawfulness of a stop under the Fourth Amendment. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citing *Whren v. United States*, 517 U.S. 806, 809-10 (1996)); *Arkansas v. Sullivan*, 532 U.S. 769, 771-72 (2001) (same); *see also United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) ("We…do not consider Trooper Chapman's subjective motivations for deciding to conduct a traffic stop.").

Reed was visibly seen to not be wearing his seat belt—the justification for stopping Reed. (*See* BWC 1 at 1:21 – 1:22; SAC ¶¶ 38, 42, still shot.) Moreover, the dark front and side window tinting of Reed's SUV was readily observed by the Officers. (*See* SAC ¶ 38; BWC 1 at 1:10-1:22.) In Illinois, it is unlawful to have tinting on the front windows of a vehicle. 625 ILCS 5/12-503(a-5). The illegal tinting, thus, establishes an objectively reasonable articulable suspicion to believe that Reed was in violation of Illinois law, and the traffic stop was therefore lawful. Plaintiff's failure to establish an underlying constitutional violation precludes a *Monell* claim based upon the traffic stop.

### C. Plaintiff insufficiently pleads a pattern and practice of unlawful traffic stops under the Fourth Amendment.

Similarly, Plaintiff fails to plausibly plead a *pattern and practice* of unlawful traffic stops that are objectively unreasonable.[5] Instead, the pattern and practice of "pretextual" traffic stops (*see* SAC ¶ 281) that she does allege is not unconstitutional because the Fourth Amendment permits pretextual traffic stops as long as an officer has reasonable suspicion that a traffic violation has occurred. *See Cole*, 21 F.4th at 427; *Huff*, 744 F.3d at 1004.

Plaintiff alleges "[m]ost CPD traffic stops since 2016 have been based on alleged, minor, non-moving violations . . . This data provides further evidence that most CPD traffic stops since 2016 have been pretextual." (SAC ¶ 141; *see id.* ¶ 10 (alleging CPD routinely targets Black drivers for minor traffic

---

[5] Notably, Plaintiff's claim against the Defendant Officers for an "unlawful pretextual traffic stop" is explicitly based on the Fourth Amendment. (*See* SAC at 70 ("42 USC § 1983 – Fourth Amendment – Unlawful, Pretextual Traffic Stop"), ¶¶ 260-65.)

violations)). Plaintiff contends that these pretextual stops are motivated by an intention to "search for evidence of crimes unrelated to the traffic violations, and/or as an alleged strategy of general deterrence." (*Id.* ¶ 136.) The Supreme Court's decision in *Whren*, however, establishes that the subjective intentions of an officer are immaterial for purposes of the Fourth Amendment where a traffic stop is objectively reasonable. 517 U.S. at 813. In *Whren,* plaintiff alleged "plainclothes vice-squad officers" were patrolling for illegal drug activity when they stopped plaintiff's truck for a minor traffic infraction. *Id.* at 808. The Court held that a police officer's "ulterior motives" will not invalidate a traffic stop that is objectively justifiable. *Id.* at 812-13. The Court then foreclosed "any arguments that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Id.* at 813.

Likewise, here in support of Plaintiff's Fourth Amendment claim, the only pattern of conduct alleged by Plaintiff in conjunction with CPD's pretextual traffic stops is that these stops are based on the race of the driver and are a pretext for investigating more serious crimes unrelated to the traffic violation. (*See* SAC ¶¶ 126, 136.) But, as *Whren* and this Circuit instruct, an officer's subjective reason for conducting a traffic stop does not violate the Fourth Amendment. *See Whren*, 517 U.S. at 813 (holding that the Fourth Amendment does not provide a basis to challenge the "intentionally discriminatory application of laws"); *see also United States v. Avila*, 615 F. Supp. 3d 846, 863 (N.D. Ill. 2022) (upholding the lawfulness of a traffic stop that was initiated for failing to use a turn signal "even if the officers wanted to pull over [plaintiff's] vehicle because he was a gang member"), *aff'd*, 106 F.4th 684 (7th Cir. 2024). Here, a pattern of initiating stops for minor traffic violations, as alleged by Plaintiff, fails to rise to a level of establishing a pattern and practice of Fourth Amendment violations.[6]

---

[6] Even if the stops were motivated in response to an alleged quota system, this allegation is insufficient to establish a pattern and practice of Fourth Amendment violations. *See Smith v. City of Chicago*, 340 F.R.D. 262, 272 (N.D. Ill. 2021) (alleged CPD policy of pressuring officers to meet quotas for individual stops did not violate Fourth Amendment because "the subjective motivations of officers when stopping people would not

Moreover, while Plaintiff alleges that the City was "on notice" of the Defendant Officers' "pattern of conducting unjustified pretextual stops," any "notice" came only *after* Reed's March 21, 2024 traffic stop. (SAC at 23.) Plaintiff points to traffic stops conducted by the Officers on March 1, 2024 and March 6, 2024. (*See id.* at ¶¶ 88, 103.) Complaints were submitted to COPA on the day of each stop, however, COPA did not conclude its investigations of these complaints or make any findings or recommendations until December 2024—well after Reed's stop.[7] Likewise, discipline imposed by CPD based on COPA's findings and recommendations necessarily occurred after those findings and recommendations were made. (*See* SAC ¶¶ 119-21.) Unsubstantiated complaints, received by COPA mere weeks before Reed's stop, could not constitute notice of a pattern of "unjustified pretextual stops." *See Harris v. City of Chicago*, No. 24 CV 3215, 2025 WL 2044020, *6 (N.D. Ill. July 21, 2025) ("caution[ing] against assigning weight to . . . unsubstantiated" misconduct complaints).

To survive dismissal, Plaintiff must plead enough factual content "that allows the court to draw the reasonable inference that the City maintained a policy, custom, or practice" that was the moving force behind Reed's unlawful traffic stop. *McCauley*, 671 F.3d at 616 (cleaned up). Aside from alleging Reed was stopped despite having committed no traffic violation (*see* SAC ¶ 43), Plaintiff pleads no pattern and practice of similar instances of objectively unreasonable traffic stops that lacked any reasonable articulable suspicion,[8] nor does she plead that the City was on notice, prior to Reed's stop, of a pattern of unjustified pretextual stops lacking legal cause by the Defendant Officers or any other officer. Consequently, she has failed to state a claim for *Monell* liability under the Fourth Amendment.

---

determine the constitutionality of the stops" and because the "use of quotas [as pleaded] was facially neutral (not directly encouraging officers to conduct unconstitutional investigative stops)").

[7] *See* https://www.chicagocopa.org/wp-content/uploads/2025/04/2024-0002691_FSR.pdf (FSR (Log No. 2024-2691) at 14 (cited at SAC ¶ 88 n.21); https://www.chicagocopa.org/wp-content/uploads/2025/04/2024-0002779_FSR.pdf (FSR (Log No. 2024-2779) at 23 (cited at SAC ¶ 102 n.34).

[8] Plaintiff's assertion that proposed changes to the City's traffic stop practices are an "admission" that its "mass traffic stop program was dangerous [and] unlawful" (*id.* ¶ 155) is a non-starter. *See Higginbotham v. Baxter Intern., Inc.*, 495 F.3d 753, 760 (7th Cir. 2007) (in affirming dismissal of complaint, noting that "[d]rawing any inference from [subsequent remedial measures] would be incompatible with Fed. R. Evid. 407").

*See, e.g., Arita v. Wexford Health Sources, Inc.*, No. 15-CV-01173, 2016 WL 6432578, at *2 (N.D. Ill. Oct. 31, 2016) (rejecting *Monell* claim because there were no allegations of misconduct outside plaintiff's own experience); *Winchester v. Marketti*, No. 11-cv-9224, 2012 WL 2076375, at *4 (N.D. Ill. June 8, 2012) (plaintiff's failure to plead pattern of similar constitutional violations with any degree of factual specificity foreclosed *Monell* claims).

## II. Plaintiff fails to plead a Fourth Amendment excessive force *Monell* claim (Count V).

### A. The Defendant Officers' gun pointing was reasonable and did not violate Reed's constitutional rights, precluding Plaintiff's *Monell* claim.

The crux of Plaintiff's excessive force claim involves the Defendant Officers' conduct in drawing and pointing their weapons at Reed. (*See* SAC ¶¶ 266-71.) In the context of a traffic stop in a high-crime neighborhood during which Reed did not comply with the Officers' direct orders, the Officers' gun pointing was reasonable and constitutional.

At issue is whether the Officers used "greater force than was reasonably necessary" under the circumstances. *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016). "Reasonableness" is an objective inquiry: "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). While officers cannot draw their weapons and point their guns when there is no sign of danger, "[c]ourts do not find constitutional violations for gun pointing when there is a reasonable threat of danger or violence to police." *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009); *see Gray v. City of Evanston*, No. 23-CV-1931, 2024 WL 3495009, at *4 (N.D. Ill. July 22, 2024) (recognizing that gun pointing is permissible when officers have reason to fear potential danger).

Traffic stops are "especially fraught with danger to police officers," and this danger means officers may need to take precautions to "complete their missions safely." *Rodriguez v. United States*, 575 U.S. 348, 356 (2015). Here, the Defendant Officers were conducting a traffic stop in a police district known for violent crime. (*See* SAC ¶ 160 (quoting District 11 Commander saying that "011

[District] has the most violence").) The Officers approached a vehicle with heavily tinted windows that impaired the Officers' vision into the vehicle, limiting their ability to assess whether there was a threat of danger from Reed or whether there were other occupants in the car who may also present a threat to the Officers. (*See id.* ¶ 38.)

As they approached, no weapons were drawn. (BWC 1; BWC 5.) Reed was not treated as a threat until he failed to comply with the Officers' direct commands to roll down his windows and unlock his doors. Officer Giampapa directed Reed to roll down his windows. (SAC ¶¶ 42-43; BWC 1.) Reed initially rolled his driver-side window down, but then rolled his window partially up. (*Id.*) At this point, Giampapa unholstered and pointed her gun at Reed and attempted to open his door. (SAC ¶ 44; BWC 1.) At the same time, Officer Saint Louis likewise instructed Reed to roll down his windows and unlock his door and pulled out his baton. (SAC ¶ 47; BWC 5.) Plaintiff alleges that Reed stated, "I'm trying," but did not comply—Reed neither rolled down any window nor unlocked his doors. (SAC ¶ 45; BWC 1; BWC 5.) Under Illinois law, "no person shall willfully fail or refuse to comply with any lawful order or direction of any police officer." 625 ILCS 5/11-203. Officers Pacheco and Spanos approached Reed's vehicle and drew their guns after Giampapa and Saint Louis had drawn theirs, and after Reed had failed to comply with instructions. (SAC ¶¶ 44, 47, 49, 51; BWC 1-5.)

Faced with this situation, a "reasonable officer" in light of the totality of these circumstances would assess Reed's actions as a threat to the safety of the officers conducting the traffic stop and any civilians in the area, and react to this threat by drawing his or her weapon, and taking a defensive stance to preserve the safety of the officers and civilians. The Defendant Officers' conduct comports with the position of the Supreme Court:

> [T]he safety of the officer is both legitimate and weighty. Certainly, it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. And we have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile.

*Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (cleaned up); *see Avila*, 615 F. Supp. 3d at 869 ("When

it comes to a traffic stop . . . officer safety is mission critical.") (citing *Mimms*, 434 U.S. at 110). Their actions were objectively reasonable and did not violate Reed's rights, foreclosing Plaintiff's *Monell* claim for excessive force. *See Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014) (finding *Monell* claim cannot proceed where plaintiff has not suffered a constitutional injury).

> **B.   Plaintiff fails to allege a *current* pattern and practice of excessive force that was the "moving force" leading to Reed's alleged injuries.**

To sufficiently plead a custom or practice under *Monell*, a plaintiff must allege there have been similar incidents to establish a pattern of conduct. *See Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017). Plaintiff's allegations can be categorized into four groups: (1) specific incidents of excessive force, mostly from 1969 to 2008 (SAC ¶¶ 195, 223-25); (2) reports, findings, allegations, and admissions of a widespread practice of unconstitutional policing (*id.* ¶¶ 183-84, 186-89, 191-94, 221-22, 238-41); (3) generalized statistics of excessive force (*id.* ¶¶ 204-06, 218, 244); and (4) statistics from 2021, 2022, and 2023 regarding allegations of excessive force made to COPA against Chicago police officers (*id.* ¶ 235). These allegations are largely dated and untethered to the gun pointing allegations underlying Plaintiff's excessive force claim.

Allegations concerning individuals, such as Fred Hampton (1969), Ronald Watts (2000s), Jon Burge (1972-1991) and Glen Evans (1988-2008), do not speak to the customs and practices in place in 2024. *See Williams-Saddler v. City of Chicago*, No. 23 C 4815, 2024 WL 1677407, at * 2 (N.D. Ill. Apr. 18, 2024) (disregarding plaintiffs' allegations of police "scandals" in 1960 and 1968, a 1970 investigation into police abuse, and the history of Jon Burge when assessing the plausibility of plaintiffs' *Monell* claim). Plaintiff fails to present any current, specific incidents of excessive force beyond the claims involving Reed.

Similarly, allegations relying on the Department of Justice Report (2017), Police Accountability Task Force Report (2016), and alleged admissions concerning the code of silence predating the DOJ Report are stale for purposes of establishing a current pattern and practice of misconduct. *See Taylor*

*v. City of Chicago,* No. 21 CV 2197, 2021 WL 4523203, at *3 (N.D. Ill. Oct. 4, 2021) ("The passage of time since the DOJ report diminishes its usefulness as an allegation of the practices in place [in 2019]."); *Williams-Saddler*, 2024 WL 1677407, at * 2 ("The DOJ Report is itself now seven years old, and . . . [is] a non sequitur for purposes of establishing a plausible claim against the City for excessive force." (cleaned up)).

Generalized statistics that don't reflect unconstitutional conduct also fail to establish a plausible claim. *See Strauss v. City of Chicago*, 760 F.2d 765, 768-69 n.4 (7th Cir. 1985) (plaintiff's "generalized statistics" reflecting the "number of complaints filed, without more, indicates nothing . . . [and] represents nothing more than generalized allegations bearing no relation to [plaintiff's] injury"). Plaintiff fails to tether the number of reported gun pointing incidents over the past few years to unconstitutional incidents of excessive force. Gun pointing is not *per se* unconstitutional. *See Baird*, 576 F.3d at 346. Statistics by themselves fail to provide the requisite context to establish a pattern and practice of excessive force. (*See* SAC ¶¶ 204 (citing statistics from 2022 of the number of times CPD officers pointed their guns at individuals without assessment of constitutionality); 206-07 (indicating CPD's increase in documented uses of force, including gun pointing, correlate to the rise in police contacts with citizens).)

Plaintiff performs a sleight of hand with the COPA data presenting generalized statistics of findings of CPD misconduct for the years 2021-2023. A closer examination of the COPA reports incorporated into the SAC reflect a different story. Plaintiff pleads that in 2021, 2022, and 2023, COPA sustained 732, 905, and 758 misconduct allegations. (*Id.* ¶ 235.) In actuality, for 2021, 2022, and 2023, COPA sustained a corresponding 64, 101, and 59 allegations of excessive force and only 5, 12, and 4 allegations of unnecessarily displaying a weapon. *See* COPA 2021 Annual Report at 28, COPA 2022 Annual Report at 27-28, COPA 2023 Annual Report at 29 (cited at SAC ¶ 235 n.113-15), available at https://www.chicagocopa.org/news-publications/publications/annual-reports/ (last visited January

22, 2026). Recognizing that there is no "bright-line rule" defining "widespread custom or practice," the Seventh Circuit has indicated it must be "more than one instance" or "even three," and not a "random event." *Thomas v. Cook Cty. Sheriff's Dep't,* 604 F.3d 293, 303 (7th Cir. 2010). Given the size of the City's police department and the sheer number of police contacts with civilians, annual findings sustaining 5, 12, and 4 allegations of the unnecessary display of a firearm fail to plausibly allege a pattern and practice of excessive force.

### C.    In light of the City's reform efforts, Plaintiff has not plausibly alleged that the City was deliberately indifferent to Reed's constitutional rights.

Plaintiff relies significantly on outdated allegations that the City's failure to make significant progress in achieving the goals of the 2019 Consent Decree shows the City was deliberately indifferent to remedying the practices that caused Reed's alleged injury. (*See* SAC ¶¶ 226-34.) The reality, of which this Court may take judicial notice, paints a strikingly different picture.

The assessment of the City's compliance with the Consent Decree during the reporting period immediately preceding Reed's stop reflects "significant progress with [CPD's] use-of-force policies, training, and analysis of data since the start of the Consent Decree." *See Illinois v. City of Chicago,* No. 17-cv-6260 (N.D. Ill. May 23, 2024), Dkt. 1172 (hereinafter "IMT Report 9") at 49.[9] In fact, the City has achieved full compliance in several relevant Consent Decree use of force provisions—all notably absent from Plaintiff's SAC. At the filing of IMT Report 9, the City was in full compliance with Use of Force provisions concerning weapons policies, firearm training, training on appropriate use of firearm pointing, reporting of firearm pointing incidences, use of force training and decision-making, and supervisor training on use of force, de-escalation techniques, and investigations. (*See id.* at 48 citing Consent Decree ¶¶ 180, 181, 188, 195, 245-46, 248).[10] What is more, the Consent Decree provisions

---

[9] Herein, all IMT Report 9 page numbers reflect the CM/ECF page numbering that appears at the top of the page in this Court's electronic docket system.
[10] The Consent Decree entered in *Illinois v. City of Chicago*, No. 17-cv-6260 (N.D. Ill.) is available at https://www.chicago.gov/content/dam/city/sites/police-reform/docs/Consent%20Decree.pdf.

Plaintiff does cite undermine her allegations of deliberate indifference and instead reflect the City's commitment to reform, as the City has achieved preliminary or secondary compliance with each of the paragraphs listed by Plaintiff. (*See id.* (citing Consent Decree ¶¶ 153, 155-56 (preliminary compliance) and Consent Decree ¶¶ 161, 167, 175, 192 (secondary compliance)).)[11]

The fruits of these reform efforts bear out in key data points. For example, COPA reports that excessive force allegations against CPD officers have decreased overall by 59 percent since 2020. *See* COPA 2023 Annual Report at 5 (excessive force allegations decreased "for the fourth consecutive year," and 2023 "marked a five-year low of 962 allegations" of Fourth Amendment violations, "a significant decrease from the 2,417 allegations received in 2019"). Similar declines can also be seen in the City's reports of judgment and settlement payment requests, which have "declined substantially since 2017." *See Williams-Saddler*, 2024 WL 1677407, at * 4. This data supports that the City is not maintaining a custom or practice of excessive force, but is diligently working to reform and improve its services. *See Lapre v. City of Chicago*, 911 F.3d 424, 432 (7th Cir. 2018) (deliberate efforts to remedy a situation contradict claims of deliberate indifference); *Moore v. City of Chicago*, No. 02 C 5130, 2007 WL 3037121, at *11 (N.D. Ill. Oct. 15, 2007) (efforts to address an alleged unconstitutional practice reveal a municipality was not deliberately indifferent) (citing *Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993)). For these reasons, the *Monell* claim for excessive force must be dismissed.

### III. Plaintiff fails to plead a *Monell* claim for failure to train and maintain adequate accountability systems (Count VI) because of her failure to plead deliberate indifference.

Municipal liability attaches under a failure to train, supervise, or discipline theory "only where

---

[11] Consent Decree compliance is assessed at three levels: (1) preliminary—creation of a compliant policy, (2) secondary—adequately trained personnel on that policy, and (3) full—successfully implemented the reform in practice. If provisions do not relate to policy or training, compliance levels are assessed on whether the City or its relevant entities have (1) established the framework and resources to achieve the reform, (2) effectively communicated the reform to relevant personnel, and (3) appropriately implemented the reform. *See* Assessing Compliance, IMT Report 9, at 24-25.

a failure . . . reflects a deliberate or conscious choice by a municipality." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989). Deliberate indifference is a "high bar," which requires Plaintiff to "prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021); *see Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."). Plaintiff alleges the City has failed to adequately train, supervise, and discipline its police officers in use of force when effectuating arrests, which in turn caused Reed's injuries. (SAC ¶¶ 292-93.) In support, Plaintiff largely rests her claim on the proposition that the City "knew that such reforms and training were necessary" on use of force (*id.* ¶ 294), and "had CPD complied with its Consent Decree obligations, Dexter Reed would be alive today" (*id.* ¶ 15). However, the City's response to reported use of force deficiencies through the Consent Decree undermines Plaintiff's claim.

In assessing the City's compliance with the Consent Decree, the IMT highlighted the City's progress in CPD's yearly in-service training on use of force, de-escalation and force mitigation: "more than 95% of officers received the 2023 De-Escalation, Response to Resistance, and Use of Force in-service training" which provided "officers with the knowledge and skills regulating use of force and de-escalation." IMT Report 9, Appendix 4 (Use of Force) at 49, https://cpdmonitoringteam.com/wp-content/uploads/2024/06/IMR9-Appendix-4-Use-of-Force.pdf (last visited January 22, 2026). The IMT also reported that the City and CPD had achieved full compliance with a number of use of force training provisions in the Consent Decree. *Id.* at 53-58 (noting full compliance with ¶ 245 (use of force training of CPD officers to ensure quality, consistency, and compliance with federal and state law), ¶ 246 (use of force training topics to be covered with CPD officers annually), and ¶ 248 (training for CPD supervisors on conducting use of force reviews and implementing de-escalation strategies)).

16

Additionally, as noted above, the City has achieved preliminary or secondary compliance in numerous Consent Decree provisions cited in the SAC.

The situation found here parallels the decision to dismiss in *Anderson v. Allen*, No. 19-cv-2311, 2020 WL 5891406 (N.D. Ill. Oct. 5, 2020). In *Anderson*, the plaintiff pursued *Monell* claims stemming from CPD's alleged custom or practice of engaging in unconstitutional investigatory stops. *Id.* at *4. The court granted the City's motion to dismiss the *Monell* claim, in part, because the plaintiff could not establish that the City was deliberately indifferent to the problem. *Id.* The court, relying on a settlement agreement concerning investigatory stops, found that "the City took deliberate action to significantly decrease the number of street stops on African Americans at the time of [the plaintiff's] arrest." *Id.* at *4 n.2. Thus, "[a]lthough police reforms are far from complete," the settlement agreement established the City's "deliberate intention to reform and improve policing practices, not deliberate indifference to the problem." *Id.* Here, the circumstances go further. Not only has the City entered into the Consent Decree, it has achieved significant levels of compliance on use of force matters, including training, at issue in the SAC.

Thus, the Consent Decree's very existence reveals the City's "deliberate intention to reform and improve policing practices" concerning use of force—the exact opposite of deliberate indifference. *Anderson*, 2020 WL 5891406 at *4 n.2; *see Czosnyka v. Gardiner*, 21-CV-3240, 2021 WL 4951517, at *2 (N.D. Ill. Oct. 25, 2021) (dismissing *Monell* claim at pleading stage because Mayor's request that Inspector General investigate alleged misconduct demonstrated that City was not deliberately indifferent to misconduct).

**IV.    Plaintiff's ADA claims (Counts XIV-XV) should be dismissed because Title II does not apply to the police activity at issue and, even if Title II could apply, Plaintiff fails to state a claim against the City.**

Title II of the ADA prohibits disability-based discrimination in the provision of public services, programs, and activities. *Moore v. Western Ill. Corr. Ctr.*, 89 F.4th 582, 594 (7th Cir. 2023). To

state a claim under Title II, Plaintiff must plausibly allege that: (1) Reed was a qualified individual with a disability; (2) he was denied the benefits of the services, programs, or activities of a public entity, or otherwise subjected to discrimination by such an entity, and (3) the denial or discrimination was by reason of his disability. 42 U.S.C. § 12132; *Moore*, 89 F.4th at 594. Further, because Plaintiff seeks to recover damages, she must plausibly allege intentional conduct, and not mere negligence, by a named defendant. *Moore*, 89 F.4th at 595. Intentional conduct includes deliberate indifference, which means: (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood. *Id.* Plaintiff's ADA claims fail to state a claim for the reasons discussed below.

A. **Title II does not apply to the factual scenario alleged in the SAC.**

This Court should dismiss Plaintiff's ADA claims because Title II does not apply in the presence of "exigent circumstances" prior to officers securing their own and others' safety. *Sallenger v. City of Springfield*, No. 03–3093, 2005 WL 2001502, *31 (C.D. Ill. Aug. 4, 2005) (citing *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000)); *Hainze*, 207 F.3d at 801 (holding that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life").[12] The Fifth Circuit in *Hainze*, observing that police "already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations," concluded that requiring "officers to factor in . . . compl[iance] with the ADA" before securing the safety of themselves and others "would pose an unnecessary risk to innocents." 207 F.3d at 801. The court further explained:

> While the purpose of the ADA is to prevent the discrimination of disabled individuals, we do not think Congress intended that the fulfillment of that objective be attained at the expense of the safety of the general public. Our decision today does not deprive

---

[12] At this time, the Seventh Circuit has not directly addressed whether Title II applies to law enforcement investigations at issue here. *See Culp v. Caudill*, 140 F.4th 938, 942 (7th Cir. 2025) (whether "Title II applies to law enforcement investigations and arrests, and if so to what extent, is an open question in this circuit") (quoting *King v. Hendricks County Commissioners*, 954 F.3d 981, 988 (7th Cir. 2020)).

disabled individuals, who suffer discriminatory treatment at the hands of law enforcement personnel, of all avenues of redress because Title II does not preempt other remedies available under the law. We simply hold that such a claim is not available under Title II under circumstances such as presented herein.

207 F.3d at 801. Likewise here, as described above, Reed's actions were in disregard to direct orders of the Defendant Officers, thereby creating an exigent circumstance which precludes his ADA claims. As held in *Hainze* and *Sallenger*, Title II did not require the Officers to assess compliance with the ADA while the exigency continued, prior to securing their own and the public's safety. Plaintiff's ADA claims must therefore be dismissed.

**B. Plaintiff has not alleged that Reed was "substantially limited" in major life activities.**

The ADA defines the term "disability" as meaning a "physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(1)(A)(B). In determining whether an individual is substantially limited in a major life activity, courts may consider, among other things, the difficulty, effort, or time required to perform the major life activity. 29 C.F.R. § 1630.2(j)(4)(ii). The "Seventh Circuit has rejected ADA claims where the plaintiff had a mental impairment . . . but failed to provide any facts indicating that the impairment impacted major life activities." *Estate of Robey v. City of Chicago*, No. 17-cv-2378, 2018 WL 688316, *4 (N.D. Ill. Feb. 2, 2018) (dismissing ADA claim where complaint failed to allege facts describing nature or severity of bipolar disorder or how it impacted major life activities).

The SAC alleges that Reed's PTSD "affected one or more major life activities" (SAC ¶¶ 338, 345) but omits any facts indicating the degree to which such activities were affected. *See id.* ¶ 4 (alleging that PTSD "adversely affected Dexter's ability to work, to process and remember information, and to communicate" without indicating severity). Mental conditions, even serious ones, "can be more or less severe" (*Estate of Robey*, 2018 WL 688316, *4), and PTSD "does not constitute a *per se* disability within the meaning of the ADA" (*Robinson v. Colvin*, No. 13 C 2006, 2016 WL 1161272, *4 n.7 (N.D.

Ill. Mar. 24, 2016)) absent allegations from which it could reasonably be inferred that its impacts were "substantially limiting." Because the SAC fails to minimally allege that Reed's PTSD substantially limited his major life activities, Counts XIV-XV should be dismissed.

**C.      The City cannot be vicariously liable under the ADA for the Defendant Officers' actions.**

Vicarious liability is unavailable under Title II. *Ravenna v. Village of Skokie*, 388 F. Supp. 3d 999, 1008 (N.D. Ill. 2019). The Seventh Circuit has held that "when a statute fails to provide individual or personal liability," as in the case of Title II, "vicarious[ ] liability 'based on agency principles' is not available." *Id.* (citing *Smith v. Metro. School Dist. Perry Twp.*, 128 F.3d 1014, 1022-28 (7th Cir. 1997)). In *Smith*, the Seventh Circuit held that Title IX "provides no basis for creating a standard of liability based on agency principles" where—as with § 1983, which provides that a municipality must cause the constitutional injury—the statute provides that a "program or activity" must cause the discrimination. 128 F.3d at 1027. Likewise, Title II provides that a "public entity" must cause the discrimination and therefore provides no basis for imposing vicarious liability. 42 U.S.C. § 12132; *see Ravenna*, 388 F. Supp. 3d at 1007 (*Monell*'s rejection of respondeat superior liability extends to "any civil rights statute that . . . provides liability for the entity while excluding liability for individuals"); *Doe v. Bd. of Ed. of City of Chicago*, 611 F. Supp. 3d 516, 531 (N.D. Ill. 2020) (same). Here, Plaintiff's theory of liability rests on the vicarious actions of the Officers as agents of the City. (*See* SAC ¶¶ 341 (alleging the City "through its agents Defendant Officers discriminated against Dexter Reed"); 348-49 (same).) Accordingly, the ADA claims must be dismissed.

**D.      Plaintiff cannot plead ADA claims against the City where the Defendant Officers lacked the requisite knowledge of Reed's disability.**

Even assuming Plaintiff could allege ADA claims based on agency principles, the Defendant Officers did not violate Reed's rights under the ADA because they had no reason to know Reed suffered from a disability when the circumstances of the stop led to the Officers drawing their

weapons. An ADA claim is predicated on defendants' intentional denial of services by reason of an individual's disability. ADA liability in the law enforcement context typically arises under two circumstances: (1) wrongful action predicated on a misperception of the effects of the disability as criminal activity, or (2) lawful police conduct that failed to reasonably accommodate a person's disability in the course of the investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees. *See Gohier v. Enright*, 186 F.3d 1216, 1220 (10th Cir. 1999); *Gray v. Cummings*, 917 F.3d 1, 15 (1st Cir. 2019). Under either theory, police knew or should have known of the person's disability. *See Lewis v. Truitt*, 960 F. Supp. 175, 176-77 (S.D. Ind. 1997) (police arrested plaintiff for resisting law enforcement after being warned repeatedly that he was deaf and could not hear their instructions); *Jackson v. Inhabitants of Town of Sanford*, No. 94-12-P-H, 1994 WL 589617, *1 (D. Me. Sept. 23, 1994) (police arrested plaintiff for driving under the influence after being told that he had suffered a brain aneurysm that left him with physical difficulties); *J.H. ex rel. J.P. v. Bernalillo County*, 806 F.3d 1255, 1261 (10th Cir. 2015) (officer's duty to reasonably accommodate plaintiff's disability could only have arisen if officer had known of need for accommodation).

Here, Plaintiff does not allege that the Defendant Officers were aware of, or informed of, Reed's PTSD or need for an accommodation at any point prior to or during the encounter with Reed. She merely alleges that Reed "demonstrated symptoms of PTSD, including hypervigilance" when stopped by the Officers and describes those alleged symptoms as Reed being "flustered" and "startled." (SAC ¶ 254.) But Reed being flustered or startled, without more, could not possibly constitute notice—that it was reasonably obvious—that Reed had PTSD or required accommodation.

Plaintiff attempts to overcome these factual shortcomings by raising a spurious claim of societal knowledge of disability afflicting people who reside in the 11th District. Plaintiff alleges that, given the neighborhood where the stop occurred, a "reasonable officer" would have known of the "strong likelihood" that Reed had PTSD. (*Id.* ¶ 255.) Nothing in the SAC or ADA caselaw supports

that the Officers should have recognized Reed as having PTSD based simply on his appearing "flustered" and "startled." Without any allegations demonstrating that the Officers discriminated against Reed with knowledge of his disability, Plaintiff's ADA claims cannot survive.

> **E.** **Plaintiff fails to state ADA claims for failure to train.**

While Plaintiff contends that the City "failed to adequately train CPD officers regarding how to respond to traffic stops involving communities and people that live with heightened levels of post-traumatic stress disorder" (*id.* ¶¶ 341, 348), she fails to state ADA claims for failure to train where her claims rest on conclusory assumptions that PTSD is prevalent in the 11th District, and where, even if that were the case, she fails to allege that the need for training on responding to traffic stops involving persons with PTSD was either known or obvious to the City.

Failure to train claims are a "tenuous" form of municipal liability. *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir. 2019). A municipality will be held liable for failure to adequately train its officers "only when the inadequacy in training amounts to deliberate indifference." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007).[13] This ordinarily involves pleading that the municipality failed to provide further training after learning of a "pattern" of ADA violations by police. *Dunn v. City of Elgin*, 347 F.3d 641, 646 (7th Cir. 2003). Alternatively, where a failure to train claim is based on a single incident, a plaintiff must allege that the municipality failed to train officers "to handle a recurring situation that presents an obvious potential" for ADA violations. *Id.* Further, "merely alleg[ing] that there wasn't enough training" does not suffice. *Petropoulos v. City of Chicago*, 448 F. Supp. 3d 835, 843 (N.D. Ill. 2020). Rather, it is "incumbent on plaintiff to allege how and why CPD's [training] practices

---

[13] The Seventh Circuit has not yet addressed failure to train claims under the ADA. In 2018, the Seventh Circuit held for the first time that intentional discrimination in a Title II damage action can be established by showing deliberate indifference. *Lacy v. Cook County, Illinois*, 897 F.3d 847, 863 (7th Cir. 2018) (quoting *S.H. ex rel. Durrell v. Lower Merion School Dist.*, 729 F.3d 248, 263 (3d Cir. 2013)). In *S.H.*, the Third Circuit observed that the standard of deliberate indifference being adopted for the ADA context "is consistent with our standard of deliberate indifference" in the § 1983 context. 729 F.3d at 263 n.23.

were insufficient." *Harris v. City of Chicago*, No. 24 CV 3215, 2025 WL 2044020, *9 (N.D. Ill. July 21, 2025).

Plaintiff does not allege that the City was on notice of any "pattern" of ADA violations by officers conducting traffic stops of individuals with PTSD, foreclosing the first avenue for alleging a failure to train claim. *Dunn*, 347 F.3d at 646. And, the SAC fails to plausibly plead that the City faced a recurring situation that presented an "obvious potential" for ADA violations. *Id.* Plaintiff alleges that residents of neighborhoods policed by the 11th District "live with heightened *rates* of PTSD" (emphasis added), but relies for that assertion on reports showing a higher *number* of traffic stops and excessive force allegations without indicating how many of these incidents involved individuals with PTSD. (SAC ¶ 249.) *See Lankamer v. Lalley*, No. 24 C 506, 2024 WL 4119152, *7 (N.D. Ill. Sept. 9, 2024) (dismissing failure to train claim where generalized statistics of opioid overdoses in Illinois and drug overdoses in jails in Elgin community failed to show "recurring, obvious" risk of opioid overdoses at Elgin jail).

Plaintiff attempts to rely upon various publications to establish a nebulous claim of "community trauma" associated generally with police encounters. (*See id.* ¶¶ 250-53.) However, Plaintiff does not allege that the City knew of any of these publications or their conclusions. Further, none of these publications remotely suggest an "obvious" risk of discrimination against persons with PTSD arising from traffic stops within the 11th District. For example, one cited report finds it merely "plausible to speculate" that symptoms of PTSD "may" be associated with escalation of police encounters. (*See* p. 1667 of report cited at SAC ¶ 250 n.125; *see also id.* at p. 1664-65 (noting several limitations of the study).)[14] Such allegations fall far short of pleading that the City failed to address a recurring, obvious risk of ADA violations. *Cf. City of Canton*, 489 U.S. at 396-97 (O'Connor, J.,

---

[14] The report was based on a survey of 504 adults, mostly women over age fifty, in Chicago in 2018. Other cited reports are even more attenuated from Plaintiff's claims.

concurring) (claim "that police officers were inadequately trained in diagnosing the symptoms of emotional illness [ ] falls far short of the kind of 'obvious' need for training that would support a finding of deliberate indifference").

Contrary to Plaintiff's allegations, the City has made significant progress in training related to officer interactions with persons with mental disabilities. *See* IMT Report 8, Appendix 2 (Impartial Policing) at 57, https://cpdmonitoringteam.com/wp-content/uploads/2024/06/IMR8-Appendix-2-Impartial-Policing-2023.11.01.pdf (last visited January 22, 2026) (City met secondary compliance with requirement to train officers in "recognizing when a person has a . . . mental disability"); IMT Report 8, Appendix 4 at 28 (cited at SAC ¶ 178 n.55) (City maintained secondary compliance with requirement to de-escalate using techniques including "where appropriate, use trauma-informed communication techniques"). While Plaintiff references the Consent Decree throughout the SAC, she leaves out the City's actual training relative to these topics as reported by the IMT. Her conclusory allegation that CPD "failed to adequately train CPD officers" (SAC ¶¶ 341, 348), without alleging "how and why" that training was insufficient (*Harris*, 2025 WL 2044020, *9), fails to state a claim. *See Petropoulos*, 448 F. Supp. 3d at 843 ("Courts [ ] reject generic allegations about a failure to train."). Because Plaintiff fails to allege a pattern of ADA violations or recurring, obvious risk of ADA violations in police encounters with individuals with PTSD, Plaintiff's ADA claims must be dismissed.

**V.  Plaintiff's ICRA claim (Count VII) should be dismissed because she fails to plausibly allege that the traffic stop or gun pointing were motivated by Reed's race.**

ICRA prohibits any unit of government from discriminating against a person due to their race. 740 ILCS 23/5. ICRA allows recovery under either a "disparate treatment" or a "disparate impact" theory of discrimination. *Bell v. Pappas*, No. 22 C 7061, 2024 WL 1702691, *3 (N.D. Ill. Apr. 19, 2024). To state a claim under a disparate treatment theory, Plaintiff must plausibly allege "discriminatory motive or intent." *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716 (7th Cir. 2012); *Cary v. Ne. Ill. Reg'l Commuter R.R. Corp.*, No. 19 C 03014, 2020 WL 1330654, *4 (N.D. Ill. Mar. 22, 2020) (ICRA disparate

treatment claim requires plaintiff to allege that challenged action was "motivated by intentional discrimination").[15]

Plaintiff fails to state a claim under ICRA. Here, Plaintiff's ICRA claim is based on alleged intentional conduct of the City. Plaintiff alleges that at all relevant times, the City has "known" that CPD officers "target Black men in the City of Chicago for unlawful, pretextual traffic stops" and for "unlawful, excessive and escalatory force." (SAC ¶¶ 298-99.) She further alleges that, despite having "full knowledge" of these alleged violations, the City has "intentionally failed" to take measures reasonably calculated to end or mitigate the harms resulting from these practices. (*Id.* ¶ 300.) Absent from the SAC, however, are any allegations that the Defendant Officers intentionally conducted the traffic stop of Reed or pointed their guns at him because of his race thereby tying Reed's encounter to a discrimination claim.

First, the SAC is devoid of any allegations that the Officers conducted the traffic stop based on Reed's race. The SAC alleges that there was no reason for the stop—specifically, that the stop was pretextual because the Officers lacked reasonable suspicion that Reed violated any law—but does not allege or suggest that race was the real reason for making the stop. (*See id.* ¶¶ 6, 36-37.) Under these circumstances, *Singleton v. City of East Peoria* is instructive. In *Singleton*, the court dismissed the plaintiff's federal equal protection claim because there was no allegation that the defendant officer stopped the plaintiff because of his race. No. 15-CV-1503, 2016 WL 1408059, at *6 (C.D. Ill. Apr. 8, 2016). "Without an allegation that ties his race to [the officer's] decision to pull him over," the court concluded, "Plaintiff cannot state a plausible equal protection claim." *Id.* In contrast, in *Wilkins v. City of Chicago*, plaintiffs' ICRA and equal protection claims withstood a Rule 12(b)(6) motion because plaintiffs alleged multiple traffic stops "where they believed CPD officers saw the driver before pulling

---

[15] Because ICRA is patterned after Title VI of the Civil Rights Act, courts "look to federal civil-rights statutes to guide [its] interpretation." *Cary*, 2020 WL 1330654, *4.

them over." No. 23-CV-04072, 2024 WL 2892840, at *5 (N.D. Ill. June 10, 2024). Such allegations of discriminatory intent are absent here.

Second, the SAC similarly lacks any factual allegations that the Officers were motivated by race in using excessive force against Reed. To the contrary, the SAC alleges that the Officers pulled their guns only after Reed failed to comply with their commands to roll his windows down. (SAC ¶ 44; *see* Section II.A, *supra*.) As such, Plaintiff pleads that the Officers' use of force was prompted not by Reed's race, but by his non-compliance with their commands. *See Singleton*, 2016 WL 1408059, at *6 (dismissing equal protection claim where allegations suggested that alleged unconstitutional conduct was prompted by fact other than race). Absent an allegation tying Reed's race to the Officers' decision to point their guns at him, Plaintiff fails to state an ICRA claim.

Plaintiff's policy-based allegations also fall short of alleging discriminatory intent. The SAC's allegations relating to CPD's alleged pattern and practice of excessive force are presented in largely race-neutral terms. (*See* SAC ¶¶ 217, 219-20 (describing alleged excessive force patterns and practices without mentioning race)). To the extent Plaintiff relies on statistics or decades-old alleged incidents to establish the City's intent to use excessive force against Reed because of his race, such allegations are insufficient. *See Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017) ("Only in rare cases are statistics alone enough to prove discriminatory purpose."); *TBS Group, LLC v. City of Zion*, No. 16-cv-5855, 2017 WL 5129008, *7 (N.D. Ill. Nov. 6, 2017) (plaintiff failed to plead intentional discrimination based on historical incidents where it failed to "link those events" to the current challenged policy).[16] Accordingly, Plaintiff's ICRA claim based on discriminatory excessive force should be dismissed.

**VI.      Plaintiff's *respondeat superior* Claim (Count XII) should be dismissed because it fails to allege an independent claim.**

---

[16] The Seventh Circuit has described the "limited contexts" in which statistics are accepted as proof of intent as including, for instance, in the selection of a jury venire. *Chavez v. Illinois State Police*, 251 F.3d 612, 647 (7th Cir. 2001). None of those limited contexts are present here.

*Respondeat superior* does not create an independent cause of action. *See, e.g.*, *Wilson v. Edward Hosp.*, 981 N.E.2d 971, 980 (Ill. 2012) ("We conclude that actual agency and apparent agency are not causes of action . . ."); *Winn v. City of Chicago,* No. 20 C 5246, 2022 WL 80272, at * 7 (N.D. Ill. Jan. 6, 2022) ("[T]he court agrees that *respondeat superior* is not a basis for an independent claim; it is instead a theory on which the City can be held liable for torts committed by officers."). Plaintiff pleads *respondeat superior* as an independent claim, not a theory of liability. Count XII must therefore be dismissed.[17]

## CONCLUSION

For all the reasons set forth above, Defendant's motion to dismiss should be granted.

Dated: January 22, 2026

Respectfully submitted,

CITY OF CHICAGO

By: */s/ Michael P. Sheehan*

One of Its Attorneys

Michael P. Sheehan
Allan T. Slagel
Barton O'Brien
Elizabeth A. Winkowski
Sara Schroeder
Joan E. Ahn
TAFT STETTINIUS AND HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, Illinois 60601
Telephone:    (312) 527-4000
Facsimile:    (312) 527-4011
Email:    msheehan@taftlaw.com
    aslagel@taftlaw.com
    bobrien@taftlaw.com
    ewinkowski@taftlaw.com
    sschroeder@taftlaw.com
    jahn@taftlaw.com

197433686v9

---

[17] Count XIII asserts a claim for indemnification of Defendant Officers' conduct. The City is only liable to the extent that Plaintiff establishes liability against the individual defendants. To the extent this Court grants Defendant Officers' contemporaneously filed motion to dismiss, the City's liability is extinguished, and the indemnification claim should be dismissed.